## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HOUND PARTNERS OFFSHORE FUND, LP, HOUND PARTNERS LONG MASTER, LP, and HOUND PARTNERS CONCENTRATED MASTER, LP, | |
| Plaintiffs, | Civil Action No. |
| v. | |
| VALEANT PHARMACEUTICALS INTERNATIONAL, INC., J. MICHAEL PEARSON, HOWARD B. SCHILLER, ROBERT L. ROSIELLO, DEBORAH JORN, ARI S. KELLEN, TANYA CARRO, ROBERT A. INGRAM, RONALD H. FARMER, COLLEEN GOGGINS, THEO MELAS-KYRIAZI, ANDERS LONNER, ROBERT N. POWER, NORMA PROVENCIO, KATHARINE B. STEVENSON, PRICEWATERHOUSECOOPERS LLP, DEUTSCHE BANK SECURITIES INC., HSBC SECURITIES (USA) INC., MUFG SECURITIES AMERICAS INC. f/k/a MITSUBISHI UFJ SECURITIES (USA) INC., DNB MARKETS INC., BARCLAYS CAPITAL, INC., MORGAN STANLEY & CO. LLC, RBC CAPITAL MARKETS, LLC, and SUNTRUST ROBINSON HUMPHREY, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

**TABLE OF CONTENTS**

Page

I.   NATURE OF THE ACTION ........................................................................1

II.  JURISDICTION AND VENUE ..................................................................7

III. PARTIES ......................................................................................................8

     A.   Plaintiffs ............................................................................................8

     B.   Defendants .........................................................................................8

IV.  FACTUAL BACKGROUND ....................................................................13

     A.   Valeant's Acquisition-Centric Business Model.............................13

     B.   Valeant's Price Hikes and the Misrepresentations........................18

     C.   Valeant's Use of a Secret Pharmacy Network ..............................21

          1.   Philidor....................................................................................21

          2.   Valeant's Other Secret Pharmacies.......................................24

          3.   Valeant Used Its Network of Secret Pharmacies to Increase
               Prices.......................................................................................27

     D.   Valeant Exploits "Patient Assistance Programs" to Raise Prices.........................38

     E.   The R&O Lawsuit and the Initial Disclosure of Valeant and
          Philidor's Fraudulent Arrangement ..............................................41

V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING
     THE RELEVANT PERIOD .......................................................................45

     A.   Misrepresentations Regarding Valeant's Business Model ...................48

     B.   Misrepresentations Concerning Philidor..............................................70

     C.   Misrepresentations Regarding Revenue Recognition and GAAP
          Violations..........................................................................................84

     D.   Material Misrepresentations as to Valeant's Internal Controls............94

     E.   PwC's Misrepresentations ...................................................................100

i

F.      Defendants' Continued Misrepresentations and Omissions as Their
        Scheme Unravels ........................................................................................109

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER........................................................131

        A.      Valeant's Admission of Improper Conduct .......................................................131

        B.      The Management Defendants' Role in Valeant's Business Strategy .................132

        C.      The Management Defendants' Decision to Close Philidor................................136

        D.      Valeant's Refusal to Pursue Remedies against Individual
                Wrongdoers.........................................................................................................140

        E.      Congressional Hearings ....................................................................................141

        F.      Executive Departures .........................................................................................143

        G.      Pearson's Misrepresentations to Ackman .........................................................144

        H.      Executive Compensation ...................................................................................145

        I.      The Necessity of Inflating Valeant's Stock Price to Sustain
                Valeant's Acquisition-Centric Business Model.................................................147

VII.    LOSS CAUSATION.....................................................................................................148

VIII.   PLAINTIFFS' RELIANCE ..........................................................................................149

IX.     NO SAFE HARBOR ....................................................................................................153

X.      NEW JERSEY RICO....................................................................................................154

        A.      The Enterprise ....................................................................................................154

        B.      The Criminal Scheme .........................................................................................164

                1.      Valeant's Deceptive Business Model .....................................................164

                2.      The Defendants' Accounting Violations ................................................170

                3.      The Enterprise's Material Misrepresentations and
                        Omissions................................................................................................173

        C.      Causation and Damages......................................................................................180

        D.      The Scheme's Connection to New Jersey..........................................................181

XI.     COUNTS.......................................................................................................................181

XII.    PRAYER FOR RELIEF ..................................................................................................209

XIII.   JURY DEMAND ..........................................................................................................209

1.      Plaintiffs Hound Partners Offshore Fund, LP, Hound Partners Long Master, LP, and Hound Partners Concentrated Master, LP, (together, "Plaintiffs," "Hound Partners," or "Hound"), by and through their undersigned counsel, bring this action under the Securities Exchange Act of 1934 ("Exchange Act"), the Securities Act of 1933 ("Securities Act"), New Jersey State law, and common law to recover hundreds of millions of dollars in losses Plaintiffs have suffered on Valeant common stock purchased by Plaintiffs between January 4, 2013, and March 14, 2016, inclusive (the "Relevant Period").

2.      Plaintiffs allege the following upon information and belief, except as to those allegations specifically concerning or involving Plaintiffs, which are alleged on personal knowledge.  Plaintiffs base their allegations upon an investigation by Plaintiffs' counsel, which included a review of:  (i) U.S. Securities and Exchange Commission ("SEC") filings by Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company"); (iiii) regulatory filings and reports; (iii) securities analysts' reports and advisories about the Company; (iv) press releases and other public statements issued by the Company; (v) media reports about the Company (including statements to the media by various individuals regarding their participation in the fraudulent scheme detailed below); and (vi) other publicly available information concerning Valeant and the other Defendants.   In addition, Plaintiffs' claims are based on their direct communications with officers and employees of Valeant.  Plaintiffs believe that a reasonable opportunity for discovery will provide additional evidentiary support for their claims.

## I.      NATURE OF THE ACTION

3.      This case is about how Valeant materially misrepresented its business model as a novel and low risk model built on cost-cutting and strategic acquisitions, while failing to disclose to the market that the business model it touted to investors was in fact a sham—with artificial and unsustainable growth propped up by deceptive and illegal conduct.  For years, Valeant and

its senior management, in particular then CEO J. Michael Pearson, presented Valeant as a company with a "low-risk" business model for the pharmaceutical industry. Valeant and its senior management emphasized to investors that unlike competitors in the pharmaceutical industry, Valeant was not going to "waste" 15-20 percent of revenue on research and development ("R&D") to produce new products. Instead, Valeant would rely on a revolutionary acquisition model whereby Valeant would acquire companies with established lines of pharmaceuticals and then implement innovative cost-cutting and marketing strategies to grow market share and resulting revenues on those acquired products. Defendants represented that this model was lower-risk, more sustainable, and more profitable than the more R&D-focused approach used by other pharmaceutical companies.

4.      Because Valeant was not going to invest in creating its own products, the key to the long-term success of this model was Valeant's professed ability to expand the markets for its pharmaceuticals and increase the volume of sales for the products it acquired. Valeant and its management stressed to investors that Valeant's business model was predominantly built on market expansion and volume increases. Indeed, Valeant and its management emphasized that Valeant's financial results were achieved because volume increases were "***greater than price in terms of [Valeant's] growth***," and that Valeant's growth was fueled by its "low-risk" acquisitions model.

5.      Between 2012 and 2015, Valeant's acquisition model appeared to be working. Valeant experienced dramatic year-on-year revenue growth—purportedly driven by organic volume growth—and Valeant's common stock price sky-rocketed by almost 350 percent. Unfortunately for investors, this was based on deceit by the Company and its management.

6.      Hidden from investors was the fact that by 2012, Valeant and its management recognized that their model could not survive on "organic" (sustainable) market expansion and volume growth.  Unwilling to forego the artificially generated revenue on which they had come to depend for their acquisition strategy and the Company's elevated stock price, Defendants resorted to price gouging to create the appearance of organic growth.  This amounted to an unsustainable strategy of exponential price increases on Valeant drugs that was concealed from consumers, insurers, regulators, and investors.  As but one example, in 2014, Valeant bought the rights to Nitropress and Isuprel, two drugs used to treat emergency heart conditions.  Within two days of acquiring the rights to these drugs, Valeant increased their prices by **212%** and **525%**, respectively.  Despite the Company's reliance on these heavy price increases, Valeant continued to represent to investors that Valeant was largely relying on organic volume growth and market expansion, and the Company and management hid Valeant's reliance on price gouging.

7.      Also hidden from investors was the fact that Valeant had developed a secret relationship with a network of "specialty pharmacies" controlled by Valeant in order to facilitate Valeant's practice of price gouging and artificially inflate Valeant's sales volume.  At the center of this network was Philidor Inc. ("Philidor"), a pharmacy secretly created with the assistance, and for the benefit, of Valeant.  Working hand-in-hand with Valeant, Philidor engaged in a fraudulent and unlawful scheme to sell Valeant's massively overpriced drugs to consumers while concealing these practices from insurance companies and the entities insurance companies work with to manage pharmaceutical costs, all for the purpose of increasing Valeant's revenues and allowing Valeant to claim falsely that its volume-based business model was working.  Philidor was just one aspect of Valeant's scheme.  Valeant went on to create a web of shell companies using Philidor as the hub, through which Valeant and the other Defendants acquired interests in

specialty pharmacies throughout the United States for the purpose of hawking Valeant's overpriced drugs.

8. Philidor and Valeant engaged in a multitude of unlawful and deceptive practices to facilitate Valeant's massive price hikes on its branded drugs and to inflate artificially the volume of Valeant's sales by blocking the substitution of cheaper and medically equivalent generic substitutes. These unlawful "backdoor" practices, which were documented in employee manuals and confirmed by former employees, included:

- filling prescriptions through Valeant's secret network of pharmacies while concealing that the pharmacies were affiliated with Valeant;

- physically altering, modifying, and falsifying doctors' prescriptions to require that Valeant's specific branded drugs were used as opposed to low-cost generic equivalents;

- automatically refilling patients' prescriptions without the patients' or doctors' request and for no medically justified reason;

- falsifying the identity of the dispensing pharmacies to circumvent denials of claims for Valeant's branded drugs;

- waiving patient co-pays for Valeant's branded drugs to mute patients' incentive to seek cheaper generic substitutes;

- misrepresenting "actual charges" for Valeant drugs to private insurers by including waived co-pays as if they had actually been charged (because Valeant did not want the private insurers to require the copays to be charged);

- using shell companies to circumvent licensing requirements to gain access to insurance markets in various states throughout the United States.

9.      These practices were designed to circumvent the applicable legal and contractual restrictions that would have otherwise required substitution of cheaper and medically equivalent alternative drugs, whether generics or cheaper branded equivalents, for Valeant's overpriced and medically undifferentiated branded drugs.   These deceptive practices risked, and ultimately incurred, significant backlash from regulators and other industry stakeholders, including the insurers and other end-payors crucial to Valeant's revenue.   Valeant failed to disclose these practices and its relationship with and control over Philidor and other captive pharmacies to the pharmaceutical market or the investing public.   In addition, in coordination with its outside auditor PricewaterhouseCoopers LLP ("PwC"), Valeant falsified its financial statements in violation of GAAP to conceal these practices and relationships and to materially overstate and mischaracterize the sources of its revenues.

10.      It was not until October 2015 that Valeant's fraudulent practices started to come to light and facts began to emerge indicating that Valeant and its management had made numerous materially false and misleading statements to investors and other third parties.   The ramifications of this fraud have been devastating for Valeant's business and shareholder value.

11.      As the reality of Valeant's undisclosed and wrongful conduct began to emerge, Valeant and its management continued to mislead investors by minimizing and obfuscating the truth.   For example, in late September 2015 when Congress and market analysts began to uncover the astronomical prices Valeant was charging for certain drugs, Valeant and its management continued to conceal the extent of Valeant's reliance on price increases by telling investors that "Valeant is well-positioned for strong organic growth, ***even assuming little to no price increases***.   As we have stated many times, ***Valeant's core operating principles include a focus on volume growth***…."

12.     Similarly, when Philidor's existence came to light in late October 2015, Defendants sought to persuade investors that Philidor and its business were not critical to Valeant, Valeant had always accounted for Philidor appropriately in accordance with GAAP, and that Defendants "continue[d] to be *very comfortable* with [Valeant's] 2016 EBITDA expectation of greater than 7.5 billion," even without the improper advantages that Philidor had afforded to Valeant.  Further obfuscating the impact that the dismantling of its specialty pharmacy scheme would have, Valeant announced a replacement deal with Walgreens in December 2015 which Pearson falsely claimed would "more than replace[] Philidor," despite Valeant's internal understanding that the success of the Walgreens deal would depend upon the very same volume increases that Valeant already knew it could not achieve and had sought secretly to replace with its price-gouging model.  This was all in an effort to further mislead investors about the depths of the problems at Valeant and the unsustainability of its business model.

13.     It was not until the first half of 2016 that the full extent of Valeant's wrongdoing was revealed.  By that point, the true financial impact of Valeant's reliance on undisclosed price increases rather than promised volume increases became known:  Valeant significantly decreased its earnings forecasts on three separate occasions and reported disappointing quarterly earnings in June 2016.

14.     Since then, Valeant has forced out much of its senior management and directors and has acknowledged its own wrongdoing and the wrongdoing of other Defendants.  For example, based on an internal investigation, Valeant has conceded that its internal controls were inadequate and that its senior management engaged in "improper conduct" and set an unethical "tone at the top" that placed short-term financial results above all else.  Also, in March 2016, Valeant admitted that, contrary to Defendants' prior representations, Valeant had not accounted

for Philidor properly, which required Valeant to withdraw its financial statements and acknowledge them to be false, admit that its revenue had been materially overstated for various periods, restate its revenue for fiscal year 2014, and reduce its revenue and profitability guidance for 2015 and 2016.  Any one of these admissions alone would be devastating to a company; the combination of these admissions by Valeant speaks volumes about the extent of wrongdoing by the Company and its management.

15.     Defendants' fraudulent scheme and the numerous materially misleading and untrue statements that Defendants made in SEC filings and in public statements have damaged Plaintiffs and other investors.  As the market learned about the truth through a series of partial disclosures beginning in September 2015, Valeant's stock price plummeted from an artificially inflated high of over $262 per share on August 5, 2015, to less than $25 in June 2016.  Defendants' fraud was so persuasive and the resulting losses so severe that industry participants have understandably referred to Valeant as the "Pharmaceutical Enron."  This lawsuit seeks to hold Defendants liable for the harm they have caused to Plaintiffs in connection with this massive fraud.

## II.     JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331 and has supplemental jurisdiction over the New Jersey state law claims pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  The acts and conduct described in this Complaint, including the dissemination of false and misleading statements and information, occurred in substantial part in this District.

18.    In connection with these acts, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States' mails, interstate telephone communications, and the facilities of a national securities exchange and market (the New York Stock Exchange ("NYSE")).

## III.    PARTIES

### A.    Plaintiffs

19.    Plaintiff Hound Partners Offshore Fund, LP is a Cayman limited partnership. It is managed by Hound Partners LLC primarily out of Hound Partners LLC's New York office.

20.    Plaintiff Hound Partners Long Master, LP is a Cayman limited partnership. It is managed by Hound Partners LLC primarily out of Hound Partners LLC's New York office.

21.    Plaintiff Hound Partners Concentrated Master, LP is a Cayman limited partnership. It is primarily managed by Hound Partners LLC out of Hound Partners LLC's New York office.

### B.    Defendants

22.    Defendant Valeant is a Canadian corporation with its international headquarters located at 2150 St. Elzéar Blvd. West, Laval, Quebec, Canada. Valeant's U.S. headquarters and principal place of business is at 400 Somerset Corporate Boulevard, Bridgewater, New Jersey.

23.    Valeant is a pharmaceutical and medical device company that sells medical devices and pharmaceuticals in over 100 countries around the world. Valeant is one of the largest pharmaceutical companies in the United States. Shares of Valeant stock trade on the New York Stock Exchange (the "NYSE") and the Toronto Stock Exchange (the "TSX") under the ticker symbol "VRX."

**The Management Defendants**

24.     Defendant J. Michael Pearson ("Pearson") was Valeant's Chief Executive Officer and a director of the Company (including its predecessor entity) from 2008 until May 3, 2016. From March 2011 to January 2016, Pearson was also Valeant's Chairman of the Board of Directors.  Pearson took medical leave in January and February 2016, and in March 2016 the Company announced that Pearson was going to be replaced.

25.     Defendant Howard B. Schiller ("Schiller") was Valeant's CFO and Executive Vice President from December 2011 until his resignation from the position on June 30, 2015. Schiller also served on Valeant's Board of Directors from September 2012 until June 2016. While Pearson was on medical leave in January and February of 2016, Schiller served as the Company's interim CEO.  On March 21, 2016, Valeant announced that Schiller had engaged in "improper conduct" concerning the Company's accounting restatement and requested Schiller's resignation as a director of the Company.  Schiller refused the request.  He was not selected as a candidate for re-election to the Board of Directors.

26.     Defendant Robert. L. Rosiello ("Rosiello") has served as Valeant's CFO and an Executive Vice President of the Company since July 2015.  Rosiello also served as one of three members of the Company's "Office of the CEO" when Pearson was on medical leave and before Schiller was appointed interim CEO.

27.     Defendant Deborah Jorn ("Jorn") was Vice President of Global Marketing at Bausch & Lomb from June 2010 until she joined Valeant in August 2013, when Valeant acquired Bausch & Lomb.  Jorn was a Valeant Executive Vice President and Company Group Chairman from August 2013 through her departure on March 2, 2016.  During that time period, Jorn also served as general manager of Valeant's U.S. dermatology business.

9

28.     Defendant Tanya Carro ("Carro") was for during the relevant time period the Corporate Controller of Valeant.  On March 21, 2016, Valeant announced that Carro had been placed on administrative leave for "improper conduct" that led to the "provision of incorrect information to the [ad hoc] committee and the company's auditors."  Carro was replaced as Controller on March 23, 2016.

29.     Defendant Dr. Ari S. Kellen ("Kellen") has served as Valeant's Executive Vice President and Company Group Chairman since January 1, 2014.  Kellen temporarily served as one of the three members of the Office of the CEO during the period in early 2016 that Pearson was on medical leave and before Schiller was appointed interim CEO.  After Jorn left the Company in March 2016, Kellen became the head of Valeant's U.S. dermatology business.

30.     Pearson, Schiller, Rosiello, Jorn, Carro, and Kellen are collectively referred to as the "Management Defendants."

### The Board of Director Defendants (the "Director Defendants")

31.     Defendant Robert A. Ingram ("Ingram") has served on Valeant's Board of Directors since September 2010.  From March 2011 to February 2016, Ingram was the Board of Directors' Lead Independent Director, and from January 2016 to March 2016 he served as the Chairman of the Board of Directors.  He was replaced as Chairman in May 2016 by the incoming CEO.

32.     Defendant Ronald H. Farmer ("Farmer") served on Valeant's Board of Directors from August 2011 to June 2016.

33.     Defendant Colleen Goggins ("Goggins") served on Valeant's Board of Directors from May 2014 to June 2016.

34.     Defendant Theo Melas-Kyriazi ("Melas-Kyriazi") served on Valeant's Board of Directors from September 2010 to June 2016.

35.     Defendant Anders Lonner ("Lonner") served on Valeant's Board of Directors from May 2014 to March 8, 2016.

36.     Defendant Robert N. Power ("Power") has served on Valeant's Board of Directors since August 2008.

37.     Defendant Norma Provencio ("Provencio") served on Valeant's Board of Directors from September 2010 to June 2016.  Provencio was the Chairman of Valeant's Audit and Risk Committee during that same time period.

38.     Defendant Katherine B. Stevenson ("Stevenson") served on Valeant's Board of Directors from September 2010 through March 21, 2016.

39.     Ingram, Farmer, Goggins, Melas-Kyriazi, Lonner, Power, Provencio, and Stevenson are collectively referred to herein as the "Director Defendants."

**Auditor Defendant**

40.     Defendant PricewaterhouseCoopers LLP ("PwC") is an accounting firm with its principal place of business at 300 Madison Avenue, New York, New York 10017.  During the relevant time PwC served as Valeant's and Philidor's outside auditor, and PwC conducted the audits of Valeant's yearly financial results and signed clean audit opinions that were part of each of Valeant's year-end financial statements.

41.     Among other things, PwC certified Valeant's 2014 10-K and included a February 24, 2014, Audit Report (the "PwC 2014 Audit Report") relating to Valeant's financial statements and financial statement schedule and the effectiveness of Valeant's internal controls for purposes of financial reporting.  PwC authorized Valeant to incorporate by reference the PwC 2014 Audit

11

Report in Valeant's 2014 10-K and related Prospectus Supplement filed with the SEC for purposes of Valeant's March 2015 stock offering.

### Bank Stock Offering Defendants (the "Underwriter Defendants")

42.     Defendants Deutsche Bank Securities Inc. ("Deutsche"), MUFG Securities Americas, Inc. f/k/a Mitsubishi UFJ Securities (USA) Inc. ("MUFJ"), DNB Markets Inc. ("DNB"), HSBC Securities (USA) Inc. ("HSBC"), Barclays Capital, Inc. ("Barclays"), Morgan Stanley & Co. LLC ("Morgan Stanley"), SunTrust Robison Humphrey, Inc. ("SunTrust"), and RBC Capital Markets, LLC ("RBC") (collectively, the "Underwriter Defendants") acted together as the co-lead underwriters and sellers in Valeant's March 2015 stock offering of Valeant's common stock.

### Relevant Non-parties

43.     Philidor, Inc. was incorporated in January 2013 with the substantial assistance of Valeant.  Philidor was a specialty pharmacy registered as a Delaware limited liability company with its headquarters at 400 Horsham Road, Suite 109, Horsham, Pennsylvania.  Philidor was the hub of Valeant's clandestine network of captive specialty pharmacies used to hawk Valeant's overpriced branded drugs and to protect those drugs from competition from low-cost generic alternatives.  Philidor's only client was Valeant, and Philidor's sole purpose was to act as a mechanism through which Valeant could sell its massively overpriced branded drugs.  In December 2014, Valeant (through a subsidiary) formalized its control over Philidor, paying Philidor $100 million for a so-called option to purchase Philidor for $0 at any point in time over the ensuing decade (the "Philidor Purchase Option").  This so-called option was simply an acquisition of Philidor by Valeant; but it was structured as an "option" to justify Defendants' failure to disclose this acquisition to investors and others.

44.     Andrew Davenport was the CEO of Philidor and worked with several Valeant employees to form Philidor in January 2013.  Davenport held an approximate 40% ownership stake in Philidor.  Following Philidor's formation, Davenport worked hand-in-hand with Valeant's employees to facilitate the fraudulent sale and reimbursement of Valeant's drugs through Philidor.  Davenport profited handsomely for his leading role in the fraud.  Based on  his involvement in the Philidor Purchase Option transaction, Davenport personally received $40 million.

45.     In December 2016, Davenport was arrested and charged by the U.S. Attorney's Office for the Southern District of New York with four counts of fraud and conspiracy for his involvement with Philidor.

## IV.     FACTUAL BACKGROUND

### A.     Valeant's Acquisition-Centric Business Model

46.     Throughout the Relevant Period, Defendants publicly represented Valeant's business model as one that would maximize revenue growth by acquiring drugs and drug companies, increasing sales volume, and cutting costs.  Pearson held himself out as uniquely capable of leading a company with this business model.  Under Pearson's watch, Valeant acquired over 100 companies with a total deal value of over $36 billion dollars, making Valeant one of the largest acquirers in any industry over the past decade.

47.     With each acquisition, Valeant's management represented that they could cut costs while increasing sales.  Pearson, with a background in management consulting, claimed to have identified significant inefficiencies in the pharmaceutical sector.  Most prominently, Pearson sought to nearly eliminate R&D spending at Valeant and the companies Valeant acquired.  While traditional pharmaceutical companies spend at least 15 percent of their revenue

13

on R&D, Valeant cut R&D spending to under 3 percent of revenue, electing instead to grow by acquiring already-established products.

48.     Through Valeant's acquisition focus, the Company was able to acquire a portfolio of diverse drugs.  In September 2010, Valeant completed a $3.3 billion merger with Biovail Corporation, which resulted in a combined company (with Pearson as CEO) having access to dermatological drugs, an anti-depressant drug known as Wellbutrin, and drugs used to treat central nervous system disorders.  Valeant's revenue and stock price increased following the merger.  In 2012, Valeant paid roughly $2.6 billion for Medicis Pharmaceutical Corporation ("Medicis") and its portfolio of acne medications and other aesthetic skin care products.  Valeant expanded into developing markets in Eastern Europe, as exemplified by the acquisition of the Russian-based Natur Produkt International and its portfolio of cough and cold treatments for $180 million.  Valeant also targeted markets outside the traditional pharmaceutical industry, acquiring Bausch & Lomb, an eye-care giant known for its specialized ophthalmology and contact lens products, in 2013.  In April 2015, Valeant acquired Salix Pharmaceuticals and its portfolio of drugs for the treatment of gastrointestinal disorders for $11 billion.

49.     Until 2015, Valeant's acquisition model *appeared* successful, capable of cutting costs in the pharmaceutical companies that Valeant acquired while maintaining or increasing sales volumes.  Indeed, the Company reported growth quarter after quarter, attracting investors based on its strong track record that Pearson touted effectively; $3.48 billion for 2012, $5.76 billion for 2013, $8.25 billion for 2014, and $7.71 billion for the first three quarters of 2015.  By July of 2015, when Valeant's common stock price reached an all-time high, the market valued Valeant as the largest pharmaceutical company headquartered in the United States, with a valuation of over $90 billion.

50.     Valeant credited its success to its business model as implemented by its CEO and other members of senior management, aggressive cost-cutting strategies, innovative marketing strategies, and a portfolio of quality products.  Valeant went to great lengths to assure the market (falsely) that its success was not attributable to systemic price gouging.  For example, in its Form 10-K for the year ended December 31, 2014, Valeant attributed its growth to the Company's unique "output-focused research and development model" that avoided the pharmaceutical industry's traditional internal R&D expenses, while increasing "productivity through measures such as leveraging industry overcapacity and outsourcing commodity services."   Based on statements like these, Plaintiffs and Valeant's other investors reasonably believed that the Company and its management had identified significant inefficiencies in the pharmaceutical sector and was able to deliver consistent and stable growth by cutting costs and increasing sales volumes in Valeant's ever-expanding portfolio of pharmaceutical drugs.  Accordingly, Plaintiffs and other investors maintained or increased their holdings of Valeant's common stock, as Valeant's consistent growth appeared to attest to the effectiveness of Valeant's business model and Pearson's management approach.

51.     In reality, Valeant's purported success and its supposed "innovative" approach were nothing more than a fraudulent scheme.  Throughout the Relevant Period and in direct contradiction to the numerous representations made by Valeant and its management to investors, Valeant's growth was heavily reliant upon undisclosed exponential price increases (*i.e.*, "price gouging") facilitated by a secret network of captive pharmacies and other deceptive business practices.  In short, Valeant's growth was due to and dependent upon price gouging, ***not*** Pearson's expertise at reducing costs and increasing the sales volume of acquired drugs and products.

15

52.     Nevertheless, during the Relevant Time Period, Valeant repeatedly and fraudulently denied the extent to which unsustainable price gouging was responsible for the Company's growth.  For example, on a conference call with investors on April 29, 2015, Pearson stated that "[i]n terms of price volume, actually, **volume was greater than price in terms of our growth**" in response to a question about how much price increases had contributed to growth. Indeed, throughout Pearson's tenure at Valeant, the Company maintained that any price increases were consistent with industry standards and not a central aspect of Valeant's business model. The actual role of price gouging in the Valeant business model would not be revealed to Plaintiffs and other investors until 2016.  On February 3, 2016, for example, Valeant issued a press release effectively **admitting** that Pearson's April 2015 conference call statement representing that volume was the primary driver of Valeant's growth **was false**.

53.     Had Valeant not misrepresented the importance of price increases to the Company's business model, and had Valeant truthfully disclosed that its touted plans for market expansion and volume growth were a failure, Plaintiffs and Valeant's other investors would not have paid the prices they did for the Company's stock, if they would have purchased it at all.

54.     A business model dependent on significant price increases is unsustainable. Pharmaceutical companies may not indefinitely raise prices for drugs given the significant overlap between many drugs.  Eventually, a viable substitute emerges and significantly reduces or eliminates the value that a company can generate by raising the prices of drugs in its portfolio. Accordingly, to sustain investment in Valeant, Pearson repeatedly denied the central role that price increases played in the Valeant business model, claiming that Valeant's growth was primarily driven by volume increases.

55.     In an apparent attempt to conceal the extent to which Valeant's growth was driven by unsustainable price increases, Valeant changed its disclosure practices in 2013.  Based on these changes, investors were unable to probe Valeant's repeated representations that Valeant's growth was attributable to volume increases (and not price increases).  For example, Valeant refused to provide revenue numbers for major acquisitions, so that investors were unable to determine whether the revenues Valeant enjoyed from the drugs it acquired were growing by price or volume increases.  Likewise, Valeant reduced transparency by decreasing the number of operating segments presented in disclosures from four (distinguishing between U.S. Neurology & Other, U.S. Dermatology, Canada & Australia, and Emerging Markets) to two (distinguishing only between Developed and Emerging Markets).  With financial reporting provided on only two operating segments for the rapidly expanding Company, it became impossible for investors to determine with precision the drivers of Valeant's growth.

56.     The centerpiece of Valeant's fraudulent and undisclosed price gouging model was its secret use of captive pharmacies.  More specifically, Valeant developed a fraudulent and secret network of closely-related or jointly held pharmacies to allow the Company to increase the prices of its branded drugs exponentially, even when cheaper generic versions of the drugs or cheaper versions of near-perfect substitutes were available.  Valeant went to great lengths to conceal the existence of this scheme from investors (as part of hiding the importance of price increases to the Valeant business model), from insurers (to mask the fact that insurers were paying a premium for Valeant-branded pharmaceutical drugs when cheaper alternatives were available), and from competitors.  Indeed, Valeant structured the transaction by which it acquired Philidor as the purchase of an "option" for $100 million to potentially acquire the pharmacy for nothing within the next ten years, to avoid disclosing the transaction to investors.  The cloak of

secrecy under which Valeant concealed its reliance on Philidor and other specialty pharmacies demonstrates the lengths that Valeant was willing to go to conceal its broader secret—that its ability to expand sales of its drugs on a legitimate basis rather than through price gouging was a sham.

**B.    Valeant's Price Hikes and the Misrepresentations**

57.    Unbeknownst to Plaintiffs and other investors, by late 2012, Valeant and its management recognized that growth through Valeant's "acquisitions" model could not be sustained by relying on cost-cutting and volume.  Thus, Valeant and its management secretly reoriented the Company's business model to engage in undisclosed price gouging.

58.    A 2016 report published by the United States Senate revealed that, in late 2012, Valeant was facing declining revenue in its Neurological and Other division.  To fight this decline, Valeant's management, including Pearson, developed, approved, and implemented a plan called the "Orphan Drug Pricing Strategy."  The Orphan Drug strategy aimed to combat declining revenue by adopting repeated price increases.  The precise price increases were determined by Pearson and other high-level Valeant executives.

59.    One early example of this strategy occurred after Valeant's acquisition of Cuprimine, a drug used since 1965 to treat Wilson's disease, a rare condition that prevents the body from processing copper.  As part of the Company's undisclosed "Orphan Drug Strategy," Valeant executives, including Pearson, raised the price of Cuprimine by nearly 5,800%.  Valeant similarly approved drastic price increases on Syprine, raising its price by 3,200%.

60.    After engaging in price gouging on those drugs and certain others, Valeant executed an across-the-board price-gouging strategy to identify and implement price hike opportunities.  For example, on December 3, 2014, Andrew Davis, Valeant's SVP for Business Development, emailed Laizer Kornwasser, Valeant's EVP and Company Group Chairman, and

18

others at Valeant about purchasing the drugs Isuprel and Nitropress from Marathon. Specifically, Davis wrote that he had identified a drug manufacturer, Marathon, whose "value is largely derived from 2 hospital products [Isuprel and Nitropress] . . . which have no IP [i.e., protection from generic competition]." Steven Sembler, the General Manager of Neurology, responded: "In looking at the information, we would have to do this for the two products that make up [the] VAST majority of revenue . . . . This would have to be a price play (if we determine there is upside to take price) as we don't have a sales team calling on hospitals (i.e., no direct promotion)." In February 2015, Valeant acquired the drugs from Marathon for approximately $350 million and immediately raised the price of Isuprel by 500% and Nitropress by 200%. It subsequently further raised the price of both drugs resulting in a total increase of 720% for Isuprel and 310% for Nitropress.

61.     The revenue from these two drugs alone accounted for over 5% of Valeant's 2015 revenues of $10.4 billion. Further, these drugs were responsible for a significant portion of Valeant's revenue growth, and that revenue growth was substantially based on price increases. Valeant's internal documents confirm this. For example, on May 21, 2015, Schiller, then the CFO of Valeant, sent an email to Pearson with the subject "price volume." He stated:

> Last night, one of the investors asked about price vs volume for Q1. Excluding marathon, price represented about 60% of our growth. If you include marathon, ***price represents about 80%.***

This was in stark contrast to Pearson's statement a few weeks earlier on an April 29, 2015, conference call with Wall Street analysts where he was asked to "quantify a little bit how much was price versus volume that contributed to growth in 1Q," to which he responded:

> "In terms of price volume, ***actually volume was greater than price in terms of our growth.*** Outside the United States, it's all volume. In fact, we have negative price outside the U.S. with FX. And in the U.S., it's shifting more to volume than price. And we expect that to continue with our launch brands.

A lot of our prices is, for most of our products, are negotiated with managed care. And there's only a limited amount of price that we can take to [indistinguishable] of our consumer business, very little—Walmart doesn't like price increases. If you look at our contact lens business, we're not discounting contact lens. We're keeping the prices the same."

62.    A report in late 2015 revealed that Valeant reportedly raised 54 of its brand-name drugs by an average of 66%, five times more than any other pharmaceutical company in the industry.  Notable examples, in addition to Isuprel, Nitropress, Cuprimine, and Syprine include: (a) inflating the price of Carac Cream, a treatment for precancerous lesions, by more than 1,100%, from $230 per tube to over $2,800; (b) increasing the price of Glumetza, a drug used to control blood sugar for people with type 2 diabetes, by more than 1,000%, from $900 per 90 tablets to over $10,000; (c) gouging the price of Targetin, a treatment for skin problems associated with T-cell lymphoma, by over 1,600%, from $1,800 per tube to over $30,000; (d) raising the price of Wellbutrin XL, an anti-depressant drug, by $1,400 per one month's supply while the generic alternative sells for $30; and (e) raising the price of Addyi, a libido enhancing drug for women, by 100% immediately after Valeant acquired the drug from Sprout.

63.    In theory, inflating the prices of Valeant's products would then allow the Company to acquire additional pharmaceutical products and increase the prices of the acquired products, so long as the extent of the price-gouging remained hidden.  In reality, the short-term revenue gains undermined the long-term viability of Valeant because the extent of the price increases, especially when conducted through fraudulent means like Philidor, could not remain hidden forever.   Indeed, Valeant's price-gouging strategy created the extensive business, reputational, and regulatory risk that ultimately brought Valeant's stock price crashing down when the ramifications of the strategy were discovered.

### C.      Valeant's Use of a Secret Pharmacy Network

64.      Because Valeant was relying on undisclosed price gouging rather than the claimed volume increases to sustain its growth, it needed to ensure it could sustain those price increases despite a competitive pharmaceutical industry.  To do so, Valeant relied upon a secret network of controlled specialty pharmacies to increase sales of its branded drugs despite the availability of cheaper alternatives.   Specifically, Valeant's secret controlled network of pharmacies protected Valeant drugs from competition by ignoring legal and contractual mandates that require the substitution of generic equivalents for Valeant-branded drugs. Additionally, Valeant's controlled pharmacies submitted false claims information to insurers and other third-party payors.  The scheme allowed Valeant to increase the price of drugs without decreasing the volume of drugs sold no matter the price—and thereby continue to mislead investors about the sustainability of the Company's business model.  Insurers and other third-party payors therefore were deceived into paying for Valeant's exorbitantly priced branded drugs and were prevented from substituting cheaper generics when working through Valeant's captive specialty pharmacies.

### 1.      Philidor

65.      Philidor was the most prominent of these captive pharmacies, licensed in 45 states and the District of Columbia while operating as a purportedly independent specialty mail-order pharmacy.  True specialty pharmacies primarily sell self-administered specialty drugs covered under a patient's pharmacy insurance benefit.   These specialty drugs are usually highly differentiated brand-name drugs for patients undergoing medical treatments for complex illnesses such as HIV and cancer.  These drugs often are self-administered through injections and may require constant refrigeration.  None of this was true for drugs supplied by Philidor.

21

66.     To the contrary, Philidor dispensed __*only*__ Valeant's undifferentiated traditional brand-name drugs—primarily Valeant's dermatological products—many of which had generic low-cost substitute drugs.  And far from being independent, as Valeant attempted to persuade investors when Philidor first came to light, Philidor has since acknowledged that Valeant was Philidor's "__*only client*__."

67.     From Philidor's incorporation on January 2, 2013, Valeant was closely linked to Philidor's operations and development.  Valeant's employees worked closely with Philidor's founders in establishing Philidor as a means to funnel Valeant's high-priced brand-name drugs to patients.  In December 2012, Valeant hired manager Gary Tanner to serve as the Company's special "liaison" with Philidor and to help develop the pharmacy's operations.  On January 2, 2013, the same day that Philidor was incorporated, Valeant hired Laizer Kornwasser, a former senior executive at Medco, to serve as Valeant's EVP/Company Group Chairman to oversee Valeant's relationship with Philidor.  Throughout their time at Valeant, Kornwasser and Tanner oversaw Philidor's operations and were compensated handsomely by Valeant for their work with Philidor.

68.     From Philidor's incorporation in January 2013 until October 2015 (when Valeant finally revealed its relationship with Philidor), Valeant installed a number of its employees (including Kornwasser and Tanner) at Philidor to ensure that Valeant's fraudulent business objectives would be met.  For example, Valeant placed a team of thirty employees within Philidor so that those employees could educate doctors on how to direct patients to Valeant's products.  Throughout Philidor's existence, Valeant employees supervised critical aspects of Philidor's business operations, including interviewing potential new hires for Philidor and helping to manage Philidor's billing practices.

69.     Valeant went to great lengths to conceal Valeant's connection to Philidor.  For example, Valeant employees used fictitious names when sending emails from Philidor accounts to hide the fact that the employees were working for both Philidor and Valeant.

70.     Valeant's close relationship with Philidor went far beyond overlapping personnel. On December 15, 2014, Valeant paid $100 million for the option to purchase Philidor for $0 any time within the next ten years, and agreed to certain milestone payments based on Philidor's sales.  The first milestone payment for $33 million was paid on January 15, 2015, and further milestone payments were contingent upon achieving certain sale thresholds.

71.     Consistent with its efforts to conceal the use of overlapping employees, Valeant improperly structured the transaction with Philidor to avoid public disclosure.   Valeant's subsidiary KGA, rather than Valeant, was used to obtain the Philidor Purchase Option.  And, rather than call the transaction what it was—a purchase—Valeant acquired Philidor through a convoluted put option structure, whereby Valeant paid $100 million to Philidor's owners, including some Valeant employees, for the option to acquire Philidor for ***nothing*** within the following ten years.

72.     The Philidor Purchase Option agreement was an acquisition in all but name.  Not only did Valeant, through KGA, pay the entirety of Philidor's valuation up front, but Valeant also had the right to form a joint steering committee that would "assess and discuss" matters relating to Philidor's "internal policies, manuals and processes."  The transaction document also gave Valeant the right to "make the final determination" with regard to "the Strategic Plan of Philidor" and "the compliance of [Philidor] with applicable Legal Requirements, Contractual obligations (including agreements with Third-party payors) and the Company's internal policies and manuals" in the event of any failure to reach an agreement among the joint steering

23

committee members.  The joint steering committee also was given the "the right to review, prior to their submission, all applications of the Company for licenses and permits (including state pharmacy licenses)."  In effect, Valeant obtained the right to control Philidor, consistent with the fact that Valeant had already been controlling critical aspects of Philidor's business since inception by placing Valeant employees in supervisory roles at Philidor.

73.     Further, Valeant and Philidor entered into an exclusive distribution and services agreement on December 15, 2014.  The agreement superseded the previous services agreement that Philidor had signed in January 2013 with Medicis (one of the pharmaceutical companies that Valeant acquired in 2012).   Under the services agreement, Valeant had the right to inspect Philidor's policies and procedures and conduct site visits to verify compliance with the procedures that Valeant imposed upon Philidor.  This was yet another aspect of the relationship confirming that Valeant effectively controlled Philidor.

### 2.     Valeant's Other Secret Pharmacies

74.     After forming Philidor, Valeant and its management created a number of shell companies affiliated with Philidor through which Valeant surreptitiously acquired interests in smaller retail pharmacies across the country to extend the captive pharmacy network.  Through this process, Valeant and its management developed a network of at least 76 captive specialty pharmacies through which Valeant could file pharmacy applications with state regulators.  On these pharmacy applications, the shell companies that Valeant controlled through Philidor frequently issued false and misleading statements to hide from regulators and investors the true nature of the relationship between Valeant, Philidor, and the network of shell companies.  When submitting a pharmacy application to the California State Board of Pharmacy on or about August 15, 2013, for example, Philidor misrepresented the relationship between Valeant and Philidor. The California State Board of Pharmacy ultimately found that Philidor and its CEO Davenport

had falsely represented the following facts under penalty of perjury:  (i) that no entities possessed an ownership interest in Philidor equal to or exceeding 10%, when Valeant in fact controlled Philidor; (ii) that Davenport himself did not possess an ownership stake in Philidor, when in fact he held a 27% stake in the pharmacy; (iii) that there were no persons with a "beneficial interest" in Philidor, when sixteen owners or shareholders did possess such an interest; and (iv) that Alan Gubernick was Philidor's accountant and bookkeeper, when in fact an employee of a Valeant/Philidor subsidiary (known as BQ6 Media), Gregory W. Blaszczynski, was Philidor's accountant and bookkeeper.

75.      Philidor's application was denied by the California State Board of Pharmacy on May 16, 2014, due to the numerous knowingly false statements made by Philidor and its CEO Davenport.  The California State Board of Pharmacy found that these false statements were made "with the intent to substantially benefit" Philidor and Davenport, and that Philidor and its CEO were therefore "guilty of unprofessional conduct."  The denial of Philidor's pharmacy license was affirmed by the California State Board of Pharmacy in February 2016.

76.      Eager to gain access to California's market even by improper means, Valeant and its management orchestrated a scheme to circumvent the California State Board of Pharmacy's denial of Philidor's requested license.  Specifically, Defendants caused a Philidor/Valeant-affiliated company, Lucena Holdings ("Lucena"), to purchase a stake in an existing California pharmacy called "West Wilshire Pharmacy."  On September 24, 2014, Defendants caused Lucena to file a "Change of Permit Request" with the California State Board of Pharmacy.  At the direction of Defendants, Lucena's filing falsely stated that:  (i) Lucena did not have a parent company; (ii) there was only one entity or individual with an interest in Lucena, (iii) that Lucena's CEO and pharmacist-in-charge, Sherri Leon—who had been Philidor's Director of

Pharmacy Operations at the time when the California State Board of Pharmacy had denied Philidor's pharmacy license—was not "associated in business with any person, partnership, corporation, or other entity whose pharmacy permit . . . was denied."

77.      The California scheme was not limited to Lucena.   On December 1, 2014, Philidor caused another shell company, Isolani, LLC ("Isolani"), to acquire a California-based mail-order pharmacy, R&O Pharmacy ("R&O").   Once Philidor acquired R&O through Isolani, R&O's business grew significantly by dispensing thousands of prescriptions for Valeant-manufactured drugs—primarily expensive prescriptions for acne or eczema-related dermatological conditions.   Isolani concealed from California regulators its relationship with Philidor and Valeant, and R&O only uncovered the relationship between Philidor and Valeant when R&O conducted its own investigation into Philidor.

78.      Defendants and Philidor conducted a similar scheme in Texas, through a Philidor-controlled shell company called Back Rank, LLC ("Back Rank").   Back Rank, whose managing member was James R. Fleming, Philidor's Controller, took control of Houston-based Orbit Pharmacy, Inc. ("Orbit Pharmacy").   In an application filed with the Texas State Board of Pharmacy in September 2015, Orbit Pharmacy—at the direction of Defendants and Philidor—falsely represented that no state had ever denied a pharmacy application filed by any of "the pharmacy's owner[s] or partner[s]."   This was false because California had denied Philidor's pharmacy application in the prior year.

79.      While elements of Valeant's secret captive pharmacy network have become public, Valeant and Philidor still have not disclosed the full scope of the network or shell companies and affiliated subsidiaries that Valeant and Philidor used to hide the fraud.

80.     Notably, Valeant never disclosed Philidor in any of its SEC filings prior to October 19, 2015, and it structured the transaction acquiring Philidor in an improper attempt to avoid public disclosure.  Philidor also never publicly disclosed its arrangement with Valeant prior to October 19, 2015.

### 3.     Valeant Used Its Network of Secret Pharmacies to Increase Prices

81.     Because Valeant could not support its purportedly "low-risk" model on volume growth and cost cutting, Valeant and its management sought to implement significant price increases across Valeant's portfolio of acquired drugs.  Valeant's use of its captive secret pharmacy network was vital to the Company's true (and undisclosed) business model by avoiding competition from generic substitutes, inflating prices, and increasing fraudulent sales. Valeant's pricing would have been unsustainable in a competitive market:  customers generally would not pay the exorbitant prices for Valeant's brand-name drugs, and doctors would not commonly prescribe Valeant's exorbitantly priced brand-name drugs, had the existing generic alternatives been made available by the captive specialty pharmacies.  Valeant's secret network of captive pharmacies, however, insulated Valeant's branded drugs from generic competition, as Valeant could be certain that the pharmacies would dispense Valeant's branded drugs rather than generic equivalents.

82.     Philidor's fraudulent dispensing of Valeant-branded drugs violated the laws of fourteen states—including the state in which Philidor is headquartered, Pennsylvania—that require pharmacists to substitute generic equivalents for branded drugs.  In the states where cost-cutting laws do not exist, contracts between pharmacies and insurers or their PBM agents generally mandate that the pharmacy dispense generic substitutes in place of branded equivalents whenever possible.  Philidor and Valeant's fraudulent conduct violated these statutory and contractual requirements.

83.     Through its illegal and fraudulent practice, Valeant shielded its branded products from generic competitors.  This scheme allowed Valeant to maintain or increase high prices not only for pharmaceutical drugs no longer protected by patent and subject to competition from direct generic equivalents, but also for branded drugs still protected by patents for which a near-perfect substitute existed.

84.     Accordingly, Valeant was able to fraudulently present a compelling story of unparalleled efficiency and growth to investors like Plaintiffs.  Valeant appeared immune to the limitations on growth encountered by seemingly every other pharmaceutical company.  Other drug companies see their drug-specific revenue decline when a generic version of that drug becomes available, a generic version of a near-perfect substitute becomes available, or a cheaper branded drug reaches the market.  Valeant, however, seemed capable of maintaining growth indefinitely.  This was a façade.

85.     As but one example, Valeant's fraudulent arrangement with Philidor allowed the Company to double revenue generated by Wellbutrin XL, an off-patent anti-depressant sold through Philidor and the captive pharmacy network.  Valeant was able to double the drug's revenue by almost tripling prices from less than $6,000 to $17,000 for a year's supply of the drug, despite the existence of a generic equivalent for only $360 a year.[1]  These results required the undisclosed illicit scheme.

86.     The fraudulent captive pharmacy arrangement similarly enabled Valeant to increase the price of and revenue derived from its dermatology drugs even when those drugs faced competition from far cheaper generic equivalents.  From 2013 to 2015, during which time

---

[1]  Valeant refused to release drug-specific revenue numbers, which allowed the Company to conceal its price gouging.

Valeant launched and exploited its secret captive pharmacy scheme and experienced significant stock price appreciation, Valeant dramatically increased the price of more than 50 drugs.  The price increases significantly outpaced those of competitors in the pharmaceutical industry. Although the Company characterized its price increases as price "optimization," in reality the Company was engaged in massive and unprecedented price gouging.  Over a nearly two-and-a-half-year period, Valeant instituted the following pricing increases, among others:  557% for Carac Cream; 381% for Wellbutrin XL 300 MG Tablet; 279% for Vanos 0.1% CRM; 250% for Targetin 60g 1% Gel; and 223% for Aldara 5% CRM.  Similarly, Valeant raised the prices for Tretinoin 0.1% CRM by 328% over one and a quarter years and for Noritate 1% Cream by 212% over one and a half years.

87.     These shocking price increases would not have been possible but for Valeant's undisclosed fraudulent arrangement with Philidor and the captive pharmacy network.   As described above, Valeant undertook herculean efforts to conceal its scheme.  Valeant prevented Philidor and the other captive pharmacies from disclosing their relationship with Valeant to the insurance companies, to regulators, to other third-party payors, or to PBMs.  Valeant and Philidor forbade former employees from mentioning Philidor's relationship with Valeant. Starting in September 2015, Philidor began requiring employees to sign confidentiality agreements that enabled Philidor to sue workers who revealed information about the Philidor and Valeant relationship.

88.     Valeant and Philidor expressly misrepresented their relationship—and the involvement of additional captive pharmacies—to insurers and other third-party payors, their PBM agents, and their members to increase the reimbursements paid by the payors and to maximize Valeant's drug sales.  Valeant's fraudulent scheme is documented in manuals provided

to Philidor employees charged with handling claims submitted to third-party payors. The manuals explained that "[w]e have a couple of different 'back door' approaches to receive payment from the insurance companies." The "back door approaches" involved rewriting prescription information, filing claims for refills that patients never requested, and falsely representing the identity of the pharmacies that dispensed the drugs to reduce denials of claims for Valeant drugs. Valeant's internal emails and correspondence between Valeant and Philidor, including a July 19, 2015, email from Philidor's CEO Davenport, demonstrate that both parties in the fraudulent arrangement—Valeant and Philidor—were fully aware of these "back door approaches."

89.     To rewrite prescription information, Valeant and Philidor instructed employees at Philidor and other captive pharmacies to deliberately modify the doctor's prescriptions so as to require the prescription be filled with expensive Valeant-branded drugs, rather than the cheaper generic substitutes that the pharmacies would be required to provide by law or contract. Generally, pharmacists who receive a prescription for a branded drug instead dispense a generic substitute when available. Because some alternatives may not be perfect substitutes, physicians are able to prescribe particular branded drugs by specifying "dispense as written" on the prescription. *Bloomberg* reported on October 29, 2015, that Philidor employees confirmed that Valeant's captive pharmacies **regularly falsified prescriptions** by adding the words "**dispense as written**" whenever the prescription included Valeant products and cheaper generic substitutes were available. The employees interviewed in the *Bloomberg* investigation specified that Valeant and Philidor employed this fraudulent method for increasing sales volume at the inflated prices especially for Valeant's dermatologic products for which third-party payors would otherwise refuse to fund, including Retin-A Micro and Vanos.

30

90.     Valeant directed two forms of fraud perpetrated by Philidor employees.  *First*, Valeant directed Philidor employees to avoid third-party payors' denials of claims for expensive Valeant-branded drugs by modifying prescription codes so that the prescriptions appeared to order only Valeant-branded drugs, thereby precluding the use of low-cost generic alternatives. *Second*, when third-party payors denied initial claims for Valeant drugs because the prescription allowed for generic substitutes, Philidor employees falsely resubmitted modified prescriptions allowing only for the dispensing of Valeant drugs as new prescriptions.

91.     Valeant used false pharmacy identifications to misrepresent to insurance companies and other third-party payors which pharmacies were dispersing the Valeant-branded drugs.  Valeant and Philidor's manual for handling claims directed Philidor employees to submit claims to third-party payors or their PBM agents first using Philidor's National Provider Identification Number ("NPI").   If the claim was rejected, the manual directed employees to resubmit that claim on the NPI of another captive-Valeant/Philidor controlled pharmacy. Valeant thus directed Philidor employees to claim that a pharmacy dispensed a prescription that the pharmacy had not actually dispensed and may not have even stocked.

92.     Former Philidor/Valeant employees told *Bloomberg* that they received maps and specific instructions detailing the false NPI information that they should fraudulently submit if a third-party payor denied a claim from a particular dispensing pharmacy.  Valeant/Philidor issued a manual instructing employees on how to handle claims which stated that if an employee received a denial for a particular third-party payor, it should "submit the NPI for our partner in California, West Wilshire Pharmacy" because "[t]here is a good chance they are contracted."   In the event that the third-party payor denied  West Wilshire Pharmacy's NPI, Valeant/Philidor instructed employees to replace the denied pharmacy with "Cambria Central Fill insurance and

run that as the primary."  Cambria Central Fill, based out of Philadelphia, Pennsylvania, was another of Philidor's secret retail pharmacies.

93.    Valeant and Philidor also directed pharmacies in the Valeant network, such as Isolani, to use the NPI belonging to the California-based R&O Pharmacy, which was another Valeant/Philidor controlled entity.  In many instances, Philidor employees submitted claims for prescriptions that R&O had never filled and for drugs that R&O did not even stock.  By directing employees to submit fraudulent NPI information for claims, Valeant and Philidor sought to secure payment for properly denied claims.  In an interview with the Southern Investigative Reporting Foundation, a former Philidor claims adjudicator, Taylor Geohagen, explained this fraudulent practice as follows:  "Pretty much everything we did in the [Philidor] Adjudication department was to use the [NPI] codes from the pharmacies we bought out to get something [approved] in a pinch."

94.    Additionally, Philidor and Valeant submitted falsified payer audits to third-party payors or their PBMs.  Generally, the retail pharmacies themselves submit payer audits for the prescriptions they fill.  By contrast, in Valeant's captive pharmacy network, Valeant's agents would submit the payer audits on behalf of all the captive pharmacies, so as to inaccurately state that a particular pharmacy had filled a particular prescription, when those prescriptions had actually been filled by Philidor or one of Valeant's other captive pharmacies.  To perpetrate this fraud on the third-party payors, Defendants' agents falsely claimed authority to approve the audit statements on behalf of the retail pharmacies, or even forged the signatures of management at those pharmacies.

95.    For example, a July 14, 2015, email between Russell Reitz of R&O Pharmacy and Eric Rice, Senior Director at Philidor, demonstrates that Defendants' agents' audit statements

32

submitted on behalf of R&O Pharmacy falsely claimed that R&O had dispensed Valeant prescriptions when in fact Philidor had actually filled those prescriptions.  In that email, Reitz wrote to Rice that Philidor fraudulently billed R&O for prescriptions "filled by some other pharmacy" or "filled and billed before the execution of the R&O purchase and sale agreement," using Reitz's National Council for Prescription Drug Programs number without Reitz's knowledge or consent.  In some cases, the prescriptions that Philidor claimed R&O dispensed in R&O's fraudulent audit statements were for drugs that R&O not only had not dispensed, but also did not stock.

96.     Valeant and Philidor also fraudulently submitted numerous prescription renewals for reimbursement when patients had not requested renewals of their prescriptions.  As Philidor customers explained in an investigative article published by *New York* magazine on January 13, 2016, Valeant and Philidor directed its captive pharmacies to automatically refill patients' prescriptions for Jublia and other Philidor-dispensed Valeant drugs regardless of whether the patients had actually requested refills.  Even when patients actively refused refills, Philidor made it nearly impossible for those patients to decline or cancel the refills.  Accordingly, Valeant and Philidor fraudulently represented to third party-payors and PBM agents that patients had requested prescription renewals for Valeant-branded drugs even when patients actively declined a prescription renewal.

97.     Valeant also sought prescription renewals for non-chronic conditions that are generally resolved by a limited course of treatment.  Thus, for certain dermatological conditions treated by Valeant-branded drugs that required only one course of treatment, Valeant fraudulently stated that patients had requested prescription renewals from third-party payors even though the conditions were resolved through a single treatment.  Because Valeant directed

Philidor to waive patient copays through the deceptive PAPs program, discussed above, this scheme frequently went undetected, since there existed no incentive for patients to complain about the unnecessary refills for which the patients were not charged.

98.     One Philidor employee explained in an online forum that Philidor frequently "auto ship[ped] [Valeant-branded drugs] without proper approval" even when "most people do not need these refills" because "it is free for the patient but Philidor gets anywhere from \$550-\$1220 from the insurance companies."  Another Philidor employee further explained:

> They took the list of customers who had been approved by [insurance] and had refills available.  Instead of waiting for the customer to call they would dial and leave a msg saying your refill will be shipped unless you call within 24 hrs.  They would do this on the 30th day of the rx.  Previously they had a Co pay so would have to wait to get approval to charge the 35.00 Co pay, making the Co pay 0 allowed them to ship refills whether u wanted them or not.  Not a bad money making idea except most people did not really need refills of Solodyn so soon . . . Of course these refills were out the door ASAP sometimes within an hour of the call and the [insurance] money would come in.

> What patients don't get is your [insurance] company is paying 500 plus bucks for an old medication reformulated and refills not needed.  I would bet a lot of Solodyn and Jublia bottles are just lying around still in the shipping package.

> If you ever saw Wolves of Wallstreet well that was sorta what some of us saw at Philidor.  Let's say on average a person does not need a refill of Solodyn for 45 or 60 days from the 1st fill and you force them to take it at 30 days every month \$\$\$\$\$\$\$\$\$\$\$\$\$\$ and a ton of it! Think about it.

99.     Valeant and Philidor also misrepresented to insurance companies and other third-party payors the dispensing pharmacies "actual charges" for Valeant-branded drugs by failing to disclose that Valeant instructed Philidor to waive patient copays on those drugs.  Insurance companies institute copays to (i) deter insured patients from wastefully consuming medically unnecessary pharmacy products, (ii) incentivize insured patients to choose generic substitutes when available, and (iii) discourage unnecessary refills of prescription medications.  By waiving copays at Valeant's direction, Philidor removed all three incentives for controlling unnecessary

34

costs.  In turn, this meant that third-party payors would incur the increased costs associated with the unnecessary and exorbitantly priced Valeant-branded drugs, and those increased costs would ultimately be passed through to patients and the insured public.  To discourage pharmacies like Philidor from waiving copays, PBMs contract with pharmacies to mandate that pharmacies attempt to collect the copayment, and submit their claims reflecting "actual charges," which take into account discounts or waivers applied.  While Philidor would waive copays at Valeant's direction, Philidor frequently submitted claims for the prescriptions that falsely represented to the insurers and other third-party payors that the patient had been charged the full price of the drug and contributed the copay.

100.  Valeant and Philidor also issued patient-facing misrepresentations to increase the volume of Valeant's drug sales.  Valeant and Philidor falsely represented to doctors and patients that Valeant drugs were available at no cost if the patients and physicians submitted their prescriptions directly to Valeant's captive secret pharmacy network.  Channeling patients and physicians through Philidor allowed Valeant to guarantee that prescriptions would be filled with Valeant-branded drugs, rather than cheaper generics as would occur by law or contract if filled by a pharmacy outside of Valeant's captive and undisclosed network.  In furtherance of this scheme, Valeant and Philidor issued coupons that fraudulently told patients that third-party payors would not be billed if the prescriptions for Valeant-branded pharmaceuticals were submitted directly to Philidor.  One patient submitted a consumer complaint to the Better Business Bureau ("BBB") on March 2, 2015, which the BBB documented as follows:

> Complaint:  Received a call from the [Philidor] representative stating that they wanted to refill a Rx for ******.  They stated that they had a coupon that would pay for the medication completely, and even said "at no cost to you".  Unfortunately, I said OK.  In reviewing my healthcare plan claims, I noticed that they bill my Plan for $449.55.  Since I have a $1500 deductible, I may be liable for this charge.  This is not what I agreed to and not what the representative said

would occur.  I would like this claim removed from my healthcare plan immediately.  I will return the ****** unopened in order to have this taken off my Claims.

101.    In reality, the third-party payors were billed for the Valeant-branded drugs, despite Valeant and Philidor's representations to the contrary.  Valeant and Philidor's billing of the insurers was then passed onto the patients, whom Valeant and Philidor had promised not to bill.  Indeed, one patient reported:

> [M]y dermatologist provided me with a "Trial Coupon" for JUBLIA; a topical solution used to treat toenails.  The trial coupon offers a "$0 copay for 12 months" of this medicine . . . .  Philidor RX Services continues to INCORRECTLY bill my health insurance which, in turn, is impacting my HSA / MRA Funds - each time, removing $100 from MY Medical Reimbursement Account.

102.    Another customer reported similar conduct to the BBB:

> Hello.  My child had an appointment with a local dermatologist.  While we were there we were referred to Philidor RX Services for filling two acne prescriptions.  The dermatologist assured me that I would be charged only $25 and nothing more from our health insurance company.  She also gave us a coupon to use for one of the prescriptions that would make it free.  I called Philidor and gave them all of the information that was provided to me by the dermatologist. Philidor charged me $220 from my FSA account ($110 for each prescription).  I contacted Philidor and spoke with a man who said his name was Mickey.  Mickey told me that I needed to submit a statement from my insurance company showing that $220 was withdrawn from my FSA account.   I did as requested and have sent the information via email to Philidor, Attn: Mickey, twice.  I have received no response and no refund.

103.    Anticipating these complaints, Valeant and Philidor sought to insulate their captive pharmacies from consumer retaliation.  Valeant and Philidor attempted to make it as difficult as possible for patients to complain to Philidor that their insurers had been billed for Valeant-branded drugs despite coupons or sales literature indicating that insurers would not be billed.  Philidor customers and patients frequently reported being directed to sales staff (who rebuffed the complaints) when they tried to report the fraudulent marketing schemes to Philidor.

104.    Valeant was aware of—and indeed was directing—Philidor's improper practices even before the $100 million payment to Philidor was made.  As explained above, Valeant's management was involved in Philidor's formation and decision-making.   Valeant's senior management, and even members of Valeant's Board of Directors, went on site visits to Philidor *before* the $100 million acquisition.  After the payment for the convoluted Philidor Purchase Option, Valeant concealed the transaction and Valeant's control over Philidor from investors and all healthcare sector stakeholders—including physicians, patients, private payors, and PBMs.

105.    Until the fraudulent arrangement was exposed in October of 2015, Valeant utilized this hidden relationship to artificially inflate revenues and drive up the value of the Company's stock.  Because Valeant and its management knew that Valeant could not record revenue from shipping products to Philidor after Valeant's acquisition of Philidor, Valeant shipped millions of dollars of products to Philidor to inflate revenue directly before the purchase of the put-option.  Despite the fact that this manipulative practice clearly violated GAAP, Management Defendants Schiller, Carro, and Ingram and the Valeant Audit Committee, the Finance and Transactions Committee, and the entire Valeant Board of Directors approved the deceptive accounting practices involving Philidor.   During an October 26, 2015, investor conference call, Robert A. Ingram, a member of Valeant's Board of Directors since September 2010, admitted that the Audit Committee of the Board and the full Board of Directors approved Valeant's (misleading) accounting concerning Philidor.  Slides that corresponded to the investor call stated that the "Finance and Transactions Committee, Audit and Risk Committee and Full Board reviewed the transaction" and "[t]he appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee."

**D.      Valeant Exploits "Patient Assistance Programs" To Raise Prices**

106.     In addition to relying on its secret network of pharmacies to support its price-gouging model, Valeant also deceptively employed "patient assistance programs" ("PAPs") to support growth while raising prices.  PAPs are typically offered by drug companies to provide financial assistance to patients so that they can have access to medically critical drugs.  But Valeant's PAPS had an entirely different purpose.  Specifically, Valeant's PAPs waived patient copay requirements for Valeant's drugs—not to provide access to medically critical drugs, but instead to ensure that patients would not complain about being prescribed Valeant's branded and overpriced drugs rather than medically equivalent and far cheaper generics.  By eliminating copays, Valeant muted the incentive for patients to seek out lower-priced substitute drugs.  Thus, Valeant could sell medically unnecessary branded drugs—despite the availability of low-cost generic substitutes—at an artificially inflated price.  Had Valeant declined to waive the patient copays, patients would have chosen lower-cost generic drugs to avoid the unnecessary and costly prescriptions and thus would have lowered costs for the insurance companies.  Valeant also concealed the Company's practice of waiving patient copays, keeping private insurance companies in the dark so that they would continue to pay for the Valeant-branded drugs even when unnecessary.  Simply put, Valeant manipulated the PAP system to conceal the extent of its price increases from the paying public.

107.     With respect to this scheme, Valeant specifically targeted private insurers because of federal anti-kickback laws that prohibit such practices when government payors are involved. Testifying before the House Oversight Committee and the Committee on Aging of the U.S. Senate ("Committee on Aging") on April 27, 2016, Pearson acknowledged that Valeant was "not allowed to" use the co-pay reduction programs for those on federal insurance programs.  Senator Elizabeth Warren explained why: "These [co-pay reduction] programs are illegal [with regard to

38

federal payors] because Medicare and Medicaid understand that the programs are scams to hide the true cost of the products from the consumer and drive up the cost of all the taxpayers."  At the same hearing, Mark Merritt, President and CEO of the Pharmaceutical Care Management Association ("PCMA"), which represents PBMs, testified that Valeant caused third-party payors "to pay hundreds of thousands more for the most expensive brands" through copay coupons that allowed patients to bypass cheaper generic drugs.

108.    From 2012 to 2015, Valeant's PAPs expenditures grew 11-fold, rising from $53 million in 2012 to over $600 million in 2015, with the expectation that PAPs expenditures would rise to over $1 billion in 2016.  These rates grew even while the Company's revenues were increasing at a significantly slower rate (roughly 3-fold), from $3.5 billion in 2012 to $10.4 billion in 2015.

109.    Throughout this period, Valeant misrepresented the true purpose of its PAPs program.  A draft Q&A directed Valeant employees to respond to the question of "Isn't Valeant just trying to make insurers and managed care providers pay as much as possible for these drugs?" with the following answer:  "No.  These rate increases are essential to ensure that Valeant is able to continue to offer these important pharmaceuticals to our patients who are afflicted with Wilson's disease while also remaining commercially viable."  Valeant's production costs for these drugs had not increased in reality.  Valeant was instead using these price increases to chase additional revenue growth.  Despite the fact that Valeant's business model had eliminated nearly all spending on R&D, Valeant's customer service department lied to patients, claiming "there are many challenges associated with developing treatments for rare conditions such as Wilson's disease, the investments we make to develop and distribute novel

medicines are only viable if there is a reasonable return on the company's investment and if our business is sustainable."

110.    When certain elements of Valeant's business model were revealed to the public in October 2015 (namely, the existence of the previously undisclosed Philidor relationship), Valeant spun further deceptions.  In a letter to Senator Claire McCaskill dated October 30, 2015, Pearson stated that Valeant was "beginning to reach out to hospitals to determine an appropriate pricing strategy" for those "institutions where the impact was significantly greater."  Despite these representations, and a 30% discount program that Valeant announced shortly after the letter to Senator McCaskill, investigators could not find a single hospital that received the discounts.

111.    A number of individuals, many who were affiliated with hospitals, testified before the Senate Aging Committee in or around April 2016 that they had not received any of the promised discounts.  This was because Valeant had, in reality, maintained its price gouging well beyond October 2015 in a desperate attempt to generate further revenue growth.  By way of example, the Cleveland Clinic explained that it had called a then-vice president of Valeant, Brian Stolz, to inquire about the announced discounts.  Stolz stated that he would get back to the Clinic about the discounts, but Cleveland Clinic never received the promised follow up.  Likewise, the University of Utah Health Care wrote to the Senate Aging Committee explaining that "Valeant refused to talk [] about better contracted prices."  This, despite Pearson's October 2015 letter to Senator McCaskill indicating that Valeant would contact "hospitals that were impacted by the new pricing" to arrange pricing discounts.

112.    Subsequently, Valeant effectively admitted that Pearson's representation was inaccurate.  In an April 23, 2016, written response to the Senate Aging Committee, Stolz stated that, "[a]s of this date, Valeant has not entered into contracts with individual hospitals to provide

volume-based discounts for Nitropress and Isuprel" and had executed contracts with only three hospital groups. Thus, as of April 23, 2016, nearly half a year after Pearson's letter to Senator McCaskill, Valeant had done next to nothing to address the price increases.

      **E.**    **The R&O Lawsuit and the Initial Disclosure of Valeant and Philidor's Fraudulent Arrangement**

113.    Valeant's insatiable desire to expand its captive pharmacy network and grow its fraudulent scheme ultimately led to its demise. Its acquisition of R&O Pharmacy would result in a lawsuit and investigation against Philidor that exposed the specialty pharmacy's relationship with Valeant and the related captive network of secret specialty pharmacies.

114.    As mentioned above, on December 1, 2014, Philidor acquired a specialized dispensary for gastroenterology patients, R&O Pharmacy, from Russell Reitz. It became apparent to Reitz during the sale that Philidor was not licensed by the California State Board of Pharmacy. Immediately following the sale, R&O began to receive a massive increase in prescriptions from physicians using Philidor's mail-order service. The number of prescriptions sent to R&O significantly exceeded the size of R&O's business prior to Philidor's acquisition of the pharmacy.

115.    The orders, as discussed above, were consistently for expensive Valeant-branded pharmaceuticals, often ordered in bulk, which would be dispensed by Reitz through mail directly to patients. R&O would then receive payments from private health insurers, which frequently sent R&O single checks for more than $1 million covering hundreds of patients.

116.    R&O Pharmacy's newfound business was unusual in at least three respects: (i) the volume of prescriptions that R&O filled through Philidor-directed patients was unusually large; (ii) the prices of the prescriptions were extremely high, even for a specialized pharmacy like R&O that frequently dealt in costly specialty drugs; and (iii) whereas most specialty

pharmacies deal in treatments for chronic and serious medical conditions, the overpriced prescriptions that R&O was receiving from Philidor were for Valeant-branded drugs that treated common dermatological conditions such as Solodyn for acne, Elidel, for eczema, and Jublia, for toenail fungus, all of which could have been appropriately treated by any number of generic substitutes.

117.    The significant change in R&O's business following the acquisition resulted in an audit from one of R&O's PBMs.   The audit revealed that Philidor was using R&O to fill thousands of prescriptions for individuals all around the country, including patients with whom Reitz had never been in contact but whose prescriptions had been filled with his name and R&O's NPI.  Even more confounding was the fact that many of the prescriptions that R&O had been credited with fulfilling were for medications that R&O did not carry, and some of those prescriptions had been backdated to before Reitz sold R&O to the Philidor-controlled entity. These fraudulent practices continued throughout the summer of 2015.

118.    Because of the serious concerns raised by the PBM's audit, in the summer of 2015, R&O began its own investigation into Philidor.  R&O's investigation uncovered Philidor's unsuccessful application for a pharmacy license with the California State Board of Pharmacy in 2013, which had been denied in 2014 by the California Board because Philidor's application contained "false statements of fact."  R&O's discovery of the previous unsuccessful application alerted Reitz to the fact that Philidor had purchased R&O exclusively to use R&O as a mechanism for Philidor to conduct business in California despite the California Board's denial of Philidor's pharmacy license application.

119.    In a July 14, 2015, email to Eric Rice, the Isolani executive who signed the acquisition agreement with R&O (and who was also Senior Director at Philidor), Reitz raised

"the issue of Philidor's improper, and perhaps illegal, use of [R&O Pharmacy's] number without [Reitz's] knowledge or consent to bill for prescriptions that" other pharmacies had filled and, in some cases, had even been billed before Isolani acquired R&O.  In the email, Reitz instructed Philidor to end the fraudulent practice immediately, and he noted that the acquisition agreement mandated that Philidor and Isolani (the Philidor-controlled entity through which Philidor acquired R&O) apply for a permit to operate in California—a "process [that] does not take 7 months."  Accordingly, Reitz requested all documents concerning Isolani's or Philidor's application for a pharmacy license before the California State Board of Pharmacy.

120.    Five days later, on July 19, 2015, Philidor's CEO Davenport responded by email to Reitz.  In that email, Davenport stated that Philidor would cease using R&O's NPI number to fill prescriptions, and that Philidor had "halted activity pending coming to some alignment with you."  In response, Reitz inquired why "Philidor is responding to my concerns instead of Eric Rice," who had signed the acquisition agreement by which Isolani acquired R&O Pharmacy. Reitz also noted that he had recently learned Rice signed off on an audit that Reitz had refused to sign, despite the fact that "Rice is not the [pharmacist-in-charge] (I am) and has never stepped through R&O's doors.  I am not sure how he could verify the accuracy of anything pertaining to that audit."

121.    In response, and indicative of the severity of Reitz's concerns, on July 21, 2015, Philidor dispatched Rice and additional Philidor executives including CEO Davenport, Controller Fleming, and General Counsel Gretchen Wisehart to California to meet in person with Reitz at R&O.  Reitz's concerns on behalf of R&O were not resolved at the meeting, and R&O retained counsel who sent a letter to Rice on July 22, 2015, noting that Rice "appear[ed] to be engaging in widespread fraud."

122.    Several weeks later, on August 18, 2015, Philidor's Controller Fleming emailed Reitz to suggest responses to a pending audit.  One of the most prominent red flags identified in the audit was the fact that a large number of prescriptions R&O was filling were then shipped to patients in Pennsylvania, where Philidor was based.

123.    In light of the apparent widespread fraud, on August 31, 2015, R&O's counsel sent a notice of termination to Isolani's law firm, writing: "It is now crystal clear that Isolani/Philidor fraudulently induced Mr. Reitz to sign the [transaction] agreements in order to allow Isolani/Philidor to engage in a massive fraud. . . .  Isolani is simply a shell created by Philidor to perpetrate a massive fraud against not only against Mr. Reitz and R&O, but also the California State Board of Pharmacy, [and] various payer networks."   In the letter, R&O's counsel stated that Philidor was clearly using R&O for improper purposes because Philidor had been denied a California license.  Specifically, R&O's counsel stated that Philidor:

> targeted Mr. Reitz and R&O back in the fall of 2014 because it needed access to R&O's valuable multi-state pharmacy licenses and payer contracts . . . .  Philidor then created Isolani as the instrumentality to improperly use R&O's NCPDP and NPI numbers to distribute pharmaceuticals in jurisdictions that Philidor would not have access to but for R&O. . . .  Mr. Reitz's worst fears have been realized, as he has obtained irrefutable proof that despite Mr. Davenport's written assurance, Isolani/Philidor continue to use R&O's . . . NPI numbers to bill payors for prescriptions dispensed by Philidor . . .  Mr. Reitz now has concrete evidence that representatives of Isolani/Philidor have signed false and misleading payer audits and falsely represented themselves as officers or employees of R&O . . . to certain payors.

124.    Valeant, evidently realizing that Reitz's investigation of Philidor was endangering the Company's undisclosed business model, then intervened.  In response to the August 31, 2015 letter, Valeant's General Counsel sent letters to Reitz demanding $69 million in payments from R&O.  The letters demonstrate that Valeant was not only a drug manufacturer supplying Philidor, but in fact was at the center of a fraudulent scheme perpetuated in coordination with

44

Philidor.  Following Valeant's intervention, Isolani's counsel sent an email on September 6, 2015, notifying R&O's counsel that Isolani was seeking a protective order against Reitz and an accounting.  R&O's counsel responded to Isolani by stating that Isolani must have known for "at least six weeks that Mr. Reitz was in receipt of checks paid to his company to protect himself and his company from the massive potential/actual civil, regulatory and even potential criminal liability that your clients have exposed him to due to their malfeasance," also noting that R&O's counsel had outlined the illicit conduct in prior correspondence "to which your clients have provided no denials."

125.    R&O, through its counsel, then stated that it had not received any invoice from Valeant for any amount at any point in time, indicating that either Valeant and R&O are "victims of a massive fraud perpetuated by third parties," or that "Valeant is conspiring with other persons or entities to perpetuate a massive fraud against R&O and others."

126.    Reitz and R&O eventually filed suit against Valeant in October 2015.  The resulting disclosures, including the facts set forth above, precipitated a series of events that ultimately revealed the true nature of Defendants' and Philidor's fraudulent arrangements and the network of secret and captive specialty pharmacies.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

127.    As described below, throughout the Relevant Period, Defendants made numerous false and misleading statements regarding Valeant's business model, financial condition and business prospects.  These misrepresentations were made in press releases, SEC disclosure documents, investor conference calls, direct communications with Plaintiffs, and by other means. The materially false and misleading statements had the effect of falsely increasing or maintaining the price of Valeant securities, including the securities purchased by Plaintiffs, and inducing

Plaintiffs' purchase and retention of Valeant stock.  Similarly, the Management Defendants' materially false and misleading statements enabled Valeant to sell its various securities in secondary offerings and private placements at artificially inflated prices, including a primary offering in which Plaintiffs participated.

128.    Throughout the Relevant Period, Valeant and the Management Defendants presented Valeant as a profitable, organically growing, unique, and sustainable business.  The truth was vastly different.  During the Relevant Period, Defendants repeatedly concealed that Valeant:  (i) depended on price gouging to sustain growth and profitability; (ii) sustained price gouging by using deceptive and illegal practices including a secret controlled network of pharmacies; (iii) could not maintain price gouging or more moderate price increases absent their deceptive and illegal practices; (iv) utilized deceptive and illegal practices implemented at Philidor and Valeant's other controlled network of pharmacies to reap the "benefits" of its alternative prescription fulfillment ("AF") program; (v) maintained inadequate compliance and internal control programs; and (vi) that their deceptive and illegal practices exposed Valeant to significant regulatory risk.

129.    More specifically, the statements detailed below omitted or denied the following information, which rendered them materially false and misleading:

130.    **Valeant's Business Model**:   Contrary to Valeant's public statements that its business model relied on "organic growth" primarily sustained by volume increases and cost savings, Valeant's true business model and success relied on price gouging.  Further, Valeant's true business model was dependent on using deceptive and illegal practices in an effort to sustain its price gouging and profitability.  The deceptive and illegal practices also inflated Valeant's already overstated volume growth.  These deceptive and illegal practices included: (i) routing

prescriptions and patients through Valeant's secret network of pharmacies (including Philidor) which it controlled; (ii) altering prescriptions to prevent generic substitutes from being prescribed in favor of Valeant's brand-name drugs; (iii) utilizing its automatic refill program to ensure that patients were provided drugs they neither wanted nor needed; and (iv) submitting claims for payment from insurers and other third-party payors for the filling of prescriptions that the pharmacy seeking payment had not in fact filled.  As a result, Valeant's reported revenues, earnings per share, profitability, and future business prospects were dependent on its ability to conceal its deceptive practices, and did not accurately portray Valeant's financial performance and business prospects.  These facts were all actively concealed by Valeant and its management from Plaintiffs and other Valeant investors.

131.   **Valeant's Relationship with Philidor**:  Philidor was created with the assistance of Valeant and for the very purpose of benefiting Valeant by enabling Valeant to significantly increase the price of Valeant branded drugs despite the availability of lower priced alternatives. Valeant controlled and effectively owned Philidor.  Specifically, Valeant paid $100 million for the Philidor Purchase Option (*i.e.*, the ability to later buy Philidor for $0 at any point during the ten years after the acquisition of the option).  Further, numerous Valeant employees worked at Philidor, and Valeant even consolidated Philidor's results with its own.  When the truth of Valeant's relationship with Philidor began to emerge, Valeant denied the impropriety of the relationship and the extent to which Valeant had relied upon the relationship to sustain growth in the past and anticipated relying on the relationship to increase growth in the future.  These facts were actively concealed by Valeant and its management from Plaintiffs and other Valeant investors.

132. **Improper Revenue Recognition**:  Just before executing the Philidor Purchase Option (whereby Valeant paid $100 million for the option to acquire Philidor to $0), Valeant improperly executed transactions, not in the ordinary course of business, with Philidor so that Valeant could record the revenue from those transactions as soon as the transaction was executed—violating a basic GAAP principle and causing Valeant's revenues, net income, and EPS to be materially misstated and inflated.  In short, Valeant stuffed the Philidor channel, a classic means of engaging in accounting fraud.  Further, after the Philidor Purchase Option, Valeant recognized those same revenues again when Philidor sold the drugs-–thereby double counting revenue and further violating GAAP.  In addition, Valeant failed to disclose Philidor as a material variable interest entities ("VIE"), as require by GAAP.

133. **Failure To Create Adequate Internal Controls:**  Despite repeatedly touting the purported strength and integrity of its internal controls in earnings calls and SEC filings, Valeant's internal controls were severely lacking.   In fact, Valeant has subsequently acknowledged that certain Valeant executives instituted an "improper tone at the top of the organization" and a singled-minded "performance-based environment" in which employees prioritize stock price appreciation and individual compensation over building a sustainable, legal long-term business and complying with applicable laws and contracts.

A.    **Misrepresentations Regarding Valeant's Business Model**

134. Throughout the Relevant Period, Valeant repeatedly misrepresented the nature of its business model.  In particular, Valeant repeatedly represented that it primarily relied on "organic growth" or volume increases, as opposed to price increases, to fuel its revenue growth.  These statements were materially false and misleading because they concealed Valeant's reliance on price increases, sustainable only by virtue of an undisclosed network of controlled

pharmacies, to support its revenue increases.   Investors, including Plaintiffs, considered the representation that Valeant was relying on volume-based growth to be material when making their investment decision.

135.    The Relevant Period begins on January 4, 2013 when, on a conference call with investors to discuss Valeant's 2013 financial guidance, Pearson and Schiller made numerous material misrepresentations regarding Valeant's business model, its organic growth, and the sustainability of the Company's growth.   For example, Pearson stated:

> [2012] was another very strong year for Valeant.  From a top line perspective we added over $1 billion in revenue in 2012 . . . .   On the bottom line, we delivered cash EPS growth of greater than 50% as compared to 2011, demonstrating once again the ***sustainability of our business model***. Our businesses continued to deliver strong organic growth, and we expect full year 2012 to have same-store sales, organic growth of approximately 8%, and pro forma organic growth of approximately 10%.

136.    On the same call, Pearson responded to an analyst's question regarding projected organic growth by stating that "[r]eally the only big – the only two big changes [] are ***Neuro, which we expect as we mentioned previously, to have positive organic growth this year***, and dermatology, which will probably fall more in line with we've experienced as a Company."

137.    On February 28, 2013, Pearson and Schiller hosted a conference call to discuss Valeant's 4Q2012 Financial Results.   In his opening remarks, Pearson represented that ***"[o]rganic growth continued to be strong for both the quarter and the year.   We're particularly pleased to report a return to positive growth for our Neuro and Other business after six quarters of decline***.  As we mentioned earlier this year, we expect US Neuro and Other business to continue to grow throughout [] 2013."

138.    The statements above in ¶¶ 135-137 were materially false and misleading because the Company and its management failed to disclose that Valeant had implemented the Orphan Drug Strategy, which, as discussed above, would rely on increasing revenues by price gouging

rather than sustainable volume growth.  Further, Valeant and its management failed to disclose that to effectuate its price gouging scheme it was relying on the deceptive and illegal practices described above including in ¶¶ 130-131.

139.    Additionally, on August 7, 2013, Pearson and Schiller conducted a conference call with analysts for review of Valeant's 2Q2013 Financial Results.  On that call, an analyst asked Pearson whether Valeant should adopt "more of a mainstream strategy" so that Valeant could "become one of the world's largest healthcare companies." Pearson rejected the idea, stating: "We think [Valeant] can be successful by not doing what large pharma companies are doing.  And that's been our strategy, that will continue to be our strategy."

140.    When investors on that same call questioned whether Valeant's atypical business strategy increased compliance risks, Pearson strongly denied the existence of any such risks: "In terms of compliance, compliance is obviously very, very important for us . . . . when people come back and they rate our Company on our most positive attributes and our most negative attributes, and at the very top of the list of the positive is ethical . . . . that's our most important thing that we're – that comes before everything."

141.    The statements in ¶¶ 139-140 were materially false and misleading when made because, contrary to Pearson's representation, the Company's atypical business strategy, which required maintaining or increasing volume while simultaneously raising prices, was unsustainable absent the illegal practices described above including in ¶¶ 130-131, such as Philidor that create massive compliance risks.

142.    On October 31, 2013, Valeant released its 3Q2013 Financial Results.  Once again, Valeant emphasized its significant growth, stating that "Valeant's Developed Markets revenue was $1.14 billion, up 77% as compared to the third quarter of 2012" and that "[t]he growth in

the Developed Markets was driven by continued improvement in many of our Dermatology prescription brands, our aesthetics and oral health portfolios, our orphan drugs products and CeraVe."

143.    On January 7, 2014, Pearson and Schiller hosted a conference call with investors and analysts to discuss Valeant's 2013 performance.  During the call, Pearson stressed Valeant's supposed strong organic growth.  Specifically, Pearson stated:

> If we compare Valeant's performance in 2013 to the company's average performance from 2009 through 2012, you can see a continuing track record of consistent strong performance in terms of growth in revenues, earnings, and most important, returns to all of you, our shareholders.  ***This is a result of achieving strong organic growth in a fiscally responsible manner for the products that we already own, coupled with a consistent track record of buying durable assets in a very disciplined manner and over-achieving in terms of improving growth rates and extracting cost synergies***.

144.    The statements in ¶¶ 142-143 above were materially false and misleading when made because Valeant's revenue growth was not the product of "organic growth" nor was it achieved in a "fiscally responsible manner."  Instead, the growth was based on a price-gouging strategy implemented by Valeant's executives and was maintained through the use of the deceptive and illegal and illegal practices described above including in ¶¶ 130-131.  Further, Defendants failed to disclose that this type of revenue growth was unsustainable and subjected Valeant to significant business and regulatory risks.

145.    On February 27, 2014, Valeant released a press statement that detailed its 2013 financial results.   The press statement asserted that volume increases, specifically in dermatological products, drove the revenue growth:  "The growth in the Developed Markets was driven by continued growth in certain dermatology prescription brands, our aesthetics, consumer, neurology and other oral health portfolios, and our Canadian business unit."

146.    With the release of 2013 financial results on February 27, 2014, Pearson and Schiller conducted a conference call with investors and analysts to address Valeant's financial results from the fourth quarter of 2013, and the financial results from the previous year more broadly.    Pearson addressed Valeant's growth in the "Neurology and Other" category, explaining: "When we acquired Medicis, I think we mentioned that we picked up a couple of orphan drugs, which they weren't marketing optimally.   And so we have been able to take advantage of that and grow those products."

147.    On February 28, 2014, Valeant filed its annual report on Form 10-K for the year ended December 31, 2013 ("2013 10-K").  The 2013 10-K was signed by both Pearson and Schiller.  The 2013 10-K included several statements attributing Valeant's growth to a supposed low-risk and legitimate business model.  Specifically, Valeant's 2013 10-K stated:

> Our low risk research and development model is one key element to this business strategy.  It will allow us to progress ***certain development programs to drive future commercial growth, while minimizing our research and development expense***.  This is achieved in four ways:  ***focusing our efforts on niche therapeutic areas***…acquiring dossiers and registrations for branded generic products, which require limited manufacturing start-up and development activities.

148.    The statements in ¶¶ 145-147 above were materially false and misleading because Valeant's supposed "low risk" business model could not sustainably "drive future commercial growth."  Instead, Valeant relied on steep price increases, as well as the deceptive and illegal practices described above including in ¶¶ 130-131.  When Valeant acquired Medicis, the increased revenue was not a result of "marketing optimally," but instead was the result of massive price increases sustained through deceptive measures.  Moreover, Valeant's growth in developed markets was due only to unsustainable price gouging as detailed above including in ¶ 141.

149.    Valeant released its financial results from the first quarter of 2014 on May 8, 2014 ("1Q2014 Financial Results").  The Company's 1Q2014 Financial Results explained Valeant's consistent revenue growth, representing "an increase of 77% over the prior year," as driven by "[p]ositive organic growth in the U.S." and "demonstrat[ing] the strong, durable nature of [Valeant's] diversified business model."

150.    Valeant filed its Form 10-Q quarterly report for 2014, covering the quarter that ended March 31, 2014, on May 9, 2014 ("1Q2014 10-Q").  Pearson and Schiller signed the 1Q-2014.  Once again, Valeant attributed its growth to a purportedly "low risk" business model. Specifically, the 1Q-2014 stated "[t]he growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense."

151.    The statements in ¶¶ 149-150 above were false and misleading when made because Valeant's supposed "low risk" business model could not sustainably "drive future commercial growth."  Instead, Valeant relied on steep price increases, as well as the deceptive and illegal practices described above including in ¶¶ 130-131.  Moreover, Valeant's business model was neither "strong" nor "durable," as it relied upon unsustainable price gouging.

152.    On April 22, 2014, Valeant released a press statement noting, "it has submitted a merger proposal to the Board of Directors of Allergan under which each Allergan share would be exchanged for $48.30 in cash and 0.83 shares of Valeant common stock."  This hostile takeover attempt to acquire Allergan valued the acquisition target at roughly $46 billion.  The April 22, 2014 Valeant press release also disclosed that the hostile takeover was supported by Bill Ackman and Pershing Square, Ackman's hedge fund, which was Allergan's largest

shareholder, holding 9.7% of Allergan's outstanding stock prior to the announcement of Valeant's takeover.

153.     In response to Valeant's hostile tender offer, Allergan's Board of Directors issued a press release on May 12, 2014 rejecting Valeant's bid.  The Allergan Board of Directors stated in the press release that the Board "believes that the Valeant business model is not sustainable." During a conference call on the same day, Allergan's Chairman and CEO also asserted that investors should "very carefully" check the revenue numbers "actually achieved" by Valeant's new product launches and "dig in [to] what are the prices increases behind those very low [organic growth] numbers because there are some eye-popping increases of price."

154.     In response, Valeant released a statement to the press on May 20, 2014, to announce that Valeant would host an investor meeting and webcast the following week "to respond to assertions Allergan has made that the Valeant model is not sustainable" and to "provide transparency into Valeant's historic, current, and future operating performance and to refute Allergan's allegations through a thoughtful and fact-based presentation."

155.     One week later, on May 27, 2014, Allergan filed a Form 8-K with the SEC. Attached to the Form 8-K was a slide presentation addressing "Certain Potential Business Risks and Issues with Valeant Pharmaceuticals International, Inc."   Allergan's slide presentation voiced concern about "Valeant's low organic sales growth," and stated that the organic sales growth Valeant had enjoyed was "driven mostly by price increases" and was therefore a function of "unsustainable price increases – not volume" increases.

156.     A day after Allergan publicly released the slide presentation through the Form 8-K SEC filing, Valeant released a press statement to announce a substantial increase in its merger offer for Allergan, valuing the acquisition target at roughly $49 billion.

157.    Also on May 28, 2014, Valeant's management, specifically Pearson, Schiller, and Jorn, conducted an investor meeting and conference call to refute Allergan's allegations.   In refuting Allergan's allegations, Pearson stated that Valeant would provide investors with "a much deeper understanding of our operating model and why we believe it is sustainable for many years to come," and demonstrate that "*when [Valeant] buy[s] a platform asset, we have either maintained the growth or in most cases, we have accelerated the growth*." Jorn noted that Valeant had launched "additional access programs so that patients can get the medicines that their physician prescribes for them," and that "in 2014 we have returned the business to growth."   Specifically, Jorn emphasized the sales volume growth of Valeant's dermatology product lines, including Solodyn and Acanya acne medications that Valeant funneled through the AF program later revealed as the Philidor fraud:

> *We have returned many of our core promoted brands to growth*.  We have new managed care capabilities, *we have launched additional access programs so that patients can get the medicines that their physician prescribes for them*.
>
> * * *
>
> So what type of growth are we talking about?  *It is important that we recognize that we have been able in 2014 to turn around our largest brand, Solodyn*.  We entered the year with 49% share, branded share of the dermatology space.  We are now up at 51% and as you can see, our competitors have issues.  Doryx has been declining and Monodox is flat.  We are very proud of this accomplishment.
> Further, *we continue to maintain greater than 80% share of the branded Clindamycin/BPO market with our brand, Acanya*.  Despite loss in some major accounts in managed care, we have been able to achieve this.

158.    At this May 28, 2014, investor meeting and conference call, Pearson also misrepresented the role of price increases in Valeant's revenue growth.  Specifically, Pearson stated that Valeant was "*limited" to a "9%" price increase for its dermatological products when addressing a question about industry data demonstrating 15% price increases while Pearson presented a slide that showed only a 1% price increase in Valeant's products*.

Pearson explained that Valeant is "limited" because "in the US with our managed care contracts, *I think the maximum price increase we can take a year is 9% across dermatology, across ophthalmology, etc.. So that is what limits*. It is managed care in the United States." Specifically, Pearson summarized Valeant's refutation of Allergan's claims by stating Valeant "showed that when we went through the 10 points that Allergan asserted which was based on just looking at conventional sources and it is just not applicable to the way we run our business. And I would argue it would be less and less applicable to most pharma companies because the role of specialty pharmacies, the role of managed care is changing the landscape…"

159.    Also on May 28, 2014, Pearson addressed the audience of the Sanford C. Bernstein Strategic Decisions Conferences on Valeant's behalf.   At the conference, Pearson made the following representations regarding the role of price and volume in Valeant's revenue growth: (i) Pearson stated that "*we focus on volume growth, and the <u>vast majority</u> of our growth on a global basis – and we went through some of that this morning – is volume*" because "the only country in the world [where] you can really sustainably increase pricing is the United States" but even there "you're governed by managed care contracts" that limit price increasing to "9% a year"; (ii) Pearson stated that Valeant did not provide detailed disclosures that would enable investors to determine product-specific growth because Valeant is "*more like a generics company in terms of the amount of revenue we get per product*"; and, (iii) Pearson stated that other pharmaceutical companies could not copy Valeant's model because "it's not a very easy model to replicate.   It's very simple.   We tell you exactly what we're doing.   But it's very hard.   It requires working really, really hard, sweating the details every day."

160.    Pearson and Schiller conducted another conference call with investors and analysts on June 17, 2014, "to refute recent misleading assertions made by Allergan."  On that call, Pearson stated that:

> I am pleased to update all of you that our business is continuing to perform well.  I find it very odd that Allergan continues to suggest that our Q2 and in particular our Q3 results will demonstrate weakness….***In short, our business is strong and I can assure you our operating model is both durable and sustainable***.
>
> In Allergan's investor presentation dated June 10, 2014, they asserted that Valeant has experienced volume decreases in 11 of its top 15 worldwide pharmaceutical products.
>
> First, the products listed in the presentation are not Valeant's top 15 products by revenue.  Only 6 of the products listed are in Valeant's top 15 products.  ***The presentation also claimed that most of our products are not growing, when in fact, 13 of our top 15 products are growing and 9 of the top 15 are growing by volume, not just price***.

161.    On that same call, Pearson again denied the centrality of unsustainable price increases to Valeant's business model, saying that "a lot of assertions are that [Valeant's organic growth]'s all about price, but it's not."  Pearson even stated that Valeant will "probably …report what the volume and price parts of our organic growth are…because I think ***volume is a much larger piece of our organic growth than most people would assume it is***."  Pearson also claimed on the June 17, 2014 conference call that all of "[Valeant's] promoted products in dermatology are growing . . ."

162.    The statements in ¶¶ 154, 157-161 above were materially false and misleading when made because the "vast majority" of Valeant's growth was not based on volume, as evidenced by Pearson's admission in Senate testimony that price drove revenue growth more than volume in every quarter except one between January 1, 2013 and September 30, 2015.  Moreover, Valeant was not "more like a generics company in terms of the amount of revenue [they] get per product," when the Company employed a price-gouging strategy to maximize revenue attributable to price, not volume.  This unsustainable strategy ensured Valeant's

operating model was neither "durable" nor "sustainable." Further, the statements detailing Valeant's acceleration of growth for core promoted brands, including that "9 of the top 15" of Valeant's products are growing by volume," failed to disclose that Valeant's growth was based on a specific price-gouging strategy implemented by Valeant's executives and the use of the deceptive and illegal practices described above including in ¶¶ 130-131.  Moreover, Pearson's claim that Valeant was limited to a 9% increase was materially false and misleading when made because Valeant increased the price of several drugs by many multiples of 9%.  For example, in 2013 and 2014, Valeant increased the price of Cuprimine by 224% and 158% respectively. Finally, Valeant did not implement "additional access programs so that patients can get the medicines that their physician prescribes for them," but instead to channel patients into Valeant's secretly controlled distribution network so that prescriptions would not go through retail pharmacies unlikely to fill Valeant's exorbitantly priced prescriptions.

163.    On July 31, 2014, Valeant issued a press release announcing its 2Q2014 Financial Results.  Valeant reported a massive increase in total, quarterly revenue of 86% from the previous year to $2.0 billion.  The press release also quoted Pearson as stating:  "Valeant once again delivered strong quarterly results and, ***as expected, organic growth has accelerated from the first quarter***.  As we look across the entire business, I have never been more confident about the growth trajectory across the entire company."

164.    On August 1, 2014, Valeant filed its quarterly report on Form 10-Q for 2Q2014 ("2Q2014 10-Q") signed by Pearson and Schiller.  The 2Q2014 10-Q contained the following representation addressing Valeant's purportedly lower risk strategy:  "***The growth of our business is further augmented through our lower risk research and development model***,

which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense."

165.    On August 19, 2014, Valeant filed a clarification with the SEC of "assertions made about Valeant's business," purportedly to refute Allergan's accusations made in an August 5, 2014 press release and further detailed in an August 15, 2014 *Financial Times* article. In its defense, Valeant stated that its "Promoted Pharmaceutical brands (i.e. Dermatology, Dental) are growing from a combination of price and volume" and that Valeant has "no knowledge of any exposures or issues other than those disclosed or for which reserves have been established."

166.    The following month, on September 11, 2014, Valeant filed with the SEC a letter from Pearson to Valeant's employees.  The filed letter again responded to Allergan's "attack[]" on Valeant's "business model and [] track record of organic growth."   Pearson's letter emphasized Valeant's business successes, including the "return to growth of our U.S. Prescription Dermatology business, including the Obagi Medical business, coupled with the early, but exciting launch successes of Jublia and Luzu" and "***continued tremendous growth in our U.S. Neuro & Other*** and OraPharma businesses."

167.    Valeant released a press statement on October 20, 2014, to announce financial results from the third quarter of 2014 ("3Q2014 Financial Results").  The release stated that Valeant's net income for the third quarter of 2014 was $275.4 million, and that "[t]otal same store sales organic growth was 19%, including impact from generics."

168.    On October 20, 2014, Pearson, Schiller and Kellen conducted a conference call with investors and analysts on behalf of Valeant to review the previous quarter's financial

results.  Pearson claimed that improved marketing and increased dermatology sales volume was

the source of Valeant's growth in earnings:

> **Revenues for our dermatology business,** including the recent Precision acquisition, **grew 33% quarter over quarter.   The turnaround of our dermatology business is continuing.   New leadership has brought stability to the sales force and has led to innovative new marketing approaches that are working well.   This has resulted in market share and revenue gains across the portfolio, including launch products.**
>
> **Elidel, Acanya, Zyclara, and Ziana have all gained market share since the beginning of 2014.   Elidel has had an exceptional year, increasing market share from 45% to 52%** and has overtaken Protopic as the leader in this category.
>
> **After years of declines Solodyn market share has stabilized.   On the new products side, both Jublia and Luzu quickly gained share, with Jublia reaching 7% script share of the total onychomycosis market, both branded and generics.  And Luzu accelerated its script share to 13% of the branded topical antifungal market.   In addition, quarter-over-quarter result growth for all of our dermatology promoted brands was over 40%.**

169.    When Allergan filed with the SEC a same-day response to Valeant's October 20,

2014 Financial Results, Valeant filed a rebuttal entitled "October 20th rebuttal items," in which

Valeant refuted Allergan's claim that "price is a larger drive[r] of growth for select Valeant U.S.

pharmaceutical businesses."  Valeant refuted this claim with the following statements: (i)

"**Overall price/volume for the Valeant business was ~50% volume and ~50% price**"; (ii) "**Like**

**all PhRMA companies, including Allergan, our managed care contracts restrict our price**

**increases each year, and many of our managed care contracts restrict price increases to less**

**than 10% net price increase per year**"; and, (iii), "Gross price increases could be seen as higher

but do not contribute to our reported net sales growth."

170.    On October 24, 2014, Valeant filed its quarterly report on Form 10-Q for the third

quarter of 2014, ending September 30, 2014 ("3Q2014 10-Q").  Pearson and Schiller signed the

10-Q, which reported quarterly revenue of $2.056 billion, net income of $275.4 million, and

GAAP EPS of $0.81.  As with previous 10-Qs, the 3Q14 10-Q stated:  "The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.  We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value."

171.    The specific statements in ¶¶ 163-170 above about Valeant's organic growth rate and the role of volume in that growth rate, business model, and purportedly "low risk" model were materially false and misleading when made because Valeant's revenue growth was not the product of "organic growth" nor was it achieved in a "fiscally responsible manner."  Instead, the growth was based on a specific price-gouging strategy implemented by Valeant's executives and through the use of the deceptive and illegal and illegal practices described above including in ¶¶ 130-131.  Further, Valeant and its management failed to disclose that this type of revenue growth was unsustainable and subjected Valeant to significant business and regulatory risks.  Additionally, Valeant did in fact rely upon extreme price increases that were far beyond industry norms not "[l]ike all PhRMA companies," and those price increases were not capped at 10% as Valeant and its management represented.  Accordingly, "[o]verall price/volume for the Valeant business was" not, as Valeant claimed, "~50% volume and ~50% price," as evidenced by Valeant's later admission that price drove growth in almost all quarters during the Relevant Period.  Moreover, these extraordinary price increases carried significant undisclosed regulatory and business risks, as explained above.

172.    On January 8, 2015, Pearson, Schiller, and Kellen conducted an earnings guidance call with investors and analysts to address the Company's expectations for its financial

performance in 2015, and the business strategies that the Company would employ.  Pearson stated that Valeant "demonstrated tremendous organic growth improvement in 2014" and concluded by noting that "all the successes from 2014 and our prospects for 2015 and beyond continue to validate that Valeant's business model is both sustainable and value creating.  Our robust organic growth profile is evidenced by our ability to deliver double-digit organic growth, not only in 2014 and 2015 but strong organic growth for the foreseeable future."

173.    On February 22, 2015, Valeant released a press statement to announce its financial results from the fourth quarter of 2014 ("4Q2014 Financial Results") and financial results for the full year of 2014.  The press release announced "Total Same Store sales organic growth" of 16% for the fourth quarter of 2014, and 13% for the 2014 fiscal year.  Further, the press release quoted Pearson as stating that Valeant's strategy "is paying off for all of our stakeholders" through "[o]utstanding growth in the U.S., most notably [in] dermatology." The release also reported Valeant's quarterly revenue at "$2.3 billion," "GAAP EPS [of] $1.56, [and] Cash EPS [of] $2.58."   Reporting for the entirety of 2014, the press release announced Valeant's revenue at "$8.3 billion . . .  GAAP EPS [of] $2.67, [and] Cash EPS [of] $8.34, (excluding Allergan gain)."   The press release also identified net income for the fourth quarter of 2014 amounting to $534.9 million and net income for the entirety of 2014 amounting to $913.5 million.

174.    A day later, on February 23, 2015, Person and Schiller hosted a conference call to address the financial numbers announced on February 22, 2015.  Schiller emphasized that Valeant's "revenues for our dermatology business were very strong and increased 70% year-over-year."  Additionally, Schiller represented that:

> *The outstanding work of our sales team's implementation of innovative marketing*
> *approaches, great leadership, a portfolio of great products, and our four new launch*

*products have contributed to the turnaround and the outstanding results in our dermatology business in Q4 and 2014.*

*Core products such as Zyclara, Elidel, and the RAM franchise continued their strong growth and Solodyn grew in Q4 and grew 5% for all of 2014, after a tough year in 2013.*

*Jublia continues its rapid growth trajectory, and reported more than 20,000 weekly scripts for the last reported weekly sales report.* This yields an annualized run rate of greater than $250 million for the product.

175.    The statements in ¶¶ 172-174 above attributing Valeant's growth to factors other than dramatic price increases was materially false and misleading when made because the statements failed to disclose that, in order to promote growth, Valeant relied on a price-gouging strategy and the use of deceptive and illegal practices described above including in ¶¶ 130-131. Accordingly, Valeant's business model was neither "sustainable," as the price increases required the deceptive and illegal practices described above, nor "value creating," as revelations about the truth of Valeant's business model resulted in significant declines in the value of the Company's shares.   Moreover, Valeant's "outstanding results" in the dermatology business were not a result of "innovative marketing approaches, great leadership, a portfolio of great products" or the Company's "four new launch products," but rather a function of the Company's deceptive and illegal practices described above including in ¶¶ 130-131.  Moreover, these extraordinary price increases carried significant undisclosed regulatory and business risks, and were ultimately an unsustainable source of growth, as they required the implementation of illegal and unsustainable practices described above including in ¶¶ 130-131.

176.    On March 16, 2015, Valeant announced a $1.45 billion public stock offering of 7.3 million shares of common stock at a price of $199 per shares (the "Stock Offering").  The proceeds of the Stock Offering were used to fund the acquisition of Salix Pharmaceuticals.  The

Stock Offering was conducted pursuant to a Registration Statement and Prospectus Supplement (together, the "Offering Materials").

177.    The Offering Materials represented that:

(a) "The growth of" Valeant's "business is further augmented through [the Company's] lower-risk, output-focused research and development model, which allows [Valeant] to advance certain development programs to drive future revenue growth," which allowed it to "maximize both the growth rate and profitability of the Company" and "to enhance shareholder value."

(b) Numerous Valeant segments, and in particular Valeant's dermatology segment, were "attractive markets" because they were "high-growth businesses" with "***sustainable organic growth***" where the "healthcare professional or patient is still the primary decision maker," and similarly stated that its business strategy "ensure[d] decisions are made close to the customer" and that there was "significant opportunity to create value through application of the Valeant model."

(c) That Valeant faces risk from "declines in the pricing and sales volume of certain of our products (or Salix's products) that are distributed or marketed by third parties, over which we have no or limited control.

178.    The statements in ¶¶ 176-177 above regarding Valeant's organic growth rate, business model, and purportedly "low risk" model were materially false and misleading when made because Valeant's revenue growth was not the product of "sustainable organic growth" nor was  there "significant opportunity to create value through the application of the Valeant model." Moreover, Valeant did control third parties who distributed and marketed Valeant's products, as demonstrated by the Company's relationship with Philidor described including in ¶¶ 131, 205-

206.    Instead, the growth was based on a specific price-gouging strategy implemented by Valeant's executives and through the use of the deceptive and illegal and illegal practices described above including in ¶¶ 130-131.

179.    On April 29, 2015, Valeant released a press statement announcing its financial results for the first quarter of 2015 ("1Q2015 Financial Results").  This press statement also announced increased guidance for the full year of 2015.  Additionally, the release reported that "Same Store Sales Organic Growth was 15% driven by…Growth from launch brands, including BioTrue Multipurpose Solution, BioTrue ONEday Contact Lens, Jublia, Luzu, and Ultra Contact Lens, [and] Double digit growth in U.S. businesses such as Contact Lens, Dermatology, Neurology and Other, Obagi, and Oral Health .. ."

180.    On that same day, Pearson, Schiller and Kellen conducted a conference call to address investors' and analysts' questions regarding Valeant's 1Q2015 Financial Results. During that call, Pearson represented that "Our US dermatology business had an outstanding quarter.  Dermatology revenue grew 38% year on year and its script growth grew 37% year on year.  Jublia scripts grew 87% in Q1 versus Q4 of last year."  Additionally, Pearson responded to an analysts' question about price versus volume growth by stating that "in terms of price/volume, *actually volume was greater than price in terms of our growth* outside the United States.  It's all volume . . .  And in the US, it's shifting more to volume than price. And we expect that to continue with our launch brands.  A lot of our prices is, for most of our products, are negotiating it with managed care.  And there's only a limited amount of price that we can take . . . .  So, it's primarily volume.  And we expect that to continue."

181.    The following day, April 30, 2015, Valeant filed with the SEC its quarterly report on Form 10-Q with the SEC for the first quarter of 2015, ending March 31, 2015 ("1Q2015 10-

Q").  The 1Q2015 10-Q addressed Valeant's "lower risk" business strategy in the same manner as Valeant's previous 10-Qs, stating:  "The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.  We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value."

182.    On May 19, 2015, Valeant held its 2015 annual shareholder meeting.  At that meeting, Pearson addressed Valeant's investors and made the following misrepresentations about Valeant's business strategy, the source of Valeant's revenue growth, Valeant's pricing model, and Valeant's stock price:  (i) "we have a differentiated R&D model that has and will continue to deliver more innovative products to our customers at a lower cost than our competitors" as Valeant has "delivered three consecutive strong quarters of organic growth, 19% and 16% and 15% respectively"; and, (ii) Valeant possessed a "unique executive compensation system tied to generating disproportionate returns for our shareholders."

183.    On May 21, 2015, Pearson attended an RBC Capital Markets, LLC ("RBC") Investor Meeting on behalf of Valeant and issued the following representations about the Company, including that:

(a) due to managed care contracts Valeant was "***contractually not allowed to raise prices beyond,***" this time, an average of "***5%***" in the United States, including in Valeant's dermatology product line;

(b) in the Neurology and Other product line Valeant had "the most ability to raise price and play with price," as raising prices "is I believe not, at least from [an investor's] standpoint a bad thing," because orphan products provided Valeant with pricing

flexibility although Valeant's base plan called only for 5% increases, which Valeant exceeded "if we can take advantage of – during times we've had significant price increases in acquisitions." Pearson claimed that Valeant raised prices by acquiring drugs from companies "that did not price their product the right way";

(c) Valeant raised prices for Isuprel and Nitropress because Marathon, the entity Valeant acquired to add Isuprel and Nitropress to the Company's portfolio, left money on "the table." Valeant explained that it raised prices only "because the drugs were mispriced vs. comparative products" and that price increases "can create lot of value for shareholders"; and

(d) "*organic growth is more volume than price and will continue to be*."

184.    Roughly two months later, on July 23, 2015, Valeant released a press statement to announce its financial results for the second quarter of 2015 ("2Q2015 Financial Results"). Valeant also used this announcement to increase the Company's full year 2015 guidance and report that "Same Store Sales Organic Growth was 19%, driven by:  U.S. businesses, driven by the strength of dermatology, contact lenses, dental and Obagi." That same press release quoted Pearson stating:  "We once again exceeded our guidance and delivered our fourth consecutive quarter of greater than 15% organic growth.  Our strong second quarter results were driven by outperformance in our U.S. businesses."

185.    Pearson, Rosiello and Kellen also hosted a conference call to address investors' and analysts' questions about the 2Q2015 Financial Results on July 23, 2015.  Pearson opened the conference call by stating:

> *We have now delivered four consecutive quarters of more than 15% same-store organic growth.  Strong performance throughout our businesses resulted in both our top and bottom line exceeding the Q2 guidance that we provided on our last call.*

* * *

*Turning to organic growth, our overall same-store total company organic growth was 19% for the quarter.  The exceptional growth of our US businesses driven by the strength of dermatology,* contact lenses, dental and Obagi was complimented by many of our emerging markets including China, Middle East/North Africa, Russia and South Korea.

* * *

*Jublia is now our second largest product with annual run-rates sales of approximately $450 million*…

*Our US dermatology business had another excellent quarter* with our launch brands leading the way.  *Both launch and core brands contributed to the dermatology revenue growth of 55% year-on-year.  Jublia scripts grew 37% in Q2 versus Q1 . . .*

186.    Also on the July 23, 2015 conference call, Pearson responded to a question about

the "extent to which [Valeant] envision[s] more pricing power" with the following statement:

I think most pharma companies that I'm aware of, as the product gets into the last stages of their life, like Glumetza -- we're going to lose Glumetza within six months -- often price increases are taken at the end.  *So that was just consistent with what most companies do*.

*Our view on pricing* -- across most of our portfolio, we do not take prices. Outside the US, there's like zero price.  I think, David, as we get more and more into segments like contact lenses and consumer products and other devices, we're not able to take price.  So we're opportunistic when it comes to price.  *But our base strategy is, how do we grow organically through volume, which is -- I think this quarter, we once again exhibited our ability to do so*.

187.    Shortly thereafter, on July 28, 2015, Valeant filed its quarterly report on Form 10-

Q with the SEC for the second quarter of 2015, which ended June 30 of that year ("2Q2015 10-

Q").  Pearson and Rosiello signed the 2Q2015 10-Q.  The 2Q2015 10-Q reported Valeant's

revenues for the previous six months of 2015 as "$4.923 billion." The 2Q2015 10-Q also stated:

*As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions* in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of

68

gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. . . . ***Provisions as a percentage of gross sales increased to 32% and 33% for the second quarter and first half of 2015, respectively, compared with 27% and 26% in the second quarter and first half of 2014. The increase was driven by (i) higher provisions for rebates, chargebacks, and returns, including managed care rebates for Jublia® and the co-pay assistance programs for launch products including Jublia®, Onexton®, and Retin-A Micro® Microsphere 0.08% ("RAM 0.08%") . . .***

188.    The 2Q2015 10-Q also highlighted Valeant's purportedly "lower risk" business strategy stating: "The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.  We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value."

189.    The statements in ¶¶ 179-188 above highlighting Valeant's supposed volume increases, minimizing the impact that price increases played in Valeant's growth, representing that Valeant was contractually unable to raise prices more than 5%, and that Valeant had did not plan to implement further price increases were materially false when made because volume increases made up a small portion of Valeant's revenue growth, price increases made up a significant majority of Valeant's revenue growth.  In fact, Valeant relied on double and triple-digit percentage price increases throughout the Relevant Period, contrary to its claims that "we do not take [increase] prices," and that Valeant's "base strategy" was not "how do we grow organically through volume," but rather the Company's business model was heavily dependent on steep price increases.  Moreover, in response to Pearson's statements regarding growth, Schiller emailed him on May 21, 2015 with the subject "price/volume," where he informed Pearson that his statement regarding volume growth was false.  Specifically, Schiller wrote

"[l]ast night, one of the investors asked about price [versus] volume for Q1. ***Excluding [M]arathon, price represented about 60% of our growth. If you include [M]arathon, price represented about 80%*** [of our growth]." Pearson did not retract or correct his false and misleading statements about price and volume. Five days later, on May 26, 2015, an analyst with RBC Capital Markets, LLC reported that a key takeaway from the meetings with Valeant management and Pearson in particular, was "volume not price is fueling organic growth." Additionally, Valeant was not "deliver[ing] more innovative products to [its] customers at a lower cost than our competitors," when the price increases Valeant employed were far beyond the industry norm, as embodied by its acquisition strategy targeting all products for which Valeant executives believed they could raise prices. When describing the growth of dermatology scripts, including Jublia, Valeant and Pearson failed to disclose that this growth was only possible because through the use of the deceptive and illegal practices described above including in ¶¶ 130-131. Moreover, Valeant in fact did "plan" for price increases in acquisitions, as the Company's entire business model was structured around, in part, acquiring pharmaceutical products for which it could raises prices.

### B.   Misrepresentations Concerning Philidor

190. Valeant and its management created Philidor and a network of secret pharmacies controlled by Valeant in order to support the price increases and price gouging that Valeant relied on to support its growth (reliance that, as described above, the Company hid from investors including Plaintiffs). Philidor and the network of secret pharmacies controlled by Valeant engaged in deceitful and illegal conduct that resulted in patients receiving Valeant exorbitantly priced drugs rather than cheaper equivalents. Further, Philidor and the network of secret pharmacies controlled by Valeant was created in order to circumvent other cost-controlling systems utilized by PBMs and other third-party payors. In order to accomplish their

fraudulent program, it was critical that Valeant and its management conceal Philidor's ties to Valeant.  Thus, Valeant and its management issued numerous false and misleading statements during the Relevant Period and violated relevant accounting rules in their public filings.

### (a)  Defendants' Incomplete and Misleading Description of The Alternative Fulfillment Program

191.    Throughout the Relevant Period, Defendants chose to speak on the operations and supposed benefits of the alternative fulfillment ("AF") Program.  Contrary to repeated representations, Valeant's AF Program was not designed to help patients.  In fact, the program served to conceal the fraudulent scheme that Valeant and its management were running through Philidor and other Valeant-controlled pharmacies.  Defendants repeatedly failed to disclose that the AF Program was unsustainable, relied on deceitful and illegal conduct by Valeant, Philidor, and the network of secret Valeant-controlled pharmacies, and that such conduct was necessary to maintain or increase sales volume at the inflated prices Valeant had set.  Further, Defendants failed to disclose that the deceitful and illegal conduct could subject Valeant to significant regulatory and business risks.

192.    On January 4, 2013, Pearson and Schiller hosted a conference call with investors and analysts to discuss Valeant's financial guidance for 2013.  During the conference call, they made several statements concerning the supposed benefits of Valeant's new AF program.

193.    Specifically, when asked about pricing on Solodyn, a dermatological product Valeant had recently acquired in the Medicis transaction, Pearson stated: "In terms of Solodyn, we're not assuming we're making any kind of major price increases in that – in terms of the end consumer.  Through the AF programs, it will allow us our average price internally to go up, because of the way the system works."

194.    Pearson further discussed the potential expansion of the AF program, stating:

[T]he more we understand about it the more excited we get about it, quite frankly because it's not – it's not just a singular sort of initiative that there's a whole evolution being planned in terms of the Stage I, Stage II, Stage III.  And there's some exciting opportunities there that we're not going to give specifics of and also as we had hoped, we think it will apply to more than just Solodyn.  Ziana is actually also being-already Medicis has Ziana being used in the AF program, and we see application for a number of our dermatology products and potentially neurology products in the US.

195.    Later during the call, an analyst asked Pearson "why are you so encouraged by the AF strategy when net sales have been heading in the wrong direction for the one case study we can observe, Solodyn?"  Pearson replied that the AF channel had "incentives" that would enable Valeant to get paid for drugs that were being rejected by retail pharmacies.  Specifically, while discussing the AF program in the context of pharmaceutical products in Medicis'—one of Valeant's 2012 acquisitions—portfolio, Pearson stated:

Again, Medicis is still learning and we're just still learning about what we can do with these AF scripts.  So when someone actually makes the call or sends the script to the alternate channel, what can be done with that.  And a number of things can be done.  One is you can continue to try to adjudicate the claim just because the claim was, *just because the script was rejected at retail pharmacy, does not mean that eventually you can't get the payer to actually pay for it*.  If you think about the retail pharmacist, the retail pharmacist doesn't have a huge incentive to work hard to get that script reimbursed.  In fact you might argue they have the opposite incentive, because they get paid more if they convert it to a generic.

*So, all of a sudden if it goes to a different channel where the incentives are in place to actually try to get that claim adjudicated, then so there's a significant amount of that volume that gets rejected by retail that you can then adjudicate, and actually get fully paid and, in fact, since its going through a channel that doesn't include the distributor or the retailer, at a higher margin.*

***

So, I think through as we continue to learn about this AF program, there are some things that we can do that might actually change the direction in terms of so rather than see a decline in Solodyn, if we're really successful we can begin starting to grow that product again.  So it's things like that that sort of start giving us some real optimism in terms of what you can do, and how this program can sort of turn out to a much better case than assuming you didn't have the AF program.

72

196.    The statements in ¶¶ 191-195 above highlighting Valeant's AF program were materially false and misleading when made.  Contrary to Pearson's claim, Valeant did impose "major price increases" on Solodyn for the "end consumer" as part of Valeant's price-gouging strategy detailed above including in ¶¶ 130-131.  Moreover, when unveiling Valeant's AF program, Pearson failed to disclose the deceptive and illegal practices the program employed, detailed above including in ¶ 130.  Indeed, the AF program did not just send a script "to a different channel where the incentives are in place to actually try to get that claim adjudicated," but in fact modified prescriptions and fraudulently claimed on prescriptions that Valeant-controlled pharmacies had not filled.

197.    On February 28, 2013, Valeant issued a release and hosted a conference call concerning Valeant's 2012 financial results.  On the conference call, Pearson and Schiller detailed the AF strategy and emphasized the benefits of the AF strategy to investors and analysts without detailing any of the improper practices and risks that the AF strategy as employed by Valeant and Philidor.  Specifically, Pearson explained: "***The [AF] program is working actually quite well***.  We are going to be rolling out a couple new generations of the program but we're not going to talk about it on this call.  And we're obviously looking at other products that could run through this system."  On this call Pearson also further misrepresented the role that price increases relative to sales volume played in the drug's revenue growth, stating that Valeant's AF program had facilitated sales increases for Solodyn and other Medicis drugs, but refusing to provide details.  Pearson stated: "We have never given details.  Medicis never gave details.  And that was probably a smart practice.  We are not going to give details in terms of what's flowing through full alternate fulfillment and what's not.  ***What we can reiterate is that all of our key brands in dermatology since our sales force are now growing.***"

198.    Schiller supplied further material misrepresentations about the AF program at the Goldman Sachs Healthcare Conference on June 11, 2013.  A Goldman Sachs analyst asked about Valeant's AF program, and Schiller explained initially that the program was a trend across the pharmaceutical industry to increase profits, a task at which the program was succeeding for Valeant:

> Alternative fulfillment – I'd say a couple things.  One is, to me, ***the alternative fulfillment was an example of what the whole pharmaceutical industry, and it's certainly what Mike and I believe, is the trend, and that is the focus on the profitable scripts***.  There was a day when you could call on anybody, and almost any script was profitable.  Those days are gone.  ***So segmenting your customer base and really focusing on profitability*** has got to be the future.  ***And that's — alternative fulfillment was the beginning of that journey, but not the endpoint***.
>
> So I probably think under Medicis, ***alternative fulfillment*** was held out a little bit too much as the holy grail.  I really think it's - it's actually the starting point, and in some ways, it was quite a clumsy starting point.  It wasn't that different, but ***it's a process where we have generation two and generation three.  But it's all trying to focus on profitable scripts, and stay away from those scripts that are unprofitable, and more judicious use of copay cards and the rest, and making sure when a customer, a patient's covered, you get reimbursed for it. . . . I'm hoping — we've got generation two and generation three, which I'm hoping sort of turn it into a pure defense, into more of an offensive tool to allow us to grow profits.  And that's really the focus, is growing profits.***

199.    With the release of Valeant's 1Q2014 Financial Results on May 8, 2014, Pearson and Schiller conducted an earnings conference call with analysts and investors.  One participant in the conference call asked how Valeant was differentiating its dermatological products, specifically whether Valeant is "doing [anything] differently, in terms of how [Valeant is] marketing them or improving the gross to net on those products."  In response, Pearson referenced the AF program: "the other thing is – that we've worked on is a much more sophisticated alternate fulfillment system that we've implemented in the US, which is really helping.  Those scripts don't show up in IMS, in terms of what's doing, but we're very pleased

that Solodyn is now growing.  And we've applied that to a number of our other products, which is also helping in terms of the growth."

200.    On July 31, 2014, Pearson and Schiller conducted a conference call to address and review the 2Q2014 Financial Results.  On that call, Pearson responded to a question from an analyst about the AF program, specifically inquiring as to "how much volume tends to run through that channel." Pearson stated: "We're not going to give specifics.  It's – we it's a competitive advantage that we have.  And it is still primarily the Medicis products, although not exclusively the Medicis products.  And – but I don't want to give specific numbers, but it is a very successful initiative."

201.    Also on the July 31, 2014, conference call, Pearson in his opening statement made the following representations regarding volume increase without mention of the alternative fulfillment program enabling those increases:

> *Turning to medical dermatology*. . .  The business has now stabilized, with a new management team.  *And the branded market share has increased across all key Medicis products since the beginning of 2014.  This includes Solodyn, Ziana, and Zyclara*.
>
> * * *
>
> *In the US, dermatology grew approximately 7% in the quarter*, including the headwinds from generics, *driven by the continued growth of Acanya, Targretin, and Elidel*.
>
> * * *
>
> Given the strong reception from physicians and patients of our recently launched products Jublia, Ultra, and Luzu, each of them has exceeded our expectations. As I mentioned, after only three weeks of being available, last week's script demand for Jublia exceeded over 1,300 scripts.  This trend is expected to accelerate, as regulatory approval for marketing materials are received and our dermatology sales forces is appropriately trained.

202.     On July 23, 2015, Valeant hosted a conference call to discuss its 2Q2015 financial results.  During the call, a Wall Street analyst asked whether the number of prescriptions for a certain drug, Jublia, going through specialty pharmacy channels had improved.  In response, Valeant's Company Group Chairman, Kellen, misrepresented Valeant's control over the network of captive secret pharmacies, most prominently concerning Philidor, stating: "Yes, the adoption through multiple specialty pharmacies continues.  I think last time we said Jublia was around 50% and that trend continues.  For derm overall, it varies by product, but it's around 40%."

203.     The statements in ¶¶ 197-202 above highlighting the success of Valeant's AF program in increasing Valeant's growth were materially false and misleading when made.  When Pearson stated that the AF "program is working actually quite well" and volume was increasing as a result of the program which is "helping in terms of growth," Valeant failed to disclose that the program was "working" by defrauding insurance companies and other third-party payors through the program's deceptive and illegal practices detailed above including in ¶¶ 130-131.  Moreover, the illegal and deceptive program Valeant operated was not "the trend" across the "whole pharmaceutical industry," but rather a practice unique to Valeant.  Further, the AF program meant that Valeant was in fact doing things "differently, in terms of" how Valeant was "marketing" its dermatological program, and Pearson concealed the fact that this growth was only due to the fraudulent nature of Valeant's alternative fulfillment program, relying on numerous "back door" practices to receive payments for Valeant pharmaceuticals, described above including in ¶¶ 130-131.  Indeed, Defendants failed to disclose that the AF program was not a "multi-stage" program, it did not involve "multiple specialty pharmacies," and it did not simply "focus[] on profitable scripts."  Instead, Valeant's "program" consisted

76

nearly entirely of routing prescriptions through a Valeant-controlled pharmacy, Philidor, which used a network of secret Valeant-controlled pharmacies, and used improper and illegal means to obtain reimbursement for drugs that would have been rejected by independent pharmacies and third-party payors but for Valeant's use of Philidor and Philidor's improper actions. These undisclosed practices inflated Valeant's financial figures and posed significant undisclosed business and regulatory risks—risk which came to fruition in the days, weeks, and months following the revelation of Valeant's control of Philidor.

> **(b)** **Defendant's Misrepresentation and Omissions Regarding Philidor Before the December 2014 Philidor Purchase Option**

204.    As discussed above in detail, Valeant created Philidor in January 2013 as a channel where Valeant could push its high-priced branded drugs on patients, insurers, PBMs, and other third-party payors, and prevent, frequently using deceptive and illegal means, efforts to switch patients to identical generic or cheaper alternatives. The success of Valeant's scheme—whereby it could overcharge for drugs, inflate their revenues, and inflate their stock price—required all third-parties (patients, insurers, PBMs, and certainly investors) to be unaware of Valeant's relationship with Philidor. Thus, Valeant repeatedly failed to disclose to investors its relationship with Philidor.

205.    On May 3, 2013 Valeant filed its quarterly Form 10-Q for the 1Q2013, which was signed by Pearson and Schiller. The 1Q2013 represented that "pricing and sales volume of certain of our products . . . are distributed by third parties, over which we have no or limited control." Until October 2015, when Valeant's control of Philidor was revealed, Valeant made identical representations in its financial filings, all of which were signed by Valeant's senior executives. For example, this exact statement appears in Valeant's: (i) August 7, 2014 quarterly report on Form 10-Q for the second quarter ended June 30, 2013 ("2Q2013 10-Q"), signed by

Pearson and Schiller; (iiii) November 1, 2013 quarterly report on Form 10-Q for its 3Q2013 ended September 30, 2013 ("3Q2013 10-Q"), signed by Pearson and Schiller; (iii) February 28, 2014 annual report on Form 10-K for the year ended December 31, 2013 ("2013 10-K"), signed by Pearson and Schiller; (iv) May 9, 2014 quarterly report on Form 10-Q for the first quarter ended March 31, 2014 ("1Q2014 10-Q"), signed by Pearson and Schiller; (v) August 1, 2014 quarterly report on Form 10-Q for 2Q2014 ("2Q2014 10-Q"), signed by Pearson and Schiller; (vi) October 24, 2014 quarterly report on Form 10-Q for the third quarter ended September 30, 2014 ("3Q14 10-Q"), signed by Pearson and Schiller; (vii) April 30, 2015 quarterly report on Form 10-Q ("1Q2015 10-Q"), signed by Pearson and Schiller; and, (viii) the July 28, 2015 quarterly report on Form 10-Q ("2Q2015 10-Q"), signed by Pearson and Rosiello;

206.    The statements in ¶ 205 above that Valeant had "no or limited control" over the pricing and sales volume of drugs in the hands of third-parties were materially false and misleading because Valeant had created and was utilizing a secret network of controlled pharmacies precisely so it could control the pricing of its drugs.  As discussed below, Valeant created Philidor.  Valeant was Philidor's sole client.  Multiple Valeant employees worked *at* Philidor, and those employees viewed Valeant and Philidor as one and the same—because it effectively was.

207.    Further, every one of the SEC filings discussed above contained a Management Discussion and Analysis ("MD&A") section.  Under SAB Topic 13, Valeant was required to disclose Philidor as a distinct sales channel in its MD&A.  In particular, Valeant was required to disclose that Valeant's usage of Philidor could constitute a "[c]hanging trend[] in shipments into …a sales channel…that could be expected to have a significant effect on future sales or sale returns."  Notably, by the third quarter of 2015, Philidor accounted for at least 7% of Valeant's

revenues.  Accordingly, Valeant had a duty to disclose Philidor as a changing trend in a sales channel that "*could*" be expected—and in fact would be expected since there is no other reason for Valeant to create Philidor—to have a significant effect on Valeant's sales.

208.   In addition, in the 2013 10-K, signed by Pearson and Schiller, Valeant represented that its financials were "prepared in accordance with U.S. generally accepted accounting principles."  However, in Note 2 to the Consolidated Financial Statements—titled "Significant Accounting Policies"—the 2013 10-K represented that, "*[t]here were no material arrangements determined to be variable interest entities*."

209.   The statements in ¶¶ 207-208 above were materially false and misleading because Valeant was Philidor's sole client and controlled and oversaw Philidor to facilitate the sale of Valeant's overpriced pharmaceuticals.  Additionally, Valeant concealed Philidor's status as a VIE.  A company must disclose in its financial statements consolidated and unconsolidated VIEs.  *See* ASB Accounting Standards Codification Topic 810, Consolidation ("ASC 810").  Indeed, in Valeant's presentation to investors and analysts on October 26, 2015, Valeant acknowledged that it considered Philidor a VIE prior to the acquisition of the Philidor Purchase Option.  Therefore, ASC 810 required that Valeant determine if Philidor should be consolidated in Valeant's financial statements.  To do so, Valeant was required to determine whether Valeant was the "primary beneficiary" of Philidor.  For these reasons, even before the December 2014 Philidor Purchase Option, Philidor was a material unconsolidated VIE which should have been disclosed by Valeant.  In addition pursuant to ASC 810, Valeant was required to disclose, among other information, qualitative and quantitative information about Valeant's relationship with Philidor (e.g., the "nature, purpose, size and activities" and financing of Philidor), and Valeant's approach for determining that it was not required to consolidate Philidor's financial statements

with its own.  Moreover, ASC 810 obligated Valeant to consolidate all VIEs for which Valeant was the primary beneficiary.  Because Valeant was Philidor's only client, Valeant was indisputably the primary beneficiary of Philidor even before acquiring the Philidor Purchase Option in December 2014.  Thus, Valeant should have included Philidor in Valeant's consolidated financial statements before 2014, and Valeant's failure to do so made its 2013 financial reports false and misleading.

(c)     **Defendant's Misrepresentation and Omissions Regarding Philidor Following the December 2014 Philidor Purchase Option**

210.    In December 2014, Valeant—through a little known subsidiary called KGA—executed the Philidor Purchase Option agreement.  This transaction (without regard to the prior relationship) required Valeant to include Philidor in Valeant's consolidated financials.  Nevertheless, Valeant continued to fail to disclose Philidor as a material consolidated VIE through October 2015.

211.    On February 25, 2015, Valeant filed its 2014 10-K signed by Pearson and Schiller.  Consistent with previous filings, Valeant, Pearson, and Schiller represented that the audited financial statements were "prepared in accordance with U.S. generally accepted accounting principles."  Valeant, Pearson, and Schiller further represented in Note 2 ("Significant Accounting Policies") that the "consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ('VIEs') for which the Company is the primary beneficiary."  In Note 3 ("Business Combinations") to the Consolidated Financial Statements, Valeant, Pearson, and Schiller also represented that in "the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate."  There was no mention of Philidor in the 2014 10-K.

80

212.   The statements in ¶¶ 210-211 were materially false and misleading when made. Once Valeant concluded that it was the primary beneficiary of Philidor and began consolidating Philidor's financial results with its own, ASC 810 mandated that Valeant disclose the factors that resulted in Valeant's reporting with respect to Valeant.   In addition, ASC 810 required Valeant to disclose the impact of the change on Valeant's consolidated financial statements, *see* ASC 810-10-50-5A.   Valeant not only declined to disclose this information in its 2014 10-K, but also failed to provide the following information necessary to make Valeant compliant with the principle disclosure objective of ASC 810: (i) significant judgments and assumptions made in determining whether it needs to consolidate the VIE and/or disclose information about its involvement with the VIE; (ii) the nature of and changes in the risks associated with its involvement with the VIE; and (iii) how its involvement with the VIE affects its financial position, financial performance, and cash flows.  *See* ASC 810-10-50-8.  Valeant failed to make any of the required disclosures concerning the Company's VIE relationship with Philidor until Valeant's 3Q15 10-Q, when the relationship between Valeant and Philidor had been widely publicized.

213.   In the March 16, 2015 Stock Offering, intended to raise funds for the Salix acquisition the Offering Materials contained information on Valeant's "Other Recent Acquisitions" and asserted that Valeant was "not currently a party to any significant transactions, other than the" Salix merger.   The Offering Materials failed to disclose that Valeant paid $100 million for the Philidor Purchase Option in December 2014.

214.   On April 30, 2015, Valeant filed its Form 10-Q with the SEC for the quarter ended March 31, 2015 ("1Q2015 10-Q").   Pearson and Schiller signed the filing.  Valeant, Pearson, and Schiller represented that the financial statements contained therein "have been

prepared by the Company in . . . accordance with U.S. generally accepted accounting principles ("U.S. GAAP") for interim reporting."   The financial statements did not identify Philidor as a material consolidated VIE.   The 1Q2015 10-Q also included the false statement related to "Business Combinations" as found in Valeant's 2014 10-K.

215.   On July 28, 2015, Valeant filed its Form 10-Q with the SEC for the quarter ended June 30, 2015 ("2Q2015 10-Q").   As with the prior 10-Q, it was signed by Pearson and Schiller and contained the representation that the financial statements had been prepared in accordance with GAAP.   However, the financial statements did not identify Philidor as a material consolidated VIE.

216.   The statements described in ¶¶ 213-215 above were materially false and misleading when made because Defendants had already concluded that Philidor was a material consolidated VIE, which triggered certain disclosure obligations under ASC 810.   Under ASC 810, Valeant was required to disclose, among other things, the nature of Valeant's relationship with Philidor (*e.g.*, the "nature, purpose, size and activities" and financing of Philidor) and the basis for consolidating Philidor (*e.g.*, the Philidor Purchase Option agreement as well as the assumptions and judgments supporting the consolidation and the financial impacts and risks resulting from Valeant's relationship with Philidor).   Philidor should have been disclosed even though Valeant would later claim in the October 26, 2015 investor presentation that the Company was not the primary beneficiary of Philidor until after Valeant had acquired the Philidor Purchase Option in December of 2014.   Even if Philidor were properly considered an unconsolidated VIE, ASC 810's guidance nonetheless mandated that Valeant disclose all material undisclosed VIEs.   Thus, Valeant was required to disclose its unconsolidated VIE relationship with Philidor because the Valeant-Philidor relationship was material.   Specifically,

Valeant should have disclosed the following information in its pre-December 2014 financial statements: (i) quantitative and qualitative information concerning Valeant's involvement in Philidor, specifically Philidor's size, purpose, nature, activities, and financing; and (ii) Valeant's basis for concluding it was not the primary beneficiary of Philidor.  Instead, Valeant violated GAAP by stating in its 2013 10-K that "[t]here were no material arrangements determined to be variable interest entities."

217.    Finally, Valeant's 2014 10-K and 10-Qs for the first and second quarter for 2015 each included an MD&A section.  In those MD&A sections, Valeant did not disclose Philidor as an alternative sales channel.

218.    Valeant's failure to disclose Philidor as a sales channel in the MD&A section was materially false and misleading when made.   The SEC's MD&A rules require Valeant to disclose the significant financial impact that closing Philidor ultimately had on Valeant's future financial results.   Valeant, however, concealed the effect that closing Philidor would have, releasing artificially inflated guidance to offset declines in Valeant's stock price as the public became aware of Philidor rendering patently unsustainable Valeant's reliance on the Philidor sales channel.  Under SAB 104, Topic 13.B, Valeant was required to disclose Philidor as a distinct sales channel given that Philidor was a "[c]hanging trend[] in shipments into . . . a sales channel" that "could be expected to have a significant effect on future sales or sale returns." Specifically concerning Valeant's relationship with Philidor, Valeant failed to disclose: (i) Philidor's role in driving Valeant's revenue growth; (ii) the existence of Philidor as a separate sales channel; and (iii) the unsustainability of Philidor-channeled sales.  Valeant highlighted U.S. organic sales growth and sales growth in its dermatological products throughout the Relevant Period.  By third quarter 2015 Philidor had certainly emerged as a "changing trend in a sales

channel" that was expected to have a significant impact on future sales:  Philidor was responsible for more than 7% of Valeant's revenues.

219.    SAB 104, Topic 13.B, provides specific examples of required MD&A disclosures concerning sales channels, and states that "changing trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns" should be addressed in MD&A disclosures.  In the Relevant Period, Valeant disclosed "Provisions to reduce gross product sales to net product sales" in its financial statements, but failed to disclose that these significant increases in provisions as a percentage of gross sales resulted from Valeant's deceptive and fraudulent practices, including routing patients into Valeant's secret network of captive pharmacies, rewriting prescriptions to insulate Valeant-branded drugs from generic substitutes, and the improper use of PAPs.  Because Valeant concealed the existence of Philidor as a distinct sales channel, Valeant's reported growth was not indicative of future performance.

**C.      Misrepresentations Regarding Revenue Recognition and GAAP Violations**

220.    In 2014 and 2015, Valeant made material misrepresentations concerning its revenue and compliance with GAAP, as follows.

**(a)      Material Misrepresentations Regarding Revenue**

221.    In 2014 and 2015, Valeant reported the following revenues:

| SEC Filing | Financial Period | Revenue Reported (million) |
|---|---|---|
| **3Q2014 10-Q** | 3 months ended September 30, 2014 | $2,022.9 |
| **2014 10-K** | 3 months ended December 31, 2014 | $2,235.5 |
| **2014 10-K** | Year ended December 31, 2014 | $8,263.5 |
| **1Q2015 10-Q** | 3 months ended March 31, 2015 | $2,146.9 |

| 2Q2015 10-Q | 6 months ended June 30, 2015 | $4,841.9 |
| 3Q2015 10-Q | 9 months ended September 30, 2015 | $7,590.1 |

222.    Valeant has admitted that these reported revenues were materially overstated because Valeant executed transactions with Philidor outside the normal course of business. Because Valeant's ability to collect revenue from these transactions was not reasonably assured, it should not have been recognized.  As conceded in Valeant's 2015 10-K, these transactions included "fulfillment of unusually large orders with extended payment terms and increased pricing, an emphasis on delivering product prior to the execution of the purchase option agreement and seeking and filling a substitute order of equivalent value for an unavailable product."

223.    These transactions were undertaken to improperly inflate revenue and related profit before the consolidation with Philidor, because Valeant knew that after consolidation it could not recognize revenue on deliveries of drugs to Philidor (and instead could only recognize revenue once the drugs were dispensed to patients).  Making matters worse, following the Philidor Purchase Option agreement in December 2014, Philidor recorded revenue from the sales of these same drugs when the drugs were dispensed to patients, despite the fact that the revenue had already been recognized by Valeant when it sent the drugs to Philidor.  Given that Philidor's financials were consolidated with Valeant's financials at this time, this resulted in a double counting of revenue for these transactions.

224.    In its March 21, 2016 Form 8-K, Valeant admitted that it had improperly booked revenue, and sometimes double booked revenue, on drugs transferred to Philidor leading up to the Philidor Purchase Option agreement.  Specifically, the Company admitted that "[p]rior to consolidation, revenue on sales to Philidor was recognized by the Company . . . when the

Company delivered product to Philidor." Thus, the Company recognized revenue on these transaction on what is known as a "sell-in" basis.

225.   The Company's March 21, 2016 Form 8-K conceded this was improper accounting: "The Company has determined that certain sales transactions for deliveries to Philidor in 2014 leading up to the option agreement **were not executed in the normal course of business** and included **actions taken by the Company in contemplation of the option agreement**." The 8-K stated that the "revenue for certain transactions should have been recognized . . . when Philidor dispensed the products to patients [] prior to entry into the option agreement . . . ." The Company further explained that certain revenue had been double-counted: "revenue that is being eliminated from 2014 **does not result in an increase in revenue to 2015** as a result of the Company having **previously also recognized that revenue in 2015**."

226.   Valeant's accounting treatment with respect to the drugs transferred to Philidor leading up to the Philidor Purchase Option agreement violated ASC 605-15-25-1. The accounting treatment also runs counter to ASC 605-15-25-1.d, which does not allow revenue to be recognized on a "sell-in" basis where "[t]he buyer acquiring the product for resale" was "established primarily for the purpose of recognizing such sales revenue." Accordingly, GAAP required Valeant to defer revenue and profit until Philidor actually sold the drugs to customers.

227.   As conceded by Valeant, this improper accounting scheme resulted in the material overstatement of reported revenues in 2014 and 2015 as follows:

| SEC Filing | Financial Period | Revenue Reported (million) | Overstatement (million) |
|---|---|---|---|
| **3Q2014 10-Q** | 3 months ended September 30, 2014 | $2,022.9 | $12.9 |
| **2014 10-K** | 3 months ended December 31, 2014 | $2,235.5 | $44.6 |

| 2014 10-K | Year ended December 31, 2014 | $8,263.5 | $57.5 |
|-----------|------------------------------|----------|-------|
| 1Q2015 10-Q | 3 months ended March 31, 2015 | $2,146.9 | $20.8 |
| 2Q2015 10-Q | 6 months ended June 30, 2015 | $4,841.9 | $20.8 |
| 3Q2015 10-Q | 9 months ended September 30, 2015 | $7,590.1 | $20.8 |

228.    The revenues and profits generated through Philidor-funneled sales were critical to Valeant's growth and business model.  For example, Valeant would not have met analysts' expectations for the fourth quarter 2014 had it not improperly recognized revenue on drugs transferred to Philidor on a "sell-in" basis.  Analysts estimated earnings of $2.55 per share that quarter; Valeant's reported earnings came in at $2.58 per share.  The $2.58 earnings per share represented adjusted net income of $880.7 million divided by 341.9 million shares.  But for the improperly recognized revenue in fourth quarter 2014, Valeant would not have met analysts' estimates.

229.    An October 30, 2015 Morgan Stanley Research report estimated that 55% of Valeant's year-over-year growth in the United States was due to Philidor.   Likewise, Morningstar stated that "a significant portion of this revenue will evaporate as CVS and Express Scripts slash these specialty pharmacies from their network," and that Morningstar expected Valeant to only have an "organic growth rate in the low single digits over the next 5 years." Had Valeant properly reported the Philidor transactions and relationship in accordance with GAAP, these lower growth expectations would have become apparent to investors well before October 2015.

**(b)     Material Misrepresentations Regarding Compliance with GAAP**

230.    During the relevant time period, various Defendants repeatedly represented in public statements and SEC filings that Valeant's financial statements had been prepared in compliance with GAAP.  These statements were false when made.

231.    In Valeant's 1Q2013 10-Q, Valeant and the Management Defendants represented that the financial statements had been "prepared by the Company . . . in accordance with U.S. GAAP for interim financial reporting."  Valeant and the Management Defendants made the same representation in Valeant's 2Q2013 10-Q, 3Q2013 10-Q, 2013 10-K, 1Q2014 10-Q, 2Q2014 10-Q, 3Q2014 10-Q, 2014 10-K, 1Q2015 10-Q, 2Q2015 10-Q, and 3Q2015 10-Q.  Under Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), financial statements that a company files that do not conform to GAAP requirements are presumed misleading and inaccurate.  This presumption of inaccuracy exists for interim financial statements filed with the SEC.  *See* 17 C.F.R. § 210.10-01.

232.    At a May 21, 2015 RBC Investor Meeting, Pearson (appearing on behalf of Valeant) represented to investors that "our accounting practices are fine."  Pearson further represented that Valeant "gets audited all the time, by the SEC . . . and we have absolutely no issue from a government standpoint" and that Valeant "never had financial irregularities."

233.    On October 26, 2015, Valeant filed its 3Q2015 10-Q, in which it stated that "its Audit and Risk Committee and the full Board of Directors have reviewed the Company's accounting for its Philidor arrangement and have confirmed the appropriateness of the Company's related revenue recognition and accounting treatment."  The 3Q2015 10-Q also contained the following misrepresentation:  "***As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net***

88

*product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. . . . Gross product sales for products dispensed through Philidor Rx Services, LLC* ("Philidor") pharmacy network (which is consolidated as a variable interest entity within our consolidated financial statements) *are recognized when a prescription is dispensed to a patient*."

234. Also on October 26, 2015, Valeant released a press statement, containing a representation from Pearson that: "[a]s we have said previously, our accounting with respect to the Company's Philidor arrangements is fully compliant with the law," and that Valeant "operate[s] our business based on the highest standard of ethics, and we are committed to transparency."

235. On October 26, 2015, Valeant's management and directors hosted a conference call to address the Philidor relationship. During that call, Pearson stated that Valeant "operate[s] [its] business based on the highest standards of ethics and [is] committed to transparency. We follow the law, and we comply with accounting and disclosure rules. These values are the core of our business model, and if I find examples of violations, I will not hesitate to take action." Rosiello, who was also on the call, stated that the "finance and transactions committee, audit and risk committee, and full Board, all reviewed the [Philidor Purchase Option] transaction. The appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee." On the same call, Board member Bob Ingram stated, on behalf of the Board, that "the Company stands by its accounting completely. The audit committee of the Board and the full Board have reviewed the Company's accounting for

the Philidor relationship, and have confirmed the appropriateness of the Company's revenue recognition and accounting treatment."

236.    On that conference call, Rosiello issued the following representations:

(a) "Valeant consolidates financials with Philidor and the Philidor network, ensuring that revenue recognition and financial statement presentation is appropriate";

(b) "Valeant recognizes revenue only when products are dispensed to patients, and Valeant records this at net realized price";

(c) "There is simply no way to stuff the channel of consolidated [VIEs], since all inventory remains on Valeant's consolidated balance sheet until dispensed to patients"; and

(d) "*Philidor was considered a VIE prior to the purchase option agreement*, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate.  A purchase option agreement for Philidor was executed in December 2014.  *The finance and transactions committee, audit and risk committee, and full Board, all reviewed the transaction.   The appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee*."

237.    Carro, Valeant's corporate controller, also spoke on the conference call to defend Valeant's accounting and prior reluctance to disclose the existence of Valeant's control over Philidor.  Carro specifically represented that: (i) as of year-end 2014, "Philidor is not considered to be material to Valeant's business for reporting purposes" because "GAAP requirement for disclosing sales to large customers is 10% of revenue" and Philidor's year-to-date net sales were only $111 million in December of 2014; and, (ii) for at least the first two quarters of 2015, "Philidor was not specifically mentioned in our disclosures because [Philidor] had not been

material to the consolidated financial statements," as Philidor "represented 1% or less of total assets and 7% or less of consolidated net revenues since the fourth quarter of 2014."

238.   The statements described in ¶¶ 231-237 above were materially false and misleading when they were made because Valeant violated numerous GAAP requirements during the relevant time period.  Among other things, Valeant violated GAAP when it:  (i) failed to disclose Philidor as a VIE both before and after the Philidor Purchase Option agreement; (ii) failed to disclose Philidor as a "changing trend" for sales in Valeant's MD&A section; (iii) and improperly recognized and then double counted certain revenue on drugs shipped to Philidor in the lead up to the Philidor Purchase Option agreement.  Moreover, Valeant's price gouging was the driving force behind Valeant's revenue and profitability growth, and the Company was thus required to disclose the role of price gouging in Valeant's annual and quarterly reports.  Pearson himself testified on April 27, 2016 before the United States Senate that Valeant's growth from 1Q2013 to 3Q2015 was driven by price increases, not volume increases as Valeant and the Management Defendants had repeatedly represented to investors.   Valeant therefore was obligated to timely disclose its reliance on price increases as those price increases had a significant impact on the Company's reported revenues and earnings, and because Item 303 explicitly requires reporting issuers to report details in MD&A disclosures describing changes in volume or price that impact reported revenues.   Additionally, in SAB 104, the SEC Staff expressly states that an analysis of volume and price changes affecting revenue are mandatory MD&A disclosures.  Despite these obligations, Valeant and other Defendants concealed from and actively misrepresented to Plaintiffs and other investors the Company's dependency on price increases to sustain revenue growth during the Relevant Period.  Finally, the SEC MD&A rules mandate disclosure of material events causing reported financial information to not necessarily

indicate the direction of future operating performance.  The unsustainable nature of Valeant's deceptive practices therefore obligated Valeant to make disclosures specifically noting the practices and associated risks that rendered Valeant's financial performance not indicative of future results.  In violation of SEC rules during the Relevant Period, Valeant did not adequately disclose how increases or decreases in price and volume altered Valeant's revenue growth.

**(c)**      **Materiality of Accounting Misrepresentations**

239.    SEC rules mandate that both quantitative and qualitative factors govern the materiality of financial statement items.  *See* SEC Topic 1-M ("[T]here are numerous circumstances in which misstatements below 5% could well be material.  Qualitative factors may cause misstatements of quantitatively small amounts to be material.").  SEC Topic 1-M explains that assessing materiality solely on a quantitative basis "has no basis in the accounting literature or the law," as the FASB "has long emphasized that materiality cannot be reduced to a numerical formula."  Accordingly, each of the Defendants' misstatements in the Relevant Period, including various disclosure violations, were quantitatively and/or qualitatively material to investors because each misstatement or disclosure violation concerned central aspects of Valeant's business, operations, and prospects.

240.    Valeant restated its financial statements for the quarter and year ending on December 31, 2014, as well as for the first nine months of 2015.  These restatements disclosed that investors should no longer rely on Valeant's original financial statements.  The financial restatements constitute an admission by Valeant that the financial statements that the Company issued to investors during the Relevant Period were materially false and misleading, because a company need only correct historical financial statements when they are materially misstated.  Furthermore, the material impact of Philidor on Valeant's revenue growth was revealed over the months that followed Valeant's closing of Philidor.

241.    Indeed, each of the Philidor-related misstatements and disclosure violations constituted qualitatively material misstatements, and this is true regardless of the size of the quantitative impact.  *See* SEC Topic 1-M.  Here, in the context of the misstatements at issue, Valeant itself admitted that the Company possessed an improper "tone at the top" and that its Controller and CFO engaged in "improper conduct" that directly contributed to the misstatements.  Further, Philidor concealed the true nature of Valeant's sales trends throughout the Relevant Period, because Philidor was a key (and undisclosed) driver of Valeant's publicly emphasized revenue growth attributed to the dermatology product line.  Valeant repeatedly highlighted to investors the role that U.S. organic sales growth, specifically dermatology sales growth, played in Valeant's revenue growth, and Philidor was responsible for a material portion of that sales growth.

242.    SEC Topic 1-M also provides that "the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."  When Valeant disclosed the existence of Philidor on October 19, 2015, the price of Valeant's stock plummeted by over 17 percent in just two trading days, demonstrating the materiality of the Philidor disclosure.  Indeed, *The Wall Street Journal* wrote on October 25, 2015, that "[w]hile Valeant may argue it didn't think the consolidation of Philidor was material, the market's reaction shows investors think otherwise.  And since materiality is a qualitative, not a quantitative concept, the company shouldn't try to stonewall with answers that try to purport that it wasn't enough of [Valeant's] assets to talk about it."

243.    Furthermore, SEC disclosure rules dictate that Valeant's MD&A disclosure violations and omissions were material, as SEC Release Nos. 33-8350, 34-48960, FR-72

provides that "Companies must provide specified material information in their MD&A, and they also must provide other material information that is necessary to make the required statements, in light of the circumstances in which they are made, not misleading."

244.    Every single aforementioned MD&A disclosure violation and omission therefore either required additional MD&A disclosures on their own, or necessitated additional MD&A disclosures "in light of" the existing MD&A disclosures that Valeant issued concerning revenue trends.  Indeed, Valeant conceded the materiality of Philidor and the Company's price increases by issuing belated additional MD&A disclosures.

245.    Finally, Valeant's Forms 10-K and 10-Q were materially false and misleading because they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations.  Item 303 of Regulation S-K mandates disclosures of such known factors.

### D.    Material Misrepresentations as to Valeant's Internal Controls

246.    In Valeant's various filings to the SEC, Pearson, Schiller and Rosiello repeatedly attested to the soundness of Valeant's internal controls and that the filings did not contain material misstatements or omissions of fact.  These statements were false and misleading when made because Valeant lacked adequate internal controls and compliance protocols and because there were numerous material misstatements or omissions of fact in Valeant's SEC filings.  As Valeant has admitted, the inadequate controls and fraudulent filings were the result of an "improper tone at the top" that resulted in a single-minded focus on short-term revenue growth at the expense of legal, regulatory, and contractual obligations and risks..

247.    Valeant's management bore responsibility to establish and maintain effective internal controls over financial reporting and disclosure controls, as mandated under the

Sarbanes-Oxley Act of 2002 ("SOX").   Specifically, Valeant management was required to conduct annual assessments of Valeant's financial and disclosure controls, and issue a report on whether such controls were effective and free from material weaknesses.  SOX also required that management employ an appropriate framework for assessing Valeant's financial and disclosure controls.  *See* Committee of Sponsoring Organizations, Internal Control - Integrated Framework. Indeed, Valeant's financial statements issued throughout the Relevant Period represented that management evaluated the Company's financial and disclosure controls based on the "COSO Framework."

248.    The COSO Framework states that the control environment determines the tone for the entire structure of internal control and influences all components of a company's business activity.   Therefore, the COSO Framework dictates that deficiencies that alter the control environment strongly indicate material weakness.    Indications of an ineffective control environment include: "[i]dentification of fraud of any magnitude on the part of senior management" and "[i]neffective oversight of the company's external financial reporting and [internal controls over financial reporting] by the company's audit committee."  Exchange Act Release No. 34-54976 (Dec. 20, 2006).  The accounting profession has widely adopted the concept of "tone at the top" as a means to analyze the attitude and actions of a company's senior management regarding internal financial controls and the control environment.  The SEC has also recognized that "the most important factor contributing to the integrity of the financial reporting process" is "the corporate environment or culture within which financial reporting occurs."  SEC Staff Accounting Bulletin No. 99.

249.    For this reason, management's annual report assessing the effectiveness of the company's internal controls over financial reporting must disclose control deficiencies that

constitute material weakness.   Material deficiencies include a "deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."   Public Company Accounting Oversight Board Auditing Standard No. 5 ("AS 5").   Accordingly, Exchange Act Release No. 34-54976 precludes management from disclosing that it has assessed as effective its internal financial controls if there exists one or more control deficiencies that constitute a material weakness. Indicia of material weaknesses in internal controls over a company's financial reporting include the following: (i) identification of fraud, whether or not material, on the part of senior management; (ii) restatement of previously issued financial statements to reflect the correction of a material misstatement; (iii) identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and (iv) ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee. *See* AS 5.

250.     On May 3, 2013, Valeant filed its 10-Q for the first quarter of 2013.   Pearson and Schiller both signed the 1Q2013 10-Q and represented that management's disclosure controls and procedures were effective:   "Our management, with the participation of our CEO and [CFO], has evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2013.   Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of March 31, 2013."

251.     Pearson and Schiller also signed Sarbanes Oxley Certifications for the 1Q2013 10Q, as required under Rules 13a-14(a) of the Exchange Act.   The certifications provided that

the 10-Q did not contain any untrue statement of material fact or omit to state a material fact.

Pursuant to Rule 13a-14(a), Pearson certified the following statements in the 10-Q for the first

quarter of 2013:

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER**
**PURSUANT TO RULE 13a-14(a)**
**AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, J. Michael Pearson, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Valeant Pharmaceuticals International, Inc. (the "Company");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of and for, the periods presented in this report;

4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a- 15(f) and 15d-15(f)) for the Company and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements tor external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting, and

5. The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions);

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: May 3, 2013

/s/J. MICHAEL PEARSON

252.    The same internal control statements and SOX certifications described above were contained in the 2Q2013 10-Q (signed by Pearson and Schiller), 3Q2013 10-Q (signed by Pearson and Schiller), 1Q2014 10-Q (signed by Pearson and Schiller), 2Q2014 10-Q (signed by Pearson and Schiller), 3Q2014 10-Q (signed by Pearson and Schiller), the 2014 10-K (signed by Pearson and Schiller), the 1Q2015 10-Q (signed by Pearson and Schiller), the 2Q2015 10-Q (signed by Rosiello and Pearson), and the 3Q2015 10-Q (signed by Rosiello and Pearson).

253.    On July 29, 2013, Valeant filed a Form 8-K with the SEC, attaching a memorandum to employees of Valeant and the soon-to-be acquired Bausch & Lomb, and a copy of the companies' intended organizational structured following the merger's completion.  The memorandum contained the following misrepresentations:

In the end, our primary mission is to serve the patients and consumers who use our products, the physicians who prescribe/recommend them and the customers who provide retail outlets for these products**.  Healthcare companies are held by society to the highest possible ethical standard – and they should be. Adhering to this extremely high ethical bar supersedes any financial or other objective**.

* * *

Consistent with our decentralized operating philosophy, our corporate center will be small, lean and focused on three things:

**Ensuring adequate controls to protect our shareholders and to ensure we are in compliance with all regulatory requirements**.

254.    The Company's 3Q2013 10-Q stated that Valeant's "management, with the participation of our CEO and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2013.  Based on this valuation, our CEO

and CFO concluded that our disclosure controls and procedures were effective as of September 30, 2013." Similar representations were made by Valeant in each of the 10-Qs from 2013 to the third quarter of 2015.

255.    As set forth in ¶¶ 250-254 above, Pearson's, Schiller's, and Rosiello's representations that Valeant's SEC filings did not contain material misrepresentations were materially false and misleading when made because each of those filings did contain material misrepresentations. Moreover, Valeant did not maintain "the highest possible ethical standard," as demonstrated by the Company's heavy reliance upon the deceptive and fraudulent conduct, and Valeant lacked adequate controls and compliance standards despite representations that Valeant would "ensur[e] adequate controls to protect our shareholders and to ensure we are in compliance with all regulatory requirements."

256.    Likewise, Pearson's, Schiller's, and Rosiello's certifications and representations regarding Valeant's internal controls were also false and misleading when made. As set forth in Valeant's 2015 10-K,

> **the Company's [CEO] and [CFO] have concluded that as of December 31, 2015, due to the existence of the material weaknesses in the Company's internal control over financial reporting** described below, the Company's disclosure controls and procedures were not effective to provide reasonable assurance that the information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding require disclosure.

257.    The 2015 10-K reported that the Company had reached the same conclusion of ineffective internal controls as of March 31, 2015, June 30, 2015, September 30, 2015, and December 31, 2014. The Company's 10-K for 2015, which Valeant filed with the SEC on April 29, 2016, admits that the Company possessed ineffective financial controls, which resulted in

two distinct material weaknesses as of December 31, 2014: the improper "tone at the top" and the failure to detect the Philidor accounting fraud.  Accompanying its restatements on March 21, 2016, the Company also released the following disclosure, in which the Company admitted that there were material weaknesses in Valeant's internal financial controls throughout the Relevant Period:

> As a result of the restatement, management is continuing to assess the Company's disclosure controls and procedures and internal control over financial reporting. Management, in consultation with the committee, has concluded that one or more material weaknesses exist in the company's internal control over financial reporting and that, as a result, internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015.

* * *

> [A]s part of this assessment of internal control over financial reporting, the company has determined that the tone at the top of the organization and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the company's improper revenue recognition and the conduct described above.

### E.    PwC's Misrepresentations

258.    PwC violated its responsibilities as an auditor under Generally Accepted Accounting Standards ("GAAS").  PwC served as Valeant's purportedly independent outside auditor throughout the Relevant Period.  Independent auditors serve a vital role in capital markets as they are the "public watchdog" responsible for improving the reliability and credibility of financial statements.  Accordingly, Congress established the Public Company Accounting Oversight Board ("PCAOB"), following Enron and WorldCom, to oversee the audits of public companies and protect investors.

259.    The PCAOB was given the responsibility to establish professional audit standards applicable to audits of certain publicly-traded companies, including Valeant.  These standards "provide a measure of audit quality and the objectives to be achieved in an audit" (AU 150.01). As Valeant's independent auditor, PwC was required to adhere to PCAOB Standards and satisfy its responsibilities thereunder, and—as part of its audit of Valeant's financial statements—PwC certified in the 2013 and 2014 10-K's that it performed its audits of Valeant's financials in accordance with these standards.  PwC's special role as independent auditor meant that it could not blindly accept Valeant's representations about its accounting decisions, and it also meant that in the case of certain unusual or potentially problematic arrangements—like Valeant's relationship with Philidor—PwC had a heightened duty to ensure that Valeant made the proper disclosures.  For example, PCAOB standards imposed the following responsibilities on PwC, among others:

(a) PwC had responsibility to plan and perform the audit to obtain reasonable assurance about whether Valeant's consolidated financial statements were free of material misstatement, whether caused by error or fraud, (AU 110.02), and to obtain reasonable assurance about whether material weaknesses existed in Valeant's internal control over financial reporting (AS 5.03).

(b) PwC had responsibility to apply due professional care and to exercise professional skepticism.  These responsibilities included reducing audit risk (i.e., the risk that the auditor expresses an inappropriate audit opinion when the financial statements are materially misstated) to an appropriately "low" level, (AS8.03; AS12.04; AS12.59; AS13.08), and required PwC to exercise "professional skepticism," i.e., "an attitude that includes a questioning mind and a critical assessment of audit evidence."  *See* AS8.03;

AS12.04; AS12.59; AS13.08.   The exercise of professional skepticism is "particularly important in those areas of the audit that involve significant management judgments or transactions outside the normal course of business, such as nonrecurring reserves, financing transactions, and related party transactions that might be motivated solely, or in large measure, by an expected or desired accounting outcome."  Audit Staff Alert No. 10. In addition, "Effective auditing involves diligent pursuit of sufficient appropriate audit evidence, particularly if contrary evidence exists, and critical assessment of all the evidence obtained."  Audit Staff Alert No. 10.

(c) PwC had additional responsibilities in connection with Valeant common shares and debt securities offerings during the Relevant Period.  PCAOB standards required PwC to follow additional procedures prior to the reissuance of previously released audit reports in connection with Valeant's audited financial statements incorporated by reference or included within the Company's Offerings.  *See* AU 711, Filings Under Federal Securities Statutes.   AU 711.10 establishes that the auditor should conduct a "reasonable investigation" with respect to subsequent events.  The "reasonable investigation," which is further detailed in AU 560.12, includes: (i) reading the latest available interim financial statements of Valeant, comparing them with the financial statements being reported upon, and making any other comparisons considered appropriate in the circumstances; (ii) making certain stipulated inquiries with Valeant's officers and other executives which could affect PwC's audit opinion, including whether the Company had entered into any significant unusual transactions since the audit report date; and (iii) inquiring with Valeant's legal counsel concerning litigation, claims, and assessments.  AU 711.11 also required PwC to read the registration statement and obtain written representations from

102

Valeant as to whether material events had occurred which required disclosure.  If material events had occurred, PwC was required to advise Valeant to make appropriate disclosure.  *See* AU 711.12; AU 561.06.

(d) PwC had a responsibility to perform additional procedures to the extent it became aware that Valeant's 10-Ks and/or 10-Qs may not comply with GAAP.  *See* AU 722.15. If PwC was aware of information indicating that a Valeant 10-K and/or 10-Q may violate GAAP, PwC was required to make additional inquiries or perform other procedures, sufficient to determine whether any material modifications should be made to Valeant's interim financial information.  *See* AU 722.22.

260.    PwC violated those obligations and the PCAOB Standards as Valeant's outside auditor during the 2014 audit.  Specifically, the 2014 Audit Report contained the following misrepresentations:

(a) ***In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income (loss), comprehensive income (loss), shareholders' equity, and cash flows present fairly, in all material respects, the financial position of Valeant Pharmaceuticals International, Inc. and its subsidiaries (the "Company") at December 31, 2014 and December 31, 2013, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2014 in conformity with accounting principles generally accepted in the United States of America.***

(b) ***Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014, based on criteria***

103

*established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).*

(c) *We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board.*

261.    These statements were materially false and misleading at the time they were made because they omitted to state material facts required to be stated or necessary to make the statements made therein not misleading, including:

(a) that Valeant's 2014 financial statements did not "present fairly, in all material respects, the financial position of Valeant . . . and the results of their operations and their cash flows" and were not prepared in conformity with GAAP due to material overstatements of revenue, net income and EPS, and that Valeant overstated revenue by $58 million, net income by $33 million and EPS by $0.09 for the year ended December 31, 2014;

(b) that Valeant did not maintain "in all material respects, effective [ICFR] as of December 31, 2014" given that Valeant's internal controls included the existence of two material weaknesses as of December 31, 2014:   an improper tone at the top and the failure to adequately design and maintain effective controls for disclosure for non-standard revenue transactions; and,

(c) that PwC did not conduct its 2014 audit of Valeant's financial statements and internal controls in accordance with PCAOB standards for the reasons stated in ¶¶ 262-264.

262.    Specifically, in the case of the Philidor transactions, several clear factors imposed upon PwC the responsibility to inquire further into the accounting for Philidor and not simply rely on management's representations, an obligation PwC did not fulfill.   Because Valeant's

transactions related to Philidor were "significant unusual transactions" that, according to PCAOB standards, pose a higher risk of fraud, PwC was required to inquire further into the transactions. Nonetheless, PwC approved Valeant's decision not to disclose Philidor despite clear indications that Philidor was material and the fact that Valeant had disclosed smaller transactions as material in the same time frame.   Accordingly, PwC either failed to inquire further into the Philidor relationship, thus failing to conduct its audit in accordance with GAAS, or PwC did inquire further, and still approved Valeant's accounting and certified its internal controls, in violation of accounting standards.   Because PwC certified in the 2014 10-K that it had conducted its audit in accordance with GAAS, that Valeant's financial statements complied with GAAP in all material respects, and that Valeant had adequate internal controls over financial reporting, at least one of those representations was knowingly or recklessly false.

263.   Even more specifically, PwC had heightened responsibility to examine the December 2014 Philidor Purchase Option agreement and the related events.   Both the Philidor Purchase Option agreement and Valeant's sales of drugs to Philidor in the third and fourth quarters of 2014 leading up to the execution of that agreement were transactions that occurred "outside the normal course of business" for Valeant, or "otherwise appear[ed] to be unusual." PCAOB therefore required PwC to consider these to be "significant unusual transactions," which are considered to pose a significant risk of fraud and imposed a duty on PwC to consider them more closely.   *See* AU 316.66.   It was apparent that the Philidor Purchase Option agreement and Valeant's sales to Philidor leading up to that transaction were "significant unusual transactions" for several reasons.   The "purchase option" structure itself was highly unusual in that it provided for a $100 million payment for the option to purchase Philidor for *free* at any point in time over the next 10 years.   Valeant's purchase of Philidor—a pharmacy—was also highly unusual

because Valeant's normal course of business had been to acquire pharmaceutical companies (not pharmacies).  In addition, Philidor was a significant customer of Valeant, and GAAP required both Valeant and PwC to evaluate whether the Philidor Purchase Option agreement had been negotiated in contemplation of other contracts, including sales contracts, which may not have been negotiated pursuant to the Company's normal business practices.  *See* ASC 605-25-25-1 and 2; ASC 605-25-55-4.  PwC should have presumed that contracts entered into at or near the same time were negotiated as a package and evaluated them as a single arrangement.  ASC 605-25-25-3.  PwC also had a responsibility to consider several clear indicators that the drug  sales were not negotiated by Philidor at arm's length, including: (i) non-standard sales terms, including unusually large sales volumes; (ii) artificially inflated sales prices; and (iii) payment terms that delayed Philidor's payment obligations.

264.    Despite these factors triggering a heightened duty to examine the Philidor transaction, PwC approved Valeant's decision not to disclose the 2014 consolidation of Philidor's finances with Valeant's and the December 2014 Philidor Purchase Option Agreement in Valeant's audited 2014 financial statements.  Although Valeant later asserted in an October 26, 2015 investor conference call that Philidor did not have to be disclosed because it was not quantitatively material as it fell below a "pre-established internal threshold," Philidor was clearly significant to Valeant's business as defined by ASC 250-10-S99.  Specifically, Valeant had agreed to pay up to $233 million (the $100 million initial payment and up to an additional $133 million in milestone payments) to acquire Philidor.  Valeant had disclosed two smaller transactions—Natur Produkt International, JSC ($149.9 million) and Gerot Lannach ($164 million)—in its 2014 10-K.  *See* Valeant 2014 Annual Report on Form 10-K, at F-21 and F-25.

265.    In fact, Philidor would account for over 7% of Valeant's 2015 sales (according to Valeant).   In addition, Valeant's sales though Philidor involved products priced significantly above average, and were thus integral to Valeant's profitability.   For 2014, Valeant originally attributed a total of $111 million in sales to Philidor, but $58 million of that was later determined not to comply with GAAP, an overstatement of 109%.   Moreover, Valeant's treatment of Philidor strongly suggests that Valeant believed Philidor to be material.   For example, Philidor was explicitly included in Valeant's SOX testing of internal control over financial reporting. PCAOB Standard AS 5 states that locations with a reasonable possibility of material misstatements should be tested.   AS 5.B11.   Similarly, Valeant's restatement of Philidor-related revenue itself constitutes an admission of materiality, as restatements are required when a misstatement is material.

266.    Moreover, in connection with the Stock Offering, PwC provided the following consent which was included in the Offering Materials:

> **We hereby consent to the incorporation by reference in the Registration Statement on Form S-3 (No. 333-189192) of Valeant Pharmaceuticals International, Inc. of our report dated February 25, 2015 relating to the financial statements, financial statement schedule and the effectiveness of internal control over financial reporting, which appears in Valeant Pharmaceuticals International, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2014.**

PwC's consent served to assure investors that Valeant's financial information included in the Offering Materials was accurate and not misleading.   PwC also consented as part of the Stock Offering to being referred to in the Offering Materials as "experts in accounting and auditing."

267.    As part of issuing its consent, PwC was required under the Securities Act and auditing standards to extend its procedures with respect to subsequent events from the date of its 2014 Audit Report up to the effective date of the Offering Materials, or as close thereto as is

reasonable and practicable under the circumstances. Procedures that PwC should have undertaken prior to issuing its consent included:

(a) reading the entire Prospectus and other pertinent portions of the Offering Materials;

(b) inquiring of and obtaining written representations from officers and other executives responsible for financial and accounting matters about whether any events occurred, other than those reflected in the Offering Materials, that in their opinion had a material effect on the audited financial statements included therein or that should be disclosed in order to keep those statements from being misleading;

(c) reading the latest available interim financial statements to make any appropriate comparisons and inquiring as to whether interim statements were prepared on the same basis as that used for the statements under audit;

(d) inquiring whether there had been any changes in the Company's related parties or any significant new related-party transactions;

(e) inquiring into whether the Company had entered into any significant unusual transactions; and

(f) making such additional inquiries or performing such procedures as considered necessary and appropriate to dispose of questions that arise in carrying out the foregoing procedures, inquiries, and discussions.

268.    For the same reasons set forth in ¶ 267 above, PwC's consents contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.

**F.      Defendants' Continued Misrepresentations and Omissions as Their Scheme Unravels**

269.     The truth concerning Valeant's true business operations and prospects gradually emerged through a series of partial disclosures that began in the fall of 2015 and did not conclude until after the end of the Relevant Period.   As the truth was gradually revealed, Defendants continued to distort and conceal Valeant's true state of affairs by downplaying and denying the truth that was being revealed to the market.

270.     **September 28, 2015**:  The relevant truth about Valeant's reliance upon price increases began to emerge on September 28, 2015, when *Bloomberg* reported that all Democratic members of the house Committee on Oversight drafted a letter to Chairman Chaffetz requesting that Chaffetz subpoena Valeant for documents concerning the massive price increases for two of Valeant's heart medications.   A day later, on September 29, 2015, a number of news organizations published reports stating that Congress was targeting Valeant because of Valeant's practice of purchasing older drugs and dramatically raising their prices, specifically focusing on the Marathon drugs, Isuprel and Nitropress, and that Valeant's inability to continue such practices could substantially impact its growth abilities.

271.     In response to this partial disclosure of Valeant's use of price-gouging practices, and the previously undisclosed regulatory and business risks such practices carried, the price of Valeant securities fell from $199 per share on Friday, September 25, 2015 to $158 per share on September 29, 2015, for a total decline of over 20 percent, on unusually high trading volume. The September 28, 2015, disclosure was only a partial one, however, because the extent to which Valeant relied upon price increases was not readily apparent, and most of the media attention concerned only two drugs:  Isuprel and Nitropress.

272.    Defendants immediately denied the truth of these criticisms, and in particular continued to misrepresent to investors that Valeant neither needed nor focused on price increases for its financial success.  Specifically, on September 28, 2015, Valeant filed a Form 8-K with the SEC that attached a letter from Pearson to the Company's employees to respond to the "two main issues worrying investors."  The "two main issues" were that Valeant's "business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business" and "[c]oncern around our exposure to U.S. government drug price reimbursement."  In his letter, Pearson:

(a) referred to these concerns as a "bear thesis," claimed they were "incorrect on both accounts," and dismissed the dependency on price increases, stating, "***Valeant is well-positioned for strong organic growth, even assuming <u>little to no price increases</u>***.  As we have stated many times, ***Valeant's core operating principles include a focus on volume growth*** and a concentration on private and cash pay markets that avoid government reimbursement in the U.S." and "***the majority of our portfolio will continue to deliver strong volume-based organic growth and is not dependent on price increases***";

(b) purported to "lay out the facts" noting, in part, that:  (i) growth in dermatology, ophthalmology, Rx and dentistry was based on having "delivered over 30% script growth year to date," and (ii) Valeant expected "double-digit script growth and corresponding revenue growth trends to continue" in the "Salix business"; and

(c) added "we expect double-digit organic growth in 2016 and beyond as we prepare for the launch of Addyi and anticipate other potential product approvals . . ."

273.    The statements in ¶ 272 that criticisms of Valeant were inaccurate, that the "majority of [Valeant's] portfolio" was "not dependent on price increases," and the financial

guidance issued to allay investor concerns were false and misleading when made for the reasons discussed in ¶¶ 130-131.

274.   **October 4, 2015**:   Additional details concerning Valeant's use of price gouging were revealed on October 4, 2015 by *The New York Times* in a critical article addressing Pearson's letter to employees following the initial disclosure on September 28, 2015.   The article emphasized that Valeant had raised the prices on its branded drugs at a rate nearly five times that of its closest competitor.   Moreover, the article observed that exorbitant price increases on eight Valeant drugs produced roughly 7 percent of Valeant's revenue and 13 percent of the Company's earnings before taxes and interest in 2Q15.

275.   In response to *The New York Times* exposition of the severity of Valeant's price increases, including the observation that the price gouging spread well beyond the two Marathon drugs that initially captured public attention, Valeant's stock fell by more than 10 percent, to a close of $163 per share on Monday, October 5, 2015, trading on unusually high volume, from a close of $182 per share on Friday, October 2, 2015.

276.   **October 14-15, 2015**:   Shortly after the close of the market on October 14, Valeant issued a press release disclosing the receipt of subpoenas from the U.S. Attorneys' Offices for the District of Massachusetts and the Southern District of New York, which requested documents concerning Valeant's pricing decisions, distribution of Valeant's products, PAPs, and financial support Valeant provided for its patients.   The press release firmly situated the disclosure as related to the previous disclosures about the severity of Valeant's price increases, noting that Valeant was reaching out to hospitals impacted by above average price increases.   On October 15, it was revealed to the market that Valeant was failing to fully cooperate with the Congressional inquiries into Valeant's price-gouging practices.   With this

disclosure, Valeant's stock price declined by roughly 4.75 percent, to a close of $168 per share on October 15, 2015, trading on elevated volume, from a close of $177 per share on October 14, 2015.

277.    Even as Valeant disclosed the investigation, it sought to reassure investors, stating that "[a]ll of us at Valeant firmly believe in maintaining strong regulatory and financial controls and believe we have operated our business in a fully compliant manner."  This statement was false and misleading for the reasons discussed in ¶¶ 132-133.

278.    **October 19-20, 2015**:  During an October 19, 2015 conference call, the market first learned about Valeant's controlling interest in Philidor and the related secret network of captive specialty pharmacies.  On this conference call, Valeant disclosed for the first time its direct relationship with specialty pharmacies through which Valeant increased the price of Valeant's drugs and the volume of Valeant's sales.  Valeant disclosed the fact that it had acquired an option to purchase Philidor on this conference call.  Valeant also stated that pricing amounted to approximately 60 percent of its growth in 2014 and 2015 on this conference call.

279.    After the market closed on October 19, 2015, *The New York Times* reported that Philidor was not an industry-standard specialty pharmacy, but rather a Valeant-specific entity employed by the Company to maintain the exorbitant prices of Valeant branded pharmaceuticals.

280.    In response, Valeant stock declined over the two-day period by roughly 16 percent, or $30 per share, trading on unusually high volume.  Notably, Valeant mitigated the extent to which its stock price fell by announcing earnings, which would later be restated due to material misstatements by Valeant.

281.    Upon the disclosure of Philidor, Defendants immediately sought to downplay the impact of Philidor and price increases.  Specifically, during a conference call on October 19,

2015, hosted by Pearson, Rosiello, and Kellen, Defendants continued to mislead investors about Valeant's business.   In reference to media and government scrutiny of Valeant's pricing practices, Pearson claimed that such criticism was an industry-wide problem and told investors that Valeant's forecast was appropriately discounted for such scrutiny, claiming:

> [I]t's clear that the pharmaceutical industry has been aggressively sort of attacked for past pricing actions.  And that's not just Valeant, but I think it's all companies.  I do think given that environment, **_the pricing that pharmaceutical companies will take in the future will be more modest, and we built that into our forecast for next year_**.

282.    In the slide deck presentation accompanying the earnings conference call, Valeant included a list of anticipated "Questions from Investors," inspired by a report revealing Valeant's ties to Philidor published by the Southern Investigative Reporting Foundation ("SIRF").  One of the "anticipated" questions was "How does Valeant work with specialty pharmacies and what is Valeant's relationship with Philidor," to which the presentation responded:

- We have viewed our relationship with Philidor and our other specialty pharmacies as proprietary and as one of our competitive advantages

- Similar to many pharmaceutical companies in the U.S., an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies

- We find specialty pharmacies improve patients' access to medicines at an affordable price and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients

* * *

- We understand that Philidor:

    - Provides services under our programs for commercially insured and cash-paying claims only.  Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs

    - Does not restrict prescriptions it fills to any particular manufacturers (including Valeant) [; and]

113

- Dispenses generic products as specified in patient's prescription or as requested by patient

283.    During the conference call, Pearson repeated some of the same assertions, stating that the relationship with Philidor had not been disclosed previously because the relationship was a "competitive advantage," and suggesting Valeant's use of specialty pharmacies was similar to its competitors and resulted in more affordable prices, stating, in part:

> The topic of specialty pharmacies has not been a focus of ours on past calls because we believe this was a competitive advantage that we did not want to disclose to our competitors.  But given all the incorrect assertions by some, we will provide an update to this call.
>
> **_Similar to many pharmaceutical companies in the US_**, an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies.  We find specialty pharmacies improve patients' access to medicines at an affordable price, and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients.  In almost all cases, our inventory with specialty pharmacies in this channel and the title to our medicine only transfers to the pharmacy when the actual prescription is filled.

284.    Pearson also claimed that "[s]ince we do not recognize the revenue of our products [sold through Philidor] until the prescriptions are filled, this consolidation has the impact of delaying revenue recognition as compared to products that are sold through traditional distribution channels."

285.    During the same conference call, Rosiello discussed increased earnings guidance the Company released the same day and added that "[w]e expect our gross margins to approach 80 percent in the fourth quarter, driven by continued growth in our dermatology and Salix businesses, the launch of Addyi, and decreased sales of Xenazine."

286.    To further alleviate investor concern, and artificially buoy the price of Valeant's securities, the slide presentation also revealed that Valeant was "reaffirming our expectations to exceed $7.5 [billion] EBITDA in 2016."  When Pearson was asked during the conference call

whether Valeant could still meet its EBITDA guidance in 2016 without "the benefit of price increases," he said, "[i]n terms of our EBITDA for 2016, I think we're only going to say today that we feel very comfortable with the $7.5 billion and we expect our guidance next year will exceed that."

287.    Valeant further increased revenue and EPS guidance for the fourth quarter of 2015 ("4Q2015") and full year 2015.  Specifically, Valeant released the following guidance:

4Q15 Guidance
- ***Total Revenue increased to $3.25 - $3.45 billion [midpoint of $3.35 billion] from $3.2 - $3.4 billion [midpoint of $3.3 billion]***
- ***Cash EPS increased to $4.00 - $4.20 [midpoint of $4.10] from $3.98 -$4.18 [midpoint of $4.08]***

Full Year 2015 Guidance
- ***Total Revenue increased to $11.0 - $11.2 billion [midpoint of $11.1 billion] from $10.7 - $11.1 billion [midpoint of $10.9 billion]***

*  *  *
- ***Cash EPS increased to $11.67 - $11.87 [midpoint of $11.77] from $11.50 - $11.80 [midpoint of $11.65]***

288.    Additionally, the press release contained the following quote from Pearson: "With our strong product portfolio and growth prospects, we feel very confident in our future outlook and we are reaffirming our 7.5 billion EBITDA floor for 2016."

289.    Also on the morning of October 19, 2015, Valeant released a press statement to announce financial results for the third quarter of 2015 ("3Q15").  The press statement announced:  "Same store sales organic growth of 13%, 5th consecutive quarter of >10% organic growth, driven by:  Continued outperformance of U.S. businesses, particularly dermatology and contact lens. . . . ."

290.    The statements in ¶¶ 280-289, were materially false and misleading because, as described above, Valeant's use of specialty pharmacies did not resemble the rest of the industry, Philidor was solely serving Valeant, Philidor had been created by Valeant to solely serve Valeant

and circumvent cost controls put in place by payors and artificially inflate sales volumes, and Valeant had used its secret network of pharmacies in a manner that posed significant regulatory and business risks to Valeant.

291.   **October 21-22, 2015**:  On October 21 and 22, 2015, the market learned additional details concerning Valeant's secret network of specialty pharmacies, including Philidor and R&O.  On October 21, 2015, Citron Research published a report that called into question the independence of Philidor from Valeant, and highlighted Valeant's fraudulent accounting practices.  The Citron report suggested that Philidor was not an independent pharmacy, and that Valeant had created an entire network of "phantom" specialty pharmacies to artificially boost Valeant's revenues by maintaining or increasing sales volume despite Valeant's implementation of otherwise unsustainable price increases.  The Citron report also covered the lawsuit R&O Pharmacy filed against Valeant, including R&O's accusation that Valeant was "conspiring . . . to perpetuate a massive fraud."  The publication of the Citron report resulted in a temporary halt on trading Valeant shares because of the precipitous decline in Valeant's stock price to a close of $118 per share on October 21, 2015, on extraordinary trading volume, from a close of $146 per share on October 20, 2015.

292.   On the evening of October 21, 2015, Philidor released a press statement announcing its contractual relationship with affiliated pharmacies, including R&O, and validating the Citron report's allegations that Valeant relied upon an entire secret network of captive pharmacies to sell the Company's overpriced branded-pharmaceuticals.  Before the market opened on October 22, 2015, BMO downgraded its rating of Valeant, and Valeant's stock price declined an additional 7 percent to close at $109 per share, on unusually high trading

volume.  Over this two-day period of corrective disclosures, Valeant's stock price declined by $36 per share, or over 25 percent.

293.    Despite these revelations, Defendants continued to insist that there was nothing wrong with Valeant's accounting related to Philidor, and, in an October 21, 2015 press release again claimed, falsely, that "sales are recorded only when the product is dispensed to the patient."  Specifically, Valeant stated:

- ***All shipments to Philidor and other pharmacies in the Philidor pharmacy network, including R&O, are not recorded in Valeant's consolidated net revenue.  Sales are recorded only when the product is dispensed to the patient. All sales to Philidor and Philidor network pharmacies are accounted for as intercompany sales and are eliminated in consolidation.  They are not included in the consolidated financial results that Valeant reports externally.***

- ***Any inventory at pharmacies in the Philidor pharmacy network are included in Valeant's consolidated inventory balances – there is no sales benefit from any inventory held at these specialty pharmacies and inventory held at the Philidor network pharmacies is reflected in Valeant's reported inventory levels.***

* * *

- ***The timing of our revenue recognition by selling through the Philidor pharmacy network is actually delayed when compared to selling through the traditional wholesaler channel.***

294.    The statements in ¶ 293 above was false because, as referenced including in ¶ 132, Valeant had improperly recognized revenue upon delivery to Philidor.

295.    **October 25-26, 2015**:   Additional disclosures covering Valeant's fraudulent arrangement with Philidor and its captive network of specialty pharmacies came to light on October 25 and 26, 2015.  First, on Sunday, October 25, 2015, *The Wall Street Journal* published an article detailing interviews with former Philidor employees, revealing that Valeant employees had worked directly at Philidor under fictitious names to conceal the relationship between the

two companies "so it didn't appear [that] Valeant was using the pharmacy to steer patients" to Valeant products.

296.    On October 26, 2015, Valeant filed its 3Q15 10-Q and hosted a conference call, where Valeant expressly acknowledged for the first time that the Company possessed "the power to direct" Philidor's activities, making Philidor a "variable interest entity for which the Company is the primary beneficiary."  Valeant also announced that it was opening an internal investigation into the Company's relationship with Philidor, and would create an ad hoc Board committee to conduct the investigation. *Bloomberg* reported on October 26, 2015 that Valeant's statements on the investor conference call "left investors skeptical" as Valeant "fail[ed] to answer critical questions on Valeant's continuing relationship with Philidor."  Valeant's stock price dropped more than 5 percent following these corrective disclosures, to a close of $110 per share on Monday, October 26, 2015, trading on unusually high volume, from a close of $116 per share on Friday, October 23, 2015.

297.    The  3Q15  10-Q  provided  the  following  description  of  the  Company's performance:

> Excluding the items described above, we realized incremental product sales revenue from the remainder of the existing business of $236 million and $820 million in the third quarter and first nine months of 2015, respectively.  ***The growth, which incorporates sales directly to wholesalers and retailers as well as use of specialty pharmacies (primarily Philidor), reflected (1) higher sales of (i) Jublia*®** (launched in mid-2014), (ii) the ***Retin-A*®** franchise (including the launch of RAM 0.08% in mid-2014), (iii) Xenazine®, (iv) Arestin®, (v) ***Solodyn*®**, and (vi) the Carac® franchise, and (2) higher sales from other recent product launches, including the launches of Biotrue® ONEday, Bausch + Lomb Ultra®, and Onexton®.

298.    The  3Q15  10-Q  also  contained  the  following  statement  describing  Valeant's "lower risk" business strategy:  "The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain

development programs to drive future commercial growth, while minimizing our research and development expense."

299.    Defendants once again attempted to downplay the role of Philidor and reaffirmed their ability to hit their earnings guidance.  Specifically, on October 26, 2015, Pearson, Schiller, Rosiello, Ingram, Provencio, Melas-Kyriazi, Stevenson, Carro, and Kellen hosted an investor conference call with an accompanying presentations.  The presentation represented that "[o]ur specialty pharmacy strategy originated from the Medicis Alternate Fulfillment Program." Among other things, the presentation represented that:

(a)  "Prescriptions through Philidor are less profitable than traditional channels due to lower copay rates, lower cash pay rates and more cash pay scripts in Philidor than in retail and other channels";

(b)  "*We do not own or control Philidor* . . ." and "Philidor employees do not report to Valeant . . .";

(c) "*Philidor is independent* . . ."; and

(d) "Unless and until Valeant exercises the option to acquire Philidor, Philidor remains independent and Valeant has no rights to remove CEO or management."

300.    Further, Pearson assured investors that "there have been no issues with regards to the accounting or revenue recognition of the business," as "we still believe that the strategy of working with specialty pharmacies is sound and it's good for patients and physicians."  This statement was reinforced by Rosiello and Ingram and none of the other Defendants who hosted the call objected to any of the representations made on the call.

301.    Most notably, in a blatant attempt to convince investors (including Hound) that Philidor and the previously revealed price gouging would not interfere with the Company's earnings and growth, Pearson explicitly endorsed the prior 2016 guidance stating: "we continue to be *very comfortable* with our 2016 EBITDA expectation of greater than $7.5 billion."

302.    The statements in ¶¶ 296-301 were materially false and misleading when made because Valeant had improperly recorded revenue related to Philidor, and in fact was forced to restate its finances in March 2016, as described including in ¶ 132 above.  Further, Valeant, Pearson, Schiller, Rosiello, Ingram, Provencio, Melas-Kyriazi, Stevenson, Carro, and Kellen were aware that Valeant relied heavily on price gouging and Philidor to drive revenues (and sales volume) across its product portfolio, and therefore its statements regarding earnings guidance were materially false and misleading.  Moreover, Philidor was not independent, as Valeant exerted legal and actual control over Philidor during the Relevant Period, especially following the acquisition of the Philidor Purchase Option in December 2014.

303.    **October 28-30, 2015**:   From October 28 through October 30, additional information regarding the mechanism by which Valeant realized and maintained its price increases was revealed to the market.  Specifically, *Bloomberg* published an article on October 28 stating that Philidor relied upon "back door" tactics to increase payments and even expressly "instructed employees to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim – to essentially shop around for one that would be accepted."

304.    The following day, on October 29, 2015, *Bloomberg Businessweek* reported that Philidor had engaged in additional deceptive business practices to increase the sales volume of exorbitantly priced Valeant-branded drugs.  Specifically, *Bloomberg Businessweek* stated that Philidor falsified prescriptions to boost Valeant sales, according to interviews with former Philidor employees and internal company documents.  Furthermore, reports emerged that CVS Caremark, which was one of the country's three largest PBMs, terminated its relationship with Philidor in response to an audit of Philidor's practices.  Valeant's stock dropped nearly 5 percent

in response to these disclosures to a close of $111 per share on October 29, 2015, from a close of $117 per share on October 28, 2015, trading on unusually high volume.

305.    After the close of the market on October 29, 2015, the other two largest PBMs in the country, Express Scripts and OptumRx, announced that they also were terminating their relationships with Philidor.  In response, Valeant issued a press release on the morning of October 30, 2015, before the market opened, declaring that the Company had terminated its relationship with, and would shut down, Philidor.  In response to these disclosures, Valeant shares fell by nearly 16 percent to a close of $93 per share on October 30, 2015 from a close of $111 per share on October 29, 2015, trading on unusually high volume.

306.    **November 4-5, 2015**:  Before the market opened on November 4, 2015, the United States Senate Committee on Aging announced the formal opening of a probe into Valeant's price gouging, including a request for relevant documents from the Company.  Also on that day before the opening of the market, *Bloomberg* published a report that Valeant had intended to expand its reliance upon Philidor, which Valent could no longer do given the announcement that it was shutting Philidor.  The *Bloomberg* report cast doubt on Valeant's ability to meet the financial guidance it had recently issued.

307.    Following the close of the market on November 4, 2015, *The Wall Street Journal* published a report that Ackman of Pershing Square, Valeant's largest shareholder, was strongly considering whether to liquidate his entire $3.8 billion stake in the company and had demanded a full explanation from Valeant management concerning Philidor.

308.    Valeant's stock price declined by 19.5 percent over this two-day period, or $19 per share, and closed at $78 per share on November 5, 2015, trading on extraordinarily high volume.

309.   **November 10-12, 2015**:   Before the market opened on November 10, 2015, Valeant conducted a business update call to disclose the "significant" negative impact that Philidor's closing and the governmental probes would have on Valeant's business.   Pearson, Rosiello, Carro, and Kellen conducted this conference call on behalf of Valeant.   Valeant specifically revealed that the shuttering of Philidor would have significant "short-term" effects on Valeant's dermatology product lines, and that the Governmental probes were placing "short-term" pressure on the Company's neurology lines.   Valeant represented that the purpose of the conference call was to "update [investors and the market] on our strategy with respect to specialty pharmacies, to explain [Valeant's] transition plans for Philidor, to discuss our business performance for the first half of the quarter, and perhaps most importantly to take questions from all of [Valeant's investors]."   Pearson specifically stated that:

> *We began working with Philidor because we believed a strong relationship with one specialty pharmacy would deliver better, faster customer service for doctors and patients.  We were also looking for a pharmacy which would be willing to process prescriptions before adjudicating the claims, which would allow us rather than the patient, to assume the risk if the commercial payer denied the claim.*

310.   One analyst on the conference call noted that there were two fundamental "accusations aimed at the Company," the first regarding pricing and the second regarding Philidor, and noted that Valeant "decided to limit [Valeant's] pricing going forward" and "cut operations with Philidor."   Pearson responded to the Philidor component of the question with the following statement:

> Well Philidor was very specific.   *First, there was the Citron report which claimed financial fraud and other things.  They quickly came out and there was no financial fraud, in terms of what Valeant had to do.*   But then other allegations were made in terms of the practices of Philidor.   And we felt, both management and the Board felt that given these allegations, given what was happening to our stock price and given what many of our major shareholders were asking us to do that the best thing to do was to sever.

311.    The statements in ¶¶ 309-310 were materially false and misleading when made because Valeant had improperly recorded revenue related to Philidor, and in fact was forced to restate its financials in March 2016.  Moreover, Valeant did not create Philidor to "deliver better, faster customer service for doctors and patients" as claimed, but rather sought to establish a network of captive pharmacies through which Valeant could implement its otherwise unsustainable price gouging business model and inflate sales volumes, as detailed in ¶¶ 130-131 above.

312.    Valeant's share prices dropped 2%, to close at $83 per share on November 10, 2015, trading on unusually high volume.

313.    After the market closed on November 10, 2015, reports emerged that one of Valeant's largest shareholders, Sequoia Fund, was offering to pay Philidor employees to receive information on Valeant's practices.  *Bloomberg* then reported the next morning prior to the market's opening that Valeant's creditors were "[s]pooked" about a possible "revenue squeeze." Valeant's stock declined an additional 5 percent during the market day, closing at $78 per share on November 11, 2015.

314.    On November 12, again before the market opened, *Bloomberg* released another article covering Valeant's relationship with Philidor.  Valeant's stock declined an additional 6.5 percent, closing at $73 per share.  Over the three-day period of November 12 to November 15, Valeant's stock declined 13 percent, or $11 per share.

315.    **November 16, 2015**:  On November 16, 2015, *Bloomberg* reported that Congressman Cummings had requested that Pearson make Valeant employees available for interviews before the United States House Oversight Committee.  After the close of the markets on November 16, *The Washington Post* reported that the House Committee had announced it

would hold a hearing early in 2016 on prescription drug pricing, and was gathering information from Valeant in preparation for the hearing. The article also reported that the House Oversight Committee members urged Valeant's executives to testify at the hearing, and for the Committee to subpoena Valeant. Valeant's stock price dropped an additional 3 percent in response to this news, closing at $73 per share on November 16, 2015 on unusually high volume, and dropping an additional 4 percent on November 17, 2016, to close at $70 on high trading volume.

316. **December 15, 2016**: On December 15, 2015, in a further attempt to convince shareholders that Valeant could be just as successful in a post-price gouging and Philidor world, Valeant released a press statement announcing that it had entered into a deal with Walgreens to distribute Valeant's products. The Walgreens deal included a 10 percent price reduction for Valeant-branded prescription-based dermatological and ophthalmological products, but Pearson nonetheless touted the partnership as a better option than Philidor. In fact, Pearson was explicitly asked on CNBC whether investors "should [] expect [that the Walgreens partnership] will be the same sort of level of profitability and growth" as Philidor. Pearson responded that the Walgreens deal "*more than replaces Philidor* . . . ." He further admitted that the Walgreens deal would rely on "volume increases" which he said that Valeant already largely relied on—thereby signaling to investors that Valeant would be able to execute on the Walgreens deal and avoid massive losses from the termination of the Philidor relationship.

317. However, the next day, December 16, 2015, Valeant released a formal withdrawal of the inflated guidance issued less than two months before, on October 19, 2015. The new guidance entailed a 4Q2015 revenue reduction from $3.25-3.45 billion to $2.7-2.8 billion; a 4Q2015 Cash EPS guidance reduction from $4.00-4.20 to $2.55-2.65; a 2015 full year revenue guidance reduction from $11.0-11.2 billion to $10.4-10.5 billion; a 2015 full year Cash EPS

guidance reduction from $11.67-11.87 to $10.23-10.33; and, new 2016 EBITDA guidance reduction from $7.5 billion to $6.9-7.1 billion.  At Valeant's Investor Day on December 16, Pearson stated that he considered this guidance "conservative," and that management had "put an extra dose of conservatism in" it.  In conjunction with the previously announced Walgreens deal, Valeant was painting a picture that it was still a financially healthy and sustainable business.

318.    Additionally, Pearson noted that "[the drug] Addyi . . . a lot of people have said, Addyi is a disaster; today you'll see it's not a disaster.  So we believe we'll sell between $100 million and $150 million in sales of Addyi next year."

319.    The statements in ¶¶ 316-318 were materially false and misleading when made because the Walgreens arrangement would not result in "volume increases," nor would it "more than replace Philidor," facts of which Pearson and Valeant were aware when issuing the misstatement.  Moreover, Valeant and the Management Defendants knew or were reckless in not knowing that the consequences of disclosure and termination of the Philidor relationship and Valeant's inability to rely on price increases would significantly reduce future revenue.  Despite the reductions from the prior earnings guidance (which had been re-affirmed in October), the reissued earnings guidance was still materially false and misleading when made because Valeant and the Management Defendants knew Valeant could not meet this reduced, but nonetheless robust, guidance because, among other things, the success of the Walgreens deal relied on volume increases rather than price increases which was inconsistent with Valeant's business model.

320.    While Valeant and the Management Defendants issued revised guidance projecting increased growth for Valeant in 2016 and the later quarters in 2015, Valeant knew that it had already doubled the price of Addyi, a price increase which would decrease the likelihood

that insurers would cover the medication or PBMs would approve the claims. Indeed, Valeant knew that it had cancelled the Company's distribution agreement with Cardinal Health, increasing Valeant's reliance on Philidor for Addyi's distribution. At the time that Valeant issued the increased guidance, Valeant also knew that the disclosure of Valeant's relationship with Philidor and the attendant investigations into Valeant's price gouging would decrease Valeant's sales, prices, revenue, and earnings. Therefore, Valeant and the Management Defendants had no reasonable basis to believe, and in fact did not believe, that Valeant would achieve: (i) the 4Q2015 and full year 15 revenue of $3.25-45 billion, and $11-11.2 billion, respectively; (ii) 4Q2015 and full year 2015 Cash EPS of $4.00-4.20 and $11.67-87 respectively; (iii) full year 2016 EBITDA of at least $7.5 billion; (iv) full year 2016 revenue of $12.5-12.7 billion and Cash EPS of $13.24-75 or EBITDA of $6.9-7.1 billion.

321. **December 17, 2015**: Prior to the market opening on December 17, 2015, Mizuho cut its rating on Valeant stock from "buy" to "neutral," citing a lack of clarity regarding Valeant's recently announced agreement with Walgreens. During market hours, Valeant's stock declined 6 percent to close at $111 on December 17, 2015, down from $118 at close on December 16, 2015.

322. **February 19, 2016**: Media outlets on February 19, 2016 covered a Wells Fargo analyst report issued on February 18, 2016, addressing Valeant's disclosures following the Philidor discovery. The Wells Fargo report questioned whether the Company had accurately disclosed the consequences Valeant would suffer as a result of Philidor's closing. Specifically, the analysis noted that Valeant's "new guidance is not compatible with the data presented by Valeant" concerning Philidor's importance, and argued that Philidor was likely far more important to Valeant's guidance and future projections than Valeant's represented to the market.

In response to this report, Valeant stock dropped by almost 10 percent, closing at $84 per share on February 19, 2016 from $94 per share the previous day, after trading on elevated volume.

323.     **February 22, 2016**:  A Wells Fargo analyst provided an update on the Wells Fargo report from February 19, adding two valuation models and suggesting a $62 price target. CVS also announced on February 22, 2016 that it would restrict the use of Jublia, one of the drugs that Philidor had most heavily distributed, and would instead require patients try a less expensive generic substitute first.  After the close of the market on February 22, 2016, *The Wall Street Journal* published a report stating that Valeant was likely to restate its 2014 and 2015 earnings due to discoveries made by an internal audit of its financials.  Also on that evening, Valeant issued a press release confirming it would restate its 2014 earnings by at least $58 million, reducing 2014 GAAP EPS by approximately $0.10.  Valeant stated that this restatement was necessary because the Company had previously improperly recognized revenue upon the delivery of products to Philidor, when Valeant should have instead recognized revenue only when the products were dispensed to patients.  Valeant also announced it would complete accounting and internal audit matters before filing its 2015 10-K.  In response to this disclosure, Valeant stock fell an additional 10 percent, to close at $75 per share on February 22, 2016, after trading on unusually high volume.  In after-hours trading on February 22, 2016, shares fell as low as $68.

324.     **February 28-29, 2016**:  On February 28, 2016, Valeant released a press statement to announce Pearson's immediate return as CEO (he had been on medical leave), the appointment of Ingram as Chairman of the Board, and to cancel a February 29, 2016 conference call.  The announcement also officially withdrew the Company's prior financial guidance and confirmed the delay in filing its 2015 10-K pending the ad hoc committee's review of accounting

matters.   During market hours the following day, February 29, 2016, Moody's reviewed Valeant's ratings for a potential downgrade.  Also on February 29, 2016, Valeant confirmed that it was under investigation by the SEC and had received a subpoena during 4Q2015.

325.   In response to this news, Valeant's stock price fell more than 18 percent, closing at $65 per share on February 29, 2016, on unusually high trading volume, from a close of $80 per share on February 26, 2016.

326.   **March 15, 2016**:  Before the market opened on March 15, 2016, Valeant released the Company's preliminary and unaudited 4Q2015 financial results, and conducted a long-awaited conference call with investors and analysts.  On that call, Valeant disclosed that it was significantly decreasing its financial guidance for 2016, slashing its 2016 revenue guidance by 1.5 billion from $12.5-12.7 billion to $11-11.2 billion, reducing its Cash EPS guidance from $13.25-13.75 to $9.50-10.50, and cutting its EBITDA guidance from $6.7-7.1 billion to $5.6-5.8 billion.  Notably these revised figures were in fact revisions of revisions:  Valeant had issued the former numbers referenced above in December of 2015, as part of the Company's efforts to misrepresent the actual effect of closing Philidor on Valeant's business model.  Indeed, Valeant cited "reduced revenue assumptions for certain businesses, new managed care contracts and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016" as the drivers of the Company's significant downward revisions.   On the conference call with investors, Valeant was forced to disclose inaccuracies even in the Company's release of guidance from that morning, as the forecast adjusted EBITDA for the next four quarters should have been $6.0 billion, rather than the $6.2 to $6.6 billion figure contained in the release.  Furthermore, Valeant reported expenditures in excess of $130 million relating to the closing of Philidor.

327.     Accordingly, Valeant's stock price fell precipitously in response to these disclosures, dropping more than 50 percent to close at $33 per share on March 15, 2016, following extremely high trading volume, from a close at $69 per share only a day earlier, on March 14, 2016.

328.     **March 21, 2016**:   On March 21, 2016, Valeant filed a Form 8-K, which announced the restatement of Valeant's prior financial statements.  In the announced restatement, Valeant disclosed that "approximately $58 million in net revenues relating to the sales of Philidor during the second half of 2014 should not have been recognized upon delivery of product to Philidor" following the Ad Hoc Committee's review of governmental and media-based criticism of Valeant's business model.   The restatement also disclosed that investors should no longer rely upon Valeant's previous four financial statements, specifically the 2014 10-K, the 1Q2015, 2Q2015, and 3Q2015 10-Qs, and PwC's audit report on the 2014 10-K.

329.     Valeant's announced restatement disclosed that the Ad Hoc Committee had concluded that Valeant's revenue recognition "on a sell-in basis (*i.e.*, recorded when the Company delivered the product to Philidor)" prior to Valeant's acquisition of the Philidor Purchase Option was improper because "revenue for certain transactions should have been recognized on a sell-through basis (*i.e.*, record revenue when Philidor dispensed the products to patients) prior to entry into the option agreement."   As a result of the Ad Hoc Committee's conclusions, Valeant could no longer record revenues for shipments to Philidor, instead recording revenues only on shipment to the patient.

330.     Valeant also issued a March 21, 2016 press release, which  stated that:

> "Management, in consultation with the [Ad Hoc] committee, has concluded that
> ***one or more material weaknesses exist in the Company's internal control over
> financial reporting*** and that, as a result, ***internal control over financial reporting
> and disclosure controls and procedures were not effective*** as of December 31,

2014 and disclosure controls and procedures were not effective as of March 31, 2015 and the subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015."

331.    In the March 21, 2016 press release, Valeant also acknowledged that the Company's "improper revenue recognition" concerning Philidor was the result of "improper conduct" on the part of Valeant's former CFO and Former Corporate Controller.  Furthermore, Valeant specifically cited the unethical "tone at the top" perpetuated by senior management as a "contributing factor" to the Company's ineffective controls over financial reporting.  The Company's March 21, 2016 press release declared:

> "The *improper conduct* of the company's former chief financial officer and former corporate controller, which resulted in the provision of incorrect information to the committee and the company's auditors, contributed to the misstatement of results.  In addition, as part of this assessment of internal control over financial reporting, the company has determined that the *tone at the top of the organization* and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the company's improper revenue recognition."

332.    Finally, Valeant's March 21, 2016 press release stated that the Company would immediately commence the search for a CEO to replace Pearson, though Pearson would remain as CEO and Director until appointment of his replacement.

333.    **June 7, 2016**:  On June 7, 2016, Valeant issued a press release and hosted a conference call regarding the Company's long-delayed 1Q16 financial results.  The Company reported a GAAP loss per share of $1.08 and significantly lowered its 2016 guidance, and revealed that the poor financial results and outlook were caused, in large part, by the loss of Philidor.  For example, Rosiello stated that sales volume declines were "exacerbated by the loss of refills following the shutdown at the end of January of our previous specialty pharmacy relationship."  Papa, the Company's new CEO, added that with respect to dermatology, "a

significant portion of our Walgreens prescriptions have profitability significantly below our internal projections and meaningfully below non-Walgreens prescriptions" and that "[i]n some instances, these prescriptions actually have a negative average selling price.''

334.    In response to this news, which further revealed the extent to which Valeant relied on Philidor and price increases to boost revenue during much of the Relevant Period, the price of Valeant stock dropped by nearly 15 percent to close at $24 on unusually high trading volume.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

335.    As addressed above, the Defendants operated an elaborate scheme spanning years to defraud investors by issuing false and misleading statements about Valeant and its financial and operating performance.  Valeant defrauded PBMs, physicians, and insurers through secret and illicit practices intended to boost the sales and prices of Valeant-branded products.  The Management Defendants were personally aware of the deceptive and fraudulent practices detailed herein, as the Management Defendants designed and implemented those practices. Moreover, due to their frequent meetings and their effective control over, and contractual right to review and approve, Philidor's records and policies, the Management Defendants were either personally aware of, or were severely reckless in disregarding, the improper and deceptive tactics that Philidor employed.  The Management Defendants also possessed significant motives to engage in, design, and implement the aforementioned fraudulent conduct.  The facts below further demonstrate the Management Defendants' scienter.

### A.    Valeant's Admission of Improper Conduct

336.    Valeant has already admitted the falsity of several of the Management Defendants' statements from the Relevant Period.  For example, on February 3, 2016, Valeant admitted that Pearson's April 29, 2015, claim that "volume was greater than price in terms of our growth" was false.

131

337.     Similarly, on February 22, 2016, Valeant released a press statement admitting that the Company had improperly recognized Philidor-related revenues.  One month later, on March 21, 2016, Valeant issued another press release, this time accompanied by a Form 8-K, to disclose that Valeant had material weaknesses in internal controls and that Valeant's 2014 10-K and 1Q2015, 2Q15, and 3Q2015 10-Q's could no longer be relied upon.

338.     Moreover, Valeant concluded that Schiller had engaged in "improper conduct" and "that the tone at the top of the organization and the performance-based environment . . . may have been contributing factors resulting in improper revenue recognition."

339.     Finally, Valeant asked Schiller to resign from the Board and forced Pearson and Carro out of the company.

**B.     The Management Defendants' Role in Valeant's Business Strategy**

340.     The Management Defendants were active and culpable participants in the fraudulent scheme alleged herein because they received information reflecting the truth regarding Valeant, controlled and received Valeant's materially misleading misstatements, and, by virtue of their positions within Valeant, were privy to confidential and proprietary information regarding the Company's unsustainable business model and its reliance on deceptive practices. The fraud was pervasive, multi-faceted, and carefully designed.  Such a sophisticated and wide-ranging fraudulent scheme could not have been orchestrated for such a long period without the knowledge of or extreme recklessness by the most senior personnel at the Company, including the Management Defendants.   This is particularly true where, as here, the Management Defendants were actively involved in the day-to-day operations of the Company.

341.     For example, Pearson's management style, as reported by *Bloomberg Businessweek*, ensured that he would know of the Company's fraudulent practices.  Pearson "had his fingers in everything, from operations to making decisions about the salaries of individual

employees," and actively "micromanaged things he deemed important."  Further demonstrating his involvement in the wrongdoing, Pearson admitted in a written statement to the United States Senate that, "as [Valeant's] leader, [he] was too aggressive in pursuing price increases on certain drugs."

342.    Pearson also worked closely with the other Management Defendants.    For example, he held a call each Tuesday at 11:00 a.m. with all the leaders of Valeant's business, during which Valeant's senior management discussed opportunities, assessed the business, addressed developing issues, and attempted to ensure that the Company did not face any surprises at the end of each quarter.

343.    Another of the Management Defendants, Schiller, acknowledged his and Pearson's active involvement in and awareness of Valeant's strategy.  For example, on the April 29, 2015, conference call in which he announced his resignation as CFO, Schiller stated that Pearson "sets the tone at Valeant."  Schiller also stated:

> "I've completely bought into our unique strategy and culture, the transparency and fact-based approach to running our business, and our relentless focus on building a great Company and on creating shareholder value.
>
> . . . Valeant's business has never been stronger and its prospects have never been brighter. . . ."

344.    Schiller similarly revealed his and Pearson's hands-on approach, and therefore inference of scienter, when he disclosed on a May 28, 2014, conference call with investors that he and Pearson "religiously track each deal on a quarterly basis.  Our Board of Directors receives a report every quarter on each deal.  We review every quarter and ask ourselves how are we doing.  We are our own biggest critics."  Later that same day, Pearson bragged to investors and industry specialists at the Sanford C. Bernstein Strategic Decisions Conference that Valeant was "tracking every product around the world."

345.   Valeant documents, interviews with former Valeant/Philidor employees, and sworn testimony further demonstrate that the Management Defendants were directly engaged in the business, including Valeant's pricing strategies for individual products.  For instance, when Valeant added Isuprel and Nitropress to its orphan drug portfolio, Pearson, Schiller, Kornwasser, Davis, Steve Sembler (the Company's former Senior Vice President of Neurology and Other), and Sandeep Lalilt (the Company's Senior Director of Marketing) all participated in a meeting to discuss the pricing of the newly-acquired drugs.  Prominent newspapers, including *The Wall Street Journal*, reported that Pearson intended to implement drastic price increases to attain Valeant's profit targets.  At his hearing before the United States Senate, Schiller testified that, despite the recommendation of the rest of the group, "Pearson made a decision to go with the higher price."

346.   The Management Defendants also represented themselves to investors as the persons most knowledgeable about Valeant's business, operating model, strategies (including pricing, the AF initiative, and specialty pharmacies), acquisitions, organic growth, internal controls, ethical standards, compliance programs, and the volume, pricing, and performance of Valeant's products.  The Management Defendants voluntarily and repeatedly chose to speak on these topics, so they either knew or recklessly disregarded the fact that their statements were materially misleading.

347.   For example, during a May 21, 2016, RBC Investor Meeting, Pearson discussed Valeant's stock price, stating "[w]e expect our stock to go up 50%, 70% a year, that's our expectation, that's what I get paid to do and our long-term investors appreciate it."  He also said "I believe that our company is fundamentally undervalued" and that "last year when we were

trading at 105 it was so obvious to me that we were so undervalued why wouldn't all you guys rush in?  Not just you guys but I mean investors clearly we weren't worth 105."

348.    Similarly, when Allergan called into question Valeant's pricing practices in mid-2014, Pearson and Schiller vigorously refuted these allegations and claimed Allergan lacked the knowledge about Valeant's business which both Pearson and Schiller possessed.  For example, on July 21, 2014, the Company announced it had contacted Quebec and U.S. regulators regarding Allergan's "false and misleading statements regarding Valeant's business," including assertions by Allergan in "an SEC filing that Bausch + Lomb's pharmaceutical sales were stagnant or declining."  In the same release, Pearson stated:

> We can no longer tolerate unjustified attacks on Valeant's business and strongly believe we are obligated to take action to protect Valeant shareholders from Allergan's apparent attempts to mislead investors and manipulate the market for Valeant stock. . . . Allergan's continued disparagement of Valeant and repeated questioning of Bausch + Lomb's performance demonstrate their fundamental lack of knowledge about Valeant's business. . . .
>
> Finally, we do not believe that it is productive for either company to conduct due diligence in a public forum and although we have consistently offered Allergan the opportunity to conduct due diligence on our business, its management and board have refused, and have instead chosen to make misrepresentations and false statements about our business.

349.    Additionally, Pearson, Schiller, and Rosiello were responsible for obtaining the knowledge necessary to ensure the Company's disclosures to the market were true when executing SOX Certifications.  Pearson, Schiller, and Rosiello either drafted, prepared, or approved Valeant's various SEC filings, releases, and other public statements, as evidenced by their signatures and their managerial control over the information disclosed within those statements.

C.      The Management Defendants' Decision to Close Philidor

350.    The Management Defendants designed, implemented, or possessed knowledge of Valeant's reliance upon Philidor and the related secret network of captive pharmacies to artificially inflate Valeant's growth rates until Philidor's closure in late 2015.  The Management Defendants also knew that Valeant was concealing its relationship with Philidor, because the Management Defendants were involved in the acquisition of Medicis and developed the "alternative fulfillment" strategy initially employed only for Medicis pharmaceuticals that led to the formation of Philidor on January 2, 2013.

351.    Indeed, Valeant announced the hiring of Kornwasser on January 3, 2013, one day after the formation of Philidor.  Kornwasser and Tanner served as Valeant's primary points of contact at Philidor and reported to Pearson (Kornwasser directly, Tanner through Kornwasser). The fact that Kornwasser received $8.8 million in total compensation in his first year of employment evidenced the central role that Philidor was intended to serve in Valeant's business model.

352.    Furthermore, Pearson, Schiller, and senior management signed the Philidor agreements and frequently discussed the benefits of Valeant's new "alternative fulfillment program" with investors, while misrepresenting the true nature of that program.   The Management Defendants knew that numerous Valeant employees assisted in the formation of Philidor and subsequently worked at Philidor under aliases in order to conceal the connection between Valeant and Philidor.

353.    Prior to purchasing the option to acquire Philidor, Pearson, Schiller, and Valeant's Board of Directors performed extensive due diligence of Philidor.  Notably, prior to the purchase of the option, the entire Audit and Risk Committee of Valeant's Board personally toured Philidor's facility in Pennsylvania.  Valeant thereby gained further additional knowledge about

Philidor's business practices and operation. After Valeant paid $100 million to acquire the option to purchase Philidor (for $0), Valeant failed to disclose—and, in fact, actively concealed—its relationship with Philidor, including in Valeant's financial statements. Valeant's entire Board of Directors also reviewed and affirmatively approved the Philidor transaction and Valeant's accounting treatment of that transaction, despite the fact that the accounting practices violated GAAP.

354.    Because Valeant possessed actual control over Philidor from the day it was created, the Management Defendants were at minimum aware of, or they were specifically involved in designing, Philidor's role in facilitating Valeant's fraudulent revenue-inflating scheme. Valeant held a contractual right to inspect Philidor's books, records, and facilities, and to audit Philidor's practices. Valeant either conducted such an audit and knowingly approved of Philidor's deceptive practices so long as they benefited Valeant, or it recklessly failed to conduct such an audit with the knowledge that Philidor's deceptive practices were best ignored as they benefited Valeant's revenue. In fact, Philidor employees have confirmed that the deceptive practices within Philidor were widely known (within Philidor), discussed, and even documented in Philidor's training manuals, demonstrating that any audit would have revealed the wrongdoing to Valeant. Moreover, Valeant's internal control testing and internal audit program in 2015 included Philidor, and Valeant and Philidor created a joint steering committee guiding Philidor's strategic plan, contractual obligations with insurers, and "internal policies, manuals, and processes."

355.    Contemporaneous email correspondence confirms that Pearson personally monitored or directed Philidor's business practices. For example, in an email sent by Kellen to Pearson on March 9, 2015, Kellen stated "Met with Deb [Jorn]. . . . Suggested we get all the

[District Managers] in for a day . . . goal to go over the practices in each district where Philidor is working well and identify next [approximately] 10 practices where we should push harder to build it out.  That will help fuel growth."  Pearson responded, "Good stuff."  Additionally, Valeant's management invited Philidor managers to meet Valeant's Board of Directors in July 2015.

356.    Valeant and the Management Defendants also closely monitored the network of pharmacies through which Philidor operated.  For example, when R&O Pharmacy withheld invoices from Valeant because of R&O's suspicions about fraudulent conduct involving Philidor, it was Valeant's general counsel that sent a letter to R&O's owner demanding "immediate payment."

357.    When the details of Philidor's relationship with Valeant first began to emerge to the market, the Management Defendants further revealed their intimate knowledge of Philidor's operations.  For example, on October 19, 2015, Pearson, Rosiello, and Kellen held a conference call with investors in which they defended Philidor (and Valeant's failure to disclose Philidor) as Valeant's "competitive advantage that we did not want to disclose to our competitors."  On another conference call a week later, on October 26, 2015, Pearson stated that Philidor was "independent" and sales through it were "less profitable."  Valeant announced four days later that Philidor would cease operations due to Philidor's improper practices.  The fact that the Management Defendants elected to shut down Philidor only four days after declaring it was in fact "independent" and "less profitable" illustrates that the Management Defendants were already well aware of Philidor's deceptive and illegal practices and further investigation was unnecessary.

358.   The Management Defendants' knowledge of Philidor's illicit practices is also apparent from Pearson's repeatedly highlighting the benefits of Valeant's "alternative fulfillment" strategy while simultaneously refusing to provide meaningful details to investors or the public.  Pearson himself admitted that it was a conscious decision to conceal Valeant's relationship with Philidor for supposed "competitive" reasons.

359.   Additionally, Pearson, Ingram, and Carro each publicly defended Valeant's accounting in an attempt to refute Citron Research's report, which suggested that Valeant artificially boosted its revenue through Philidor.  Ingram represented on an October 26, 2015, conference call with investors that the entire Valeant Board and Audit Committee had reviewed and confirmed as appropriate Valeant's accounting practices concerning Philidor.  But when the SEC opened an investigation into Valeant's relationship with Philidor, the Board asked Carro and Schiller to step down because they had engaged in "improper conduct" concerning Valeant's accounting of Philidor-related sales.  Valeant later admitted, as described in ¶ 132, that it needed to restate its prior financial statements because, among other things, it improperly inflated revenues through Philidor by double-booking revenues—a blatant violation of GAAP.

360.   Philidor's efforts to conceal its improper conduct further indicate the Management Defendants acted with scienter, given the effective and actual control Valeant exerted over Philidor.  Reuters reported that, in September 2015, "Philidor began requiring employees to sign confidentially agreements" that would enable "the pharmacy to sue workers who divulged information about its activities."   The timing of Philidor's adoption of confidentiality agreements, immediately following R&O's threat to sue, illustrates Philidor's efforts to conceal wrongdoing.

### D.      Valeant's Refusal to Pursue Remedies Against Individual Wrongdoers

361.    The strong inference of scienter is further supported by the fact that Valeant declined to pursue remedies (such as incentive pay "clawbacks") against Pearson, Schiller, Philidor, and the Philidor executives that engaged in the fraudulent conduct.

362.    Valeant's failure to take remedial action was not for lack of options.  In fact, in 2014, Valeant instituted a "clawback" policy that allowed the company to take back an executive's incentive compensation if a restatement was required within three years of the Relevant Period and the executive was found to have participated in any fraudulent or illegal conduct.  Valeant did not pursue that remedy here—after all, the Company had approved of the fraudulent conduct.  In fact, as Ingram revealed, the Board approved the accounting for Philidor. Thus, notwithstanding the clawback right, Valeant only terminated the employment of the wrongdoers and closed Philidor.

363.    Rather than pursuing a clawback, a month after announcing Pearson would be replaced as CEO, Valeant paid Pearson even more money – effectively a multimillion dollar gratuity.  Valeant retroactively modified Pearson's employment contract to provide him with a $2 million salary for 2016, in addition to other financial benefits, despite the fact that Pearson was entitled to only a performance bonus, but no salary, in 2016.  Valeant has since given Pearson a $9 million severance package.

364.    In addition to failing to enforce the clawback provisions, Valeant also failed to enforce broad indemnification rights against Philidor.  Specifically, the Philidor Purchase Option that Valeant acquired stated that Philidor "shall indemnify, defend, and hold harmless" Valeant "from and against all Losses" that Valeant suffered "as a result of the operation of the Pharmacy or the performance by the Pharmacy of its duties."  However, the Philidor Purchase Option agreement included a provision that any such indemnity liability "shall be reduced to the extent

. . . that such Losses are caused by or arise out of . . . the negligence or intentional misconduct of Manufacturer." Tellingly, rather than pursue its indemnification claim, Valeant entered into a mutual release with Philidor, effective November 1, 2015.

### E.   Congressional Hearings

365.    Congressional committees started investigating Valeant's business practices late in the summer of 2015, and many of the admissions made during these investigations and hearings further support an inference of scienter.

366.    In connection with a February 4, 2016, House Oversight Committee Hearing, Valeant produced 75,000 pages of documents to the House Oversight Committee. A number of these documents confirm the allegations set forth in this Complaint. Specifically, a summary of Valeant's document production affirmed that: (i) "Mr. Pearson purchased Isuprel and Nitropress in order to dramatically increase their prices" and "Valeant identified goals for revenues first, and then set drug prices to reach those goals"; (ii) "Valeant used its patient assistance programs to justify raising prices and to generate increased revenues by driving patients into closed distribution systems"; (iii) Valeant "sought to exploit this temporary monopoly by increasing prices dramatically to extremely high levels very quickly"; and (iv) "Mr. Pearson utilized this strategy with many more drugs than Isuprel and Nitropress," as Valeant increased by more than 200% the prices of a number of prescription drugs in its portfolio from 2014 to 2015.

367.    Also at the hearing on February 4, 2016, Schiller acknowledged that Valeant acquired the Marathon drugs (Nitropress and Isuprel) for the purpose of raising prices, as the two drugs accounted for 4% of 2015 revenues despite the fact that they were only two of nearly two thousand drugs in Valeant's portfolio. Schiller also testified at the hearing that risks associated with Valeant's price-gouging strategy included "increased pressure for rebates from the payers,

decreased sales volumes from hospitals, increased substitution of alternative products, and heightened competition from new generic or branded drugs."

368.    Pearson, Schiller, and Ackman also testified before the Senate Aging Committee, which conducted hearings concerning Valeant on April 27, 2016.  Pearson submitted a written statement prior to the hearing that acknowledged "the company was too aggressive—and *I, as its leader, was too aggressive—in pursuing price increases* on certain drugs."  Pearson and Schiller demonstrated throughout the hearing that they were actively involved in directing and implementing Valeant's drug pricing strategy.   While Pearson sought to depict the price increases as industry standard, he acknowledged, in direct contravention of his prior statements, that "*[o]ur pricing has driven more growth than volume*. . . ."

369.    In response to Senator McCaskill's observation that price had been more responsible for growth than volume in all quarters since 2013 bar one, Pearson confirmed that Senator McCaskill was correct.  This confirmation directly contradicted Pearson's April 29, 2015, statement and his October 14, 2015, letter to Senator McCaskill in which he represented that "[t]here is a misperception in the media that Valeant's revenue growth for existing products has been driven primarily by price."

370.    Finally, the Congressional probes focused on the December 2014 Philidor Purchase Option and why the "option" cost $100 million but the potential "acquisition" would be free.   Philidor's counsel provided the following written response: "Philidor concluded that Valeant's conduct was consistent with a concern about the economic impacts of any PBM response if Valeant had purchased Philidor."  This statement confirms that Philidor and Valeant were aware that the disclosure of Valeant's control over Philidor would result in PBMs refusing

to reimburse prescriptions filled by Philidor (which would have negative repercussions on Valeant), which Valeant failed to disclose even as Philidor's existence was revealed.

       **F.**     **Executive Departures**

     371.    The departure of numerous executives and directors, including certain Management Defendants, shortly before and after the revelations concerning the deceptive practices by Valeant and Philidor, further support an inference of scienter.

     372.    For example, on April 29, 2015, less than a half year before Philidor's relationship with Valeant was revealed, Valeant announced that Schiller would resign his CFO position upon the appointment of a successor.

     373.    Kornwasser departed Valeant in July 2015—even more proximate to the Philidor revelations.  Following his departure, Kornwasser declined to speak to the press, and Valeant never made him available for an interview with the House Oversight Committee.

     374.    Following the Philidor revelations, numerous senior-level members of management departed the Company.  For example, on or about March 2, 2016, news outlets reported that Jorn, the head of the U.S. Gastrointestinal and Dermatological divisions, was leaving Valeant, effective immediately.  As explained above, Philidor played a particularly vital role in boosting the sales of U.S. dermatology product lines.

     375.    On March 21, 2016, Valeant announced in a press release that Pearson would leave the Company.  In that same press release, Valeant admitted that Schiller and Carro engaged in "improper conduct" while serving in Valeant's management.  Schiller was asked to resign from the Board and Carro was replaced as Corporate Controller.

     376.    On April 29, 2016, Valeant announced that seven of its board members would not stand for re-election.  Pearson and Schiller were among the seven board members who departed.

377.     On May 20, 2016, Valeant revealed that Stoltz had resigned as Senior Vice President of Neurology, Dentistry, and Generics.

G.     **Pearson's Misrepresentations to Ackman**

378.     The fact that Pearson actively concealed Valeant's deceptive and illegal practices from Ackman, another large investor with whom Pearson had a continuing business relationship, provides further evidence of Pearson's scienter.

379.     In 2014, Ackman, who controlled Pershing Square, one of Valeant's then-largest shareholders, met with Pearson to create a partnership between Pershing Square and Valeant with the goal of acquiring Allergan.  Pursuant to their plan, Pershing Square bought a significant stake in Allergan in order to provide Valeant shareholder support.  Pershing Square would also publicly vouch for the value of Valeant's stock (which Valeant was attempting to use to acquire Allergan).

380.     After Allergan's resistance and public campaign against Valeant's takeover attempt, in which Allergan challenged the sustainability of Valeant's business model, Pershing Square conducted further due diligence on Valeant.  Pershing Square subsequently invested another $4 billion in Valeant.  Ackman and Pearson had frequent contacts, including phone calls, emails, and dinners.  Ackman even introduced other investors to Pearson, offered to assist Pearson with earnings calls, and provided Pearson with advice after earnings calls.

381.     Despite Ackman's extensive relationship with Pearson, Pearson concealed the extent of Valeant's price gouging and deceptive and illegal conduct.  Ackman, revealing his lack of knowledge, frequently defended Valeant against public attacks, and even as late as October 6, 2015, publicly stated that a "[v]ery small part of Valeant's business is repricing drugs."

382.     Eventually, like the rest of the market, Ackman learned the truth.  Ackman testified before the Senate, under oath, that he was unaware of the "horrible" and "wrong" price

increases that were later publicly disclosed with regard to Cupromine, Isuprel, Nitropress.  He further testified that "[c]learly [there] were things I did not understand about the business."

### H.    Executive Compensation

383.    Valeant had an unusual compensation structure that provided incredibly rich compensation packages if increasingly difficult performance goals were met.  The incentive to meet these goals, coupled with the threat of termination for failing to meet them, created a culture that valued fraudulent practices and results above ethics and truthfulness.

384.    Pearson's statement at a May 28, 2014, conference is illustrative of the increasingly difficult goals.  He stated that "[t]here's no tenure at Valeant.  It's up and out. . . . It's more like a professional services firm than a sort of traditional pharmaceutical company." He further explained that Valeant's compensation system was entirely dependent on an increasing stock price, stating:

> So, our Company senior management and the Board—we—there's only one metric that really counts, and it's total return to shareholders.  That's how we're paid.  We have a unique pay model, that at least we—at least—if we don't at least achieve a 15% total return to shareholders each year, compounded annual growth rate, that basically the equity we receive in terms of our stock grabs is worth nothing.

385.    Valeant would ultimately admit that the aggressive compensation and performance-goal system employed at the Company contributed to the Defendants' wrongdoing. On March 21, 2016, the Company stated that it "determined that the tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the Company's improper revenue recognition."

386.    Though missing targets was punished with forfeiture of bonuses or worse, meeting the aggressive financial targets resulted in multi-million-dollar awards for executives. For example, in 2014 Pearson received an $8 million incentive bonus, which was four times his

$2 million base compensation.   Similarly, Schiller received a $2.4 million incentive bonus, which was nearly two and half times his base compensation.

387.    These incentives paled in comparison to the amount Pearson would receive if he was able to maintain (or increase) Valeant's stock price until 2017, when he would be permitted to sell his Valeant shares.  The value of those shares as of March 31, 2014, was approximately $1.3 billion.  If Pearson could hold steady or raise the stock price through 2017, he could cash out his shares for well over $1 billion.  Bill Ackman revealed in April 2014 that much of Pearson's compensation was tied to incredibly aggressive stock price targets requiring compounded returns over three years of between 15% and 60%.

388.    This unusual package incentivized Pearson to use any means necessary, including illegal and deceptive means, to continue to increase the stock price through 2017 even at the expense of the Company's long-term health and financial stability.

389.    Pearson also took out a $100 million margin loan from Goldman Sachs pledging his shares (which he could not sell) as collateral—which was against Company guidelines and therefore required board approval.  This created a further incentive to artificially inflate the price of the Valeant shares because if the value of the shares fell, Goldman Sachs could make a margin call and force the sale of the shares to repay itself.  This, in fact, happened in November 2015.

390.    During the Relevant Period, Schiller also had millions of dollars in incentive compensation tied to meeting challenging share price increases.

391.    Ultimately, on March 21, 2016, Valeant admitted that its overly aggressive compensation targets had contributed to the wrongdoing at Valeant, stating:  "the Company has determined that the tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key

performance expectation, may have been contributing factors resulting in the Company's improper revenue recognition."

392.    Valeant's admitted issues with the "tone at the top" further supports an inference of scienter, since accounting and internal control guidance expressly recognize the importance of "top management" setting an appropriate tone  *See* SEC Staff Accounting Bulletin No. 99 at 16. As CEO during the Relevant Period, Pearson was ultimately responsible for Valeant's internal controls and setting an appropriate "tone at the top" which prioritized ethics and compliance with accounting practices over personal financial gain.  He failed to do so.

I.      **The Necessity of Inflating Valeant's Stock Price to Sustain Valeant's Acquisition-Centric Business Model**

393.    The Management Defendants also possessed motive to conceal their fraudulent business practices meant to inflate Valeant's stock price so as to sustain the viability of Valeant's acquisition strategy.  Without spending on R&D, Valeant was entirely dependent upon acquiring drugs or entire portfolios from other pharmaceutical companies.  The price of Valeant's stock played a significant role in either facilitating or impeding these acquisitions.

394.    In 2014, for instance, Valeant issued a cash and shares tender offer for shares of Allergan's stock, meaning that the value of Valeant's stock determined the value of Valeant's offer.  Indeed, Allergan's shareholders indicated to Ackman that they would support Valeant's bid if Valeant could "deliver $180 a share in Valeant in the value of the bid," meaning that the higher Valeant's stock price rose, the less cash Valeant would be required to include its offer.

395.    Similarly, Defendants utilized Valeant's inflated stock price to raise significant sums of capital in debt and stock offerings, which they used to fund Valeant's acquisition strategy.  For example, during the Relevant Period, Valeant conducted a series of massive high-yield debt offerings, producing almost $15 billion in cash for the Company from the investing

147

public, which Valeant then used to acquire companies such as Salix and Bausch & Lomb.   As another example, the March 16, 2015, stock offering in which Plaintiffs purchased Valeant common stock provided an additional $1.5 billion of capital for Valeant's acquisition of Salix.

## VII.   LOSS CAUSATION

396.   As described above, Defendants' wrongful conduct proximately and directly caused Plaintiffs' economic loss.   Defendants' statements and material omissions either caused or were a substantial contributing factor in causing Valeant's stock to trade at artificially inflated priced during the Relevant Period.   Due to Defendants' misstatements and material omissions, Valeant's stock reached $262.5 per share on August 5, 2015.

397.   When the false and misleading nature of Defendants' statements became apparent to the market, commencing in the third quarter of 2015 and continuing through the third quarter of 2016, Valeant's stock price plummeted, closing at as low as $24 per share on June 7, 2016. Tens of billions of dollars of shareholder market capitalization was destroyed when Defendants' false and misleading statements came to light, causing substantial damage to Plaintiffs and other investors.

398.   The corrective disclosures, revealing the artificially inflated price of Valeant shares, were disseminated gradually through a number of partial disclosures, discussed above in ¶¶ 269-334, revealing the truth and gradually undermining the market's willingness to accept the Defendants' misrepresentations and material omissions.   These disclosures caused economic injury to Plaintiffs.   No single disclosure was sufficient to fully negate the artificial inflation present in Valeant's common stock, because each single disclosure only partially revealed the concealed risks in Valeant's business.   Moreover, Defendants' repeated misstatements and omissions after or even in direct response to a corrective revelation further mitigated the corrective impact of any particular disclosure.   The continued misrepresentations not only

mitigated declines in the price of Valeant's publicly traded securities so as to artificially preserve some degree of inflation, but also directly induced Plaintiffs to retain their existing Valeant shares and purchase additional Valeant common stock even after certain corrective information had entered the market.  The release of subsequent additional corrective information caused further price declines that caused additional injury to Plaintiffs.

## VIII.  PLAINTIFFS' RELIANCE

399.    During the Relevant Period, Plaintiffs relied upon the materially false and misleading statements alleged herein when purchasing Valeant common stock.

400.    In this case, there is a presumption of reliance established by fraud-on-the-market doctrine because: (i) the Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period; (ii) the misrepresentations and omissions were material; (iii) the Company's common stock traded in efficient markets; (iv) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and (v) Plaintiffs purchased Valeant common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed without knowledge of the misrepresented or omitted facts.

401.    At all relevant times, the markets for Valeant's common stock were efficient for the following reasons, among others: (i) As a regulated issuer, Valeant filed periodic public reports with the SEC on a consolidated basis; (ii) Valeant regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (iii) Valeant was followed by several securities analysts

149

employed by major brokerage firm(s) who wrote reports that were distributed to the sales force(s) and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and, (iv) Valeant's common stock was listed and traded actively on the NYSE, a highly automated and efficient market.

402.    As a result of the foregoing, the markets for Valeant common stock promptly digested current information regarding the Company and its subsidiaries from all publicly available sources and reflected such information in the prices of the Valeant common stock. Under these circumstances, Plaintiffs were injured by their purchases of Valeant common stock during the Relevant Period at artificially inflated prices, and the presumption of reliance applies.

403.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

404.    Furthermore, Plaintiffs actually relied on Defendants' misrepresentations and material omissions when deciding whether to purchase Valeant common stock.

405.    During the Relevant Period, Plaintiffs' investments were managed by their investment advisor, Hound Partners, LLC ("Hound"), which utilized an active strategy based on an analytical and research-based investment process.   Hound analysts, in conjunction with Hound's Managing Member, made the decisions whether to purchase, sell, or hold shares of Valeant common stock for Plaintiffs.   Analysts regularly evaluated individual companies, including Valeant, and were responsible for advising the Managing Member whether to purchase, sell, or hold shares in those companies.   Factors considered by Hound analysts and investment professionals included, among other things, Valeant's financial performance and an

evaluation of Valeant's strengths, weaknesses, and opportunities.  Hound then relied on the analysis conducted by its analysts in deciding whether to purchase, sell, or hold shares.

406.   For instance, Plaintiffs or their representatives read the 2013 10-K, filed on February 28, 2014, and relied upon the misrepresentations referenced in ¶¶ 134-334 above in purchasing shares of Valeant common stock between February 28, 2014 and February 25, 2015. For example, Hounds' analysis during that period was premised on the fact that Valeant's financial statements purportedly complied with GAAP and Valeant supposedly had adequate internal controls.  Plaintiffs or their representatives also read the 2014 10-K, filed on February 25, 2015, and relied upon the misrepresentations referenced in ¶¶ 134-334 above in purchasing Valeant common stock between February 25, 2015 and the close of the Relevant Period.  For example, Hounds' analysis during this period was premised on the fact that Valeant's financial statements purportedly complied with GAAP and Valeant supposedly had adequate internal controls.

407.   Additionally, Plaintiffs or their representatives read the 1Q2013 10-Q, filed on May 3, 2013, and relied upon the misrepresentations referenced in ¶¶ 134-334 above in purchasing shares of Valeant common stock between May 3, 2013 and November 1, 2013. Plaintiffs or their representatives read the 3Q2013 10-Q, filed on November 1, 2013, and relied upon the misrepresentations referenced in ¶¶ 134-334 above in purchasing shares of Valeant common stock between November 1, 2013 and February 28, 2014.  Plaintiffs or their representatives read the 1Q2014 10-Q, filed on May 9, 2014, and relied upon the misrepresentations referenced in ¶¶ 134-334 above in purchasing Valeant common stock between May 9, 2014 and August 1, 2014.  Plaintiffs or their representatives read the 2Q2014 10-Q, filed on August 1, 2014,  and relied upon the misrepresentations referenced in ¶¶ 134-334

above in purchasing Valeant common stock between August 1, 2014 and October 24, 2014. Plaintiffs or their representatives read the 3Q2014 10-Q, filed on October 24, 2014, and relied upon the misrepresentations referenced in ¶¶ 134-334 above in purchasing Valeant common stock between October 24, 2014 and February 25, 2015. Plaintiffs or their representatives read the 1Q2015 10-Q, filed on April 30, 2015, and relied upon the misrepresentations referenced in ¶¶ 134-334 above in purchasing Valeant common stock between April 30, 2015 and July 28, 2015. Plaintiffs or their representatives read the 2Q2015 10-Q, filed on July 28, 2015, and relied upon the misrepresentations referenced in ¶¶ 134-334 above in purchasing Valeant common stock between July 28, 2015 and October 25, 2015. Plaintiffs or their representatives read the 3Q2015 10-Q, filed on October 25, 2015, and relied upon the misrepresentations referenced in ¶¶ 134-334 above in purchasing Valeant common stock between October 25, 2015 and the close of the Relevant Period.

408. Plaintiffs or their representatives also actually relied on numerous other misrepresentations made by Defendants. For example, on May 22, 2015, a Hound analyst reported internally on Pearson's May 21 speech at RBC and specifically noted that Pearson had stated that "organic growth is more volume than price and will continue to be." Over the next two months, relying on those misstatements, Hound authorized the purchase of more than 363,000 shares of Valeant common stock on behalf of Plaintiffs. Hound further relied on this critical misstatement in authorizing purchases for Plaintiffs for the remainder of the Relevant Period. Similarly, on September 28, 2015, a Hound analyst read and relied upon the misstatements contained within Valeant's September 28, 2015 8-K as referenced in ¶¶ 272-273. Over the next 3 days, relying on those misstatements, Hound authorized the purchase of more than 588,000 shares of Valeant common stock on behalf of Plaintiffs. Hound further relied on

these critical misstatements in authorizing purchases of Valeant common stock on behalf of Plaintiffs throughout the remainder of the Relevant Period.  Similarly, after Hound analysts and employees heard Pearson's misstatements regarding the Walgreens deal referenced in ¶¶ 316-319, Hound authorized the purchase of 82,000 additional Valeant common stock.  Hound further relied on these critical misstatements in authorizing the purchase of additional Valeant common stock throughout the Relevant Period.

409.    In addition, analysts and management of Hound had direct communications (by phone, in person, and email) with Valeant management, including Pearson and Schiller, in which Pearson and Schiller reiterated and reinforced to Hound the same misstatements Valeant made publicly, including that: (i) Valeant relied predominantly on volume growth to achieve its organic growth; (ii) price increases made up a relatively small portion of Valeant's business model, especially in comparison with volume growth; and (iii) Valeant's business model was sustainable.  Further, despite their direct communications with Hound, Pearson and Schiller never disclosed to Hound: (i) the existence of Philidor or Valeant's other controlled network of pharmacies; (ii) Philidor's deceptive and illegal conduct; or (iii) Valeant's inability to maintain price increases absent Philidor or similar controlled pharmacies.  Plaintiffs actually relied upon Valeant and the Management Defendant's' representations when making decisions to invest.  Including when initial allegations about Valeant's misconduct began to emerge in the fall of 2015 and Plaintiffs increased their position in Valeant, the representations that Valeant and the Management Defendants made to Plaintiffs influenced Plaintiffs' decisions to invest.

## IX.    NO SAFE HARBOR

410.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of

current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

411.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Valeant who knew that the statement was materially false or misleading when made.

## X.    NEW JERSEY RICO

412.    The RICO Defendants (defined as Valeant, the Management Defendants, and PwC) also violated New Jersey's Racketeer Influenced and Corrupt Organizations Act ("NJ RICO"), N.J. Stat. Ann. § 2C-51-1, et seq, which prohibits the involvement in the affairs of an enterprise through a pattern of racketeering activity.  More specifically, the RICO Defendants were employed by or associated with an enterprise and conducted the affairs of that enterprise through a pattern of racketeering activity, and the RICO Defendants conspired to conduct that illicit activity.

### A.    The Enterprise

413.    The illegal enterprise (the "Enterprise") consisted of various legally distinct but associated-in-fact entities, including pharmaceutical companies, specialty pharmacies, auditors, and other individuals and entities who associated together for the purpose of the artificial inflation of the value of Valeant stock by carrying out the pattern of racketeering activity through the use of mails and wires to defraud investors, engage in fraudulent market manipulation, obtain

154

illicit kickbacks, transport and transmit misappropriated funds and property through interstate commerce, and conspire to do the same.   The Enterprise purposefully enriched its members, including Valeant, the Management Defendants, and the Company's outside auditor by artificially increasing the value of the Company.   By increasing the Company's value, each of the Defendants' was personally enriched.   The Enterprise included but was not limited to the members detailed below.

414.   **Valeant**:   When Pearson became Valeant's CEO in 2008, Valeant identified and pursued a new strategy to increase revenue growth.   This strategy prioritized inflating Valeant's stock price, including by cutting R&D costs, so that Valeant could acquire pharmaceutical companies with established products, raise (unbeknownst to investors) the prices of those products, and falsely claim that the price-driven revenue growth was actually a function of increases in sales volume and cost-cutting measures.   This scheme was designed to further artificially inflate the value of Valeant's securities.

415.   Despite its public strategy, Valeant knew that it could not increase revenue through price increases alone in a competitive market, as price increases resulted in lower market share for Valeant-branded pharmaceuticals.   Valeant thus employed a sales strategy to fraudulently circumvent the competitive market.   Initially characterized as Valeant's "alternative fulfillment program," Valeant created a network of secret captive pharmacies through which Valeant could raise prices while insulating Valeant-branded drugs from competition from cheaper generic substitutes or alternatives.   Valeant's captive network of secret pharmacies employed a number of deceptive and fraudulent practices to increase the sales volume of Valeant-branded pharmaceuticals, as detailed above.   Valeant relied upon its alternative fulfillment strategy to increase prices well beyond those rates sustainable in the market.

416.    Moreover, Valeant's alternative fulfillment network defrauded not only the investors that acquired Valeant's securities at an artificially inflated premium, but also third-party payors and insurance companies that Valeant and its captive network of secret pharmacies billed for prescriptions that the pharmacies either did not dispense, or modified so as to prevent the replacement of costly Valeant-branded drugs with cheaper generic substitutes or near-identical alternatives, as detailed above.

417.    **Pearson**:  Pearson was the CEO of Valeant from February of 2008 until March of 2016.  Pearson led Valeant's development of the alternative fulfillment program, and personally designed and implemented Valeant's price-gouging business strategy.

418.    Pearson also coordinated with and directed other members of the Enterprise. Pearson conducted and coordinated numerous meetings with key members of the Enterprise. Finally, Pearson signed all of Valeant's quarterly and annual financial statements, including the SOX Certifications attesting to the accuracy of Valeant's financials and effectiveness of Valeant's internal controls.

419.    **Schiller**:  Schiller, Valeant's CFO between December 2011 and June 30, 2015, and Valeant's interim CEO during Pearson's medical absence in January and February of 2016, worked alongside Pearson to "religiously track each deal on a quarterly basis," and "track every [Valeant] product around the world."  Schiller coordinated with senior Valeant and Philidor executives, and contributed to the planning, approval, direction, and monitoring of every aspect Valeant and Philidor's fraudulent scheme.    Indeed, Schiller directly authorized the implementation of illegal practices in Valeant's alternative fulfillment program.

420.    In March 2016, Valeant would even admit that Schiller engaged in "improper conduct," which "contributed to the misstatement of [financial] results" and led to Valeant's

restatement of the Company's 2014 10-K and 1Q2015, 2Q2015, and 3Q2015 10-Q financial statements.

421.    **Carro**:   Carro exerted operational and managerial control over Valeant, and participated in the illegal scheme by directly authorizing the implementation of Philidor's fraudulent and unsustainable practices through the "alternative fulfillment program," facilitating and directing price increases, including of the drug Cuprimine by nearly 6,000 percent, and overseeing or participating in the preparation of Valeant's false and misleading financial statements.

422.    **Tanner**:   Tanner directed the alternative fulfillment program at Medicis, and was selected by Valeant management to develop Valeant's own alternative fulfillment program. Valeant's internal documents stated that Tanner was a "key organization talent," and Valeant promoted Tanner in April 2013 to Senior Director for the "Access Solutions Team."   Valeant promoted Tanner again to VP in charge of Access Solutions.

423.    As Access Solutions VP, Tanner worked with other members of the Enterprise to develop Philidor and implement the proposal for Valeant to partner with Philidor in support of Valeant's alternative fulfillment program.  Tanner also helped facilitate funding for Philidor.  On January 3, 2013, for instance, when Philidor was created, Tanner emailed Valeant executives for the following purposes: (i) to seek approval for the Philidor project; (ii) to receive a commitment to advance $2 million in funds to Philidor after fulfillment of certain milestones; and, (iii) to request that Valeant provide expertise and additional personnel support for the new pharmacy. Tanner also submitted a Valeant contract approval form, listing Tanner as the "Initiator" of the contract with Philidor.  The contract approval form described Tanner as the "Valeant Employee Primarily Responsible for Administration And Performance of Contract."   Eight Valeant

executives, including the CEO Pearson, would eventually sign the contract approval form by the summer of 2013.

424.    Tanner oversaw or directed all aspects of Philidor's business operations, including directing and implementing Philidor's fraudulent and unsustainable practices.  Moreover, Tanner personally directed Philidor employees to fraudulently resubmit denied claims for reimbursement to insurers and other third-party payors using different prices and different pharmacy fulfillment numbers under which Philidor would eventually receive payment at the highest possible amount. Tanner adopted an alias when directing involvement at Philidor, and communicated with Philidor employees under the alias "Brian Wilson" so that Tanner and Valeant's relationship with Philidor would remain concealed from the public.

425.    Additionally, Tanner enabled Valeant's purchase of Philidor, completed on December 15, 2014, when Valeant and Philidor executed the Philidor Purchase Option Agreement whereby Valeant paid $100 million in exchange for a ten-year option to acquire Philidor for $0.

426.    In August 2015, Valeant released Tanner.  Tanner was then immediately hired by Philidor, and negotiated a consulting agreement with Valeant while working at Philidor to enable Tanner to continue performing services for Valeant.

427.    Tanner received millions of dollars in compensation for his participation in the Enterprise.  Specifically, a four-count indictment filed by the U.S. Attorney for the Southern District of New York charged Tanner with fraud and conspiracy, alleging that Tanner was compensated $10 million for overseeing and directing Valeant's acquisition of the Philidor Purchase Option.  Valeant promised Tanner additional millions linked with milestones for Valeant products sold through the Philidor network.

428.   **Kornwasser**:  Laizer Kornwasser served as Valeant's EVP and Chairman from January 2013, joining Valeant's management team almost immediately after Valeant helped to create Philidor, through July 2015.  Pearson selected Kornwasser to serve as a liaison between Valeant and Philidor because Kornwasser had a background in the specialty pharmacy and pharmaceutical production industry, with unique expertise that enabled Valeant and Philidor to exploit specialty pharmacy distribution chains for the fraudulent sales of overpriced Valeant-branded pharmaceuticals.

429.   **Additional Valeant Employees**:  Additional Valeant employees either directed, oversaw, or coordinated the Enterprise's activities, including but not limited to the following individuals: (i) Bijal Patel, who helped facilitate the creation of Philidor and developed Philidor's "back door" reimbursement practices that enabled Valeant and Philidor to defraud insurance companies and other third-party payors; and (ii) Defendant Kellen, who served as Valeant's EVP and head of Valeant's U.S. dermatology business and orchestrated Valeant's price gouging of dermatology pharmaceuticals, a product line that relied heavily upon Philidor for sales volume.

430.   **Philidor**:  Gary Tanner and Andrew Davenport created Philidor under Valeant's control on January 2, 2013.  Philidor's sole purpose was to maximize (by increasing or at least preserving) Valeant's sales volume while Valeant implemented massive price increases across its pharmaceutical portfolio that ordinarily would have resulted in significant declines in market share and ultimately revenue.  Throughout Philidor's existence, Valeant was Philidor's only customer, and Valeant employees helped form and staff Philidor and directed its improper activities.

431.   Philidor fraudulently represented itself as a specialty pharmacy.  Unlike true specialty pharmacies that focus on highly-differentiated branded drugs for patients undergoing

intensive therapies or suffering from complex illnesses, Philidor primarily dispensed Valeant's undifferentiated drugs, for which Valeant charged a significant price premium for minimal benefit relative to generic substitutes or near-identical alternatives available to treat common dermatological conditions like acne and eczema.  Through Philidor, Valeant insulated itself from competition from cheaper substitutes for Valeant's overpriced drugs by: (i) ignoring contractual or statutory mandates that pharmacies substitute cheaper generics for unnecessary branded drugs; (ii) submitting fraudulent claims, including for refills that patients neither requested nor needed; (iii) submitting claims for pharmacies that had not filled the submitted prescription; and (iv) implementing fraudulent and illegal patient co-pay assistance programs.

432.    Moreover, the Enterprise went to extensive lengths to conceal the relationship between Philidor and Valeant, creating a number of shell companies tied to Philidor, which would then acquire interests in smaller retail or mail order pharmacies across the country. Valeant and Philidor would then utilize these smaller captive pharmacies for substantially similar purposes to Philidor.  As explained in more detail below, each of these entities also was a member of the Enterprise.

433.    **Andrew Davenport**:  Andrew Davenport was the principal of BQ6 Media, and later Philidor's CEO.  Davenport met Tanner through BQ6 Media's services for Medicis' alternative fulfillment program.  When Valeant acquired Medicis, Andrew Davenport worked with Tanner and others to create Philidor.  Davenport, personally and through a wholly-owned shell company, held 40% of Philidor.  Davenport worked with Tanner and others in the Enterprise to defraud investors and healthcare industry stakeholders, by facilitating the fraudulent sale and reimbursement of Valeant-branded drugs through Philidor and other captive secret pharmacies controlled by Philidor and Valeant.  Davenport also helped arrange for

Valeant's concealed acquisition of Philidor.  In December of 2016, Davenport was arrested and charged with four counts of fraud and conspiracy as a result of his participation in the Enterprise's fraudulent scheme, specifically Davenport's payment of a $10 million kickback to Tanner for Tanner's role creating the Philidor Purchase Option.

434.    **Matthew Davenport**:  Matthew Davenport was Andrew Davenport's brother, and a principal at Philidor.  Matthew Davenport participated and coordinated the Enterprise's fraudulent scheme, specifically by certifying Philidor's fraudulent applications for pharmacy licenses to expand Philidor's captive pharmacy network, conceal the Philidor/Valeant relationship, and increase the number of channels through which Philidor could artificially inflate Valeant's revenue.

435.    **Valeant Board Members and Audit Committee**:  Norma Provencio, Katherine Stevenson, and Theo Melas-Kyriazi served on Valeant's Audit Committee during the Relevant Period.  Valeant's Board of Directors also included Robert Ingram, Ronald Farmer, Colleen Goggins, Anders Lonner, and Robert Power.  Valeant's Board Members and Audit Committee enabled and supervised the Enterprise's fraudulent scheme by:  (i) approving the $100 million acquisition of the Philidor Purchase Option; (ii) concealing this acquisition from investors and regulators by failing to identify Philidor as a VIE in the Company's financial reporting; and, (iii) approving Valeant's fraudulent accounting of drug sales to Philidor leading up to the acquisition of the Philidor Purchase Option.  Specifically, CFO Rosiello admitted on an October 26, 2015 conference call with investors and analysts that the "Finance and Transaction Committee, Audit and Risk Committee and the Full Board all reviewed the [Philidor] transaction [and] [t]the appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee."

436.   **PwC**:  PwC was Valeant's outside auditor, responsible for auditing Valeant's year-end financials in accordance with U.S. Generally Accepted Auditing Standards ("GAAS") and issuing audit opinions addressing the adequacy of Valeant's financial reporting and internal controls.  Additionally, PwC served as Philidor's outside auditor, and thus had direct knowledge of the Philidor Purchase Option that Valeant acquired and Valeant's subsequent consolidation of Philidor's sales in the Company's public financial statements.

437.   Working in concert with the other members of the Enterprise, PwC facilitated Valeant's concealment of the Company's relationship with Philidor by, among other actions, certifying Valeant's fraudulent accounting.  In PwC's audit opinion accompanying Valeant's 2014 year-end financial statements, for instance, PwC stated: "[Valeant's] consolidated balance sheets . . . present fairly, in all material respects, the financial position of Valeant Pharmaceuticals International Inc. and its subsidiaries . . . at December 31, 2014 and December 31, 2013, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2014 are in conformity with accounting principles generally accepted in the United States of America."  Moreover, PwC's 2014 audit opinion stated that Valeant "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014."

438.   PwC's representations were materially false at the time that they were made.  Following the exposure of the Enterprise's scheme, Valeant admitted that its financial statements for fiscal 2014 and the first quarter of 2015 contained material misstatements.  Specifically, Valeant admitted that it overstated revenues by $58 million, overstated net income by $33 million, and EPS by $0.09.  Moreover, Valeant has admitted to material failures in its internal controls and violations of GAAP, as described above.  PwC similarly admitted the falsity of its

own statements, including its accounting restatement for Valeant that confirmed: (i) Valeant's 2014 financial statements violated GAAP; (ii) Valeant's 2014 and 1Q2015 financial statements materially overstated Valeant's revenues, income, and EPS; and, (iii) Valeant's internal controls were not adequate.

439.   Finally, on or about March 16, 2015, Valeant benefited, with PwC's knowledge, from PwC's materially misleading audit report for the fiscal year ending December 31, 2014, by raising over $1.45 billion through a public offering of 7.3 million shares of common stock at a price of $199 per share, of which Plaintiffs purchased nearly $55 million.

440.   **Additional Enterprise Members**:   The Enterprise also included additional known and unknown participants who participated in and facilitated the fraudulent scheme, including but not limited to: Isolani LLC, a Philidor-controlled shell company used to purchase R&O Pharmacy; Lucena Holdings, a Philidor-controlled shell company used to purchase West Wiltshire Pharmacy in California; Back Rank, LLC, a Philidor-controlled shell company used to purchase a stake in Orbit Pharmacy, Inc.; KGA Fulfillment Services, Inc., a Valeant subsidiary used to lend money to Philidor's owners and the vehicle through which Valeant held the Philidor Purchase Option; Fifty Moves, LLC, ELO Pharmacy LLC, C-K Pharmacies LLC, Tarrasch Pharmacy Holdings, LLC, NC3 Pharmacy LLC, and Lasker Pharmacies, LLC, all of which were Philidor-created shell companies intended to expand Valeant's network of captive pharmacies; and SafeRx Pharmacy, D&A Pharmacy, Prescription Shoppe, Heritage Compounding Pharmacy, Parkwest Pharmacy, all of which were specialty pharmacies that Philidor controlled and through which Philidor distributed Valeant's price-gouging drugs.

441.   Although these entities and persons are legally distinct, each associated in fact with a common purpose, identifiable relationships and sufficient longevity to pursue their

common purpose.  Specifically, beginning no later than January 2013 and continuing until the illegal scheme was revealed and Philidor was shut down in or around January 2016, these aforementioned entities and persons engaged in a mutually understood, agreed-upon, and coordinated campaign of racketeering activity for financial gain, resulting in the enrichment of the Enterprise members, the defrauding of insurance companies and other third-party payors in the American health system, and the artificial inflation of the price of Valeant's securities, all at the expense of Valeant's investors.  These wrongful acts resulted in the loss of tens of billions of dollars in investor value.

      **B.**    **The Criminal Scheme**

           **1.**    **Valeant's Deceptive Business Model**

442.    **Growth by Acquisition**:  As described above including in ¶¶ 46-56, Pearson eliminated nearly all R&D spending at Valeant, seeking to acquire companies with already established products and then supposedly increase revenue from those established products though increasing sales volume, cutting costs, and appropriately pricing the products.  As part of this strategy, Valeant acquired more than 100 pharmaceutical companies or drug portfolios between 2008 and 2014.

443.    **Valeant's Extensive Price Gouging**:  Valeant's acquisition strategy, described above including in ¶¶ 57-63, required continuous revenue growth so that Valeant could carry its heavy debt load, effectively acquire other companies, and enrich itself and its executives.  If Valeant's revenues declined, the Company's stock prices would decline and the Valeant business model would no longer be practicable.  To increase revenue, Valeant could either increase sales volume while maintaining price, increase prices while maintaining sales volume, or some combination of the two.  While Pearson represented to investors that the Company's revenue increases were driven by sales volume increases, which are considered a safe form of "organic

growth," as detailed above, the Company actually pursued price-gouging tactics whereby Valeant would massively increase the prices of the pharmaceutical products in its portfolio, such that price rather than volume was responsible for the majority of Valeant's growth.  Also as detailed in ¶¶ 57-63, Valeant would ultimately raise its brand name drug prices by 66 percent on average, which amounted to five times the price increases of its closest competitor in the pharmaceutical industry.  By depicting the revenue accrued from these unsustainable price increases as primarily volume increases, Valeant was able to mislead its investors regarding the sustainability of Valeant's business model, as detailed above.

444.    **The Enterprise Inflated Sales through a Secret Network of Captive Pharmacies**:  Because Valeant's price-gouging strategy involved unsustainable price increases that payors would never accept in a transparent market, Valeant created a fraudulent arrangement with a secret network of captive pharmacies to implement its price increases by defrauding insurance companies and other third-party payors, as detailed above.  Specifically, Valeant created an intentionally oblique "alternative fulfillment program," which investors and industry stakeholders eventually discovered was a euphemism for the fraudulent, clandestine pharmacy network, as described above including in ¶¶ 64-105.  Most prominently, Valeant was instrumental in the creation of Philidor, the Valeant-controlled "specialty pharmacy" at the center of this captive network, under the direction of Tanner and Andrew Davenport, as detailed above.  Notably, in addition to being necessary to pursuing Valeant's undisclosed price-gouging practice, the illegal tactics utilized by Valeant and its network of specialty pharmacies also had the effect of inflating Valeant's already overstated volume growth.

445.    Specifically, Valeant provided financing, staffing, and other resources to develop and operate Philidor, as described above including in ¶¶ 64-105.  Valeant then utilized Philidor

to dispense its products, communicate with patients and other actors in the prescription drug distribution chain, manage the prior authorization process, handle delivery of Valeant products, and manage Valeant prescription refills, as detailed above.  Valeant possessed significant formal control over Philidor, including the right to inspect Philidor, audit Philidor's compliance with the parties' contractual arrangements, and to "assess and evaluate the operation of the program."

446.    The Enterprise, as defined above, employed a number of measures to conceal the relationship between Philidor, Valeant, and the individual members of the Enterprise.   For example, Valeant employees, including Tanner and Patel, operated under aliases when conducting work on behalf of Philidor to conceal the relationship between the two entities, and to enable Valeant management covertly to direct and facilitate Philidor's operations.   And as detailed above, Valeant repeatedly failed to disclose its relationship to, and reliance on, Philidor and the other captive pharmacies.

447.    **The Enterprise Sold Price Gouged Drugs by Manipulating Patient Assistance Programs and a Specially Designed Public-Relations Campaign**:   As described above including in ¶¶ 106-112, Valeant's scheme to sell its price-gouged drugs also depended on manipulating the Company's PAPs programs to avoid the scrutiny of the public and increases the sales of exorbitantly-priced  Valeant-branded pharmaceuticals by removing the incentives for patients to seek less costly treatment.   Specifically, Valeant waived and eliminated patient copays, increasing the costs of patient assistance programs by over 1,100 percent to ensure sales of its price-gouged drugs, as detailed above.   As Valeant's own presentations indicated, "[s]ubstantial price actions could attract undue negative publicity from patients, HCP's, payors, and/or government agencies," so the Company developed and implemented a "PR Mitigation" plan to "[p]rivately address concerns from patients, insurance companies, or managed care

providers to prevent public displays of negative sentiment" and "[m]inimize media coverage of [] price increase[s]."  The price-gouging strategy described herein was critical to the Enterprise's scheme, as the strategy enabled Valeant to drive massive short-term revenues, which then provided Valeant with the ability to further artificially inflate the value of the Company's securities.  The Enterprise touted the unsustainable short term gains to mislead investors that Valeant had in fact developed a unique but sustainable and legitimate business model that would continue to produce such performance in the future.

448.  **The Enterprise Creates a National Network of Captive Pharmacies through Philidor**:  As described above including in ¶¶ 64-105, the Enterprise created a web of shell companies through which Valeant expanded its network of captive secret specialty pharmacies. The ownership structure facilitated the Enterprise's price-gouging by fraudulently maintaining volume across the country, without revealing that the pharmacies used to maintain volume by insulating Valeant's products from competition were in fact directed and controlled by Valeant, as detailed above.  The purpose of this secret network was to obfuscate Valeant's role in the aggressive promotion and sale of its unnecessary price-gouged drugs.  Additionally, the network allowed Valeant to implement deceptive practices designed to trick payors into reimbursing Valeant for drugs, as detailed above.

449.  Specifically, Valeant utilized its wholly-owned shell companies to acquire legally operating pharmacies in states in which Philidor could not operate, and then misleadingly denied their association with Philidor when applying for pharmacy licenses through those acquired pharmacies.  The acquisition of R&O Pharmacy in California, for instance, eventually led to the unveiling of the Philidor/Valeant connection, as its principal owner learned that Philidor was misleadingly submitting claims for reimbursement to insurance companies using R&O's

information, despite the fact that R&O had not filled those prescriptions, as detailed above.  This lawsuit revealed the following ways in which the Enterprise utilized the secret deceptive relationship between Valeant and Philidor, including that: (i) Philidor sold Valeant drugs using other pharmacies' identification numbers, including for drugs those other pharmacies did not even stock, to decrease the rate at which insurance companies would reject those claims; (ii) Eric Rice, Philidor employee and sole member of Philidor shell company, Isolani, signed audits of R&O that R&O's CEO refused to sign; and, (iii) Philidor refused to apply for, or provide R&O with proof of application for, pharmacy licenses in states where Philidor operated under the R&O name.  As detailed above, R&O ended up bringing suit against Philidor and Valeant when their relationship became apparent when Valeant's general counsel responded to R&O inquiries with hostile threats.

450.    Philidor created other shell companies for the acquisition of other licensed pharmacies nationwide, including West Wilshire Pharmacy in California, and Back Rank Pharmacy in Texas, as detailed above.  The Enterprise used these shell companies and captive pharmacies to implement Philidor's range of deceptive and illegal sales practices.  Specifically, as detailed above, Philidor created an internal "adjudication" department to receive prescriptions from doctors and ship drugs to patients before health insurance coverage was secured.  Philidor distributed a training manual, as detailed above, which instructed employees on deceptive and fraudulent practices, including but not limited to: (i) application of "back door" approaches so that insurers who would not be willing to pay for Valeant-pharmaceuticals would be tricked into paying; (ii) filling prescriptions through Philidor in states where neither Philidor nor the captive pharmacies had a pharmacy license; and (iii) altering without authorization doctors' prescriptions

to include a "dispense as written" instruction to prevent a pharmacy from substituting cheaper generic equivalents.

451.    The Enterprise therefore misled investors and the public by failing to disclose Valeant's relationship with Philidor and the nationwide network of captive pharmacies so that patients, other third-party payors, and PBMs would continue to pay for Valeant-branded pharmaceuticals despite the price-increases and minimal pharmacological benefit over comparable generics, as described above including in ¶¶ 134-334.  Concealing the Valeant-Philidor relationship was critical to the Enterprise's scheme because, among other reasons, the tactics described herein violated numerous legal and contractual obligations governing Valeant's relationship with pharmacies, as detailed above.  The fact that OptumRx sent cease and desist letters to, and ceased doing business with, R&O and West Wilshere Pharmacy after discovering that Philidor was operating through those entities evidences the fact that these practices violated PBM agreements.  When Valeant's relationship to Philidor was exposed, many major third-party payors terminated their contracts with Philidor and scrutinized Valeant pricing even more closely, leading to a massive decline in revenue for many of Valeant's most important drugs, and directly causing damages to Plaintiffs' property in the subsequent devaluation of Valeant securities.

452.    **Valeant Formalizes its Control over Philidor through the Execution of an Undisclosed Purchase Option Agreement**:  As detailed above, the Philidor Purchase Option allowed Valeant to make a payment of $100 million for the right to acquire Philidor for $0.  The Enterprise structured the deal in this way so as to (wrongly) avoid disclosing the acquisition, as detailed above, and even routed the transaction through Valeant's wholly owned subsidiary, KGA.  The Philidor Purchase Option was subject to further malfeasance by Tanner and

169

Philidor's CEO, Andrew Davenport, both of whom exploited the Valeant-Philidor relationship to operate a kickback and money-laundering scheme yielding nearly $50 million and resulting in their federal criminal indictment.  Valeant's top executive team (including Pearson and Schiller) was aware of, sanctioned, or even directed Tanner and Andrew Davenport's scheme, but did nothing to prevent or disclose their illegal conduct because Tanner and Andrew Davenport facilitated the Valeant/Philidor relationship central to the Enterprise's success.  Indeed, the secret network of captive pharmacies and attendant host of deceptive and illegal side practices was part of the value that Valeant sought when it purchased the Philidor Purchase Option, as the purchasing agreement required Valeant to enter into subsequent agreements with Philidor shell companies, including Lucena and Isolani.

### 2.  The Defendants' Accounting Violations

453.  **Valeant Violated the Company's Obligations under GAAP**:  Under federal securities laws, as detailed above, Valeant had important reporting and disclosure obligations. Specifically, Valeant is required to prepare its financial statements in accordance with GAAP, a set of rules and standards that are designed to ensure uniform financial reporting, as described above including in ¶¶ 220-268.  Failing to prepare such statements in accordance with GAAP renders them misleading and inaccurate.  As described above including in ¶¶ 220-268, Valeant violated these obligations by omitting to disclose material information and directly misrepresenting Valeant's use of a secret network of captive pharmacies, Valeant's recorded revenue, Valeant's reliance on Philidor, and the true nature and source of Valeant's growth. Valeant's financial statements violated GAAP in at least the following ways, as described above including in ¶¶ 220-268: (i) Valeant failed to disclose Philidor despite the fact that Philidor should have been considered a material VIE during the period, Philidor was a material change in sales channel, and the Philidor Purchase Option was a material acquisition; (ii) Valeant

improperly double-booked revenue for sales to Philidor in the fourth quarter of 2014; and, (iii) Valeant's executives falsely certified that Valeant maintained adequate internal controls over financial reporting throughout the Relevant Period, statements that Valeant later admitted were untrue. Indeed, when Valeant finally disclosed its relationship with Philidor in October 2015, analysts considered these transactions to be significant as, for example, Morgan Stanley estimated that Philidor contributed over 50 percent of Valeant's 2015 U.S. organic growth, and BMO Capital Markets concluded that Valeant should have disclosed the structure of its relationship and the consolidation because the secret pharmacy channel represented approximately 10 percent of Valeant's revenue.

454.    The Enterprise nonetheless suppressed information about Philidor, falsely attributed Valeant's growth to volume increases, and misstated its revenues because this information was material to investors, who the Enterprise sought to convince that Valeant's acquisition strategy constituted a viable model for sustainable, volume-based growth. If investors understood how much Valeant's growth relied on fraudulently extracting payments from insurance companies and other third-party payors, they would not have valued Valeant's securities so highly, as demonstrated by the massive devaluation of Valeant's securities that occurred when the truth emerged.

455.    **PwC Violated Auditor's Responsibilities under GAAS**:  PwC served as Valeant's purportedly independent outside auditor throughout the Relevant Period, as described above including in ¶¶ 258-268.

456.    As Valeant's independent auditor, PwC was required to adhere to PCAOB Standards and satisfy its responsibilities thereunder, and—as part of its audit of Valeant's financial statements—PwC certified in the 2013 and 2014 10-K's that it performed its audits of

Valeant's financials in accordance with these standards.  PwC's special role as independent auditor meant that it could not blindly accept Valeant's representations about its accounting decisions, and it also meant that in the case of certain unusual or potentially problematic arrangements—like Valeant's relationship with Philidor—PwC had a heightened duty to satisfy itself on behalf of Valeant's investors that Valeant made the proper disclosures, as described above including in ¶¶ 258-268.  Specifically, PwC had responsibility to plan and perform the audit to obtain reasonable assurance about the truth of Valeant's consolidated financial statements; apply professional care and exercise professional skepticism to reduce audit risk; conduct reasonable investigation in connection with Valeant common stock offerings; and, perform additional procedures to the extent PwC became aware of noncompliance.

457.    PwC violated those four obligations, including PCAOB Standards, as Valeant's outside auditor during the 2014 audit, as described above including in ¶¶ 258-268.  Specifically, in the case of the Philidor transactions, several clear factors imposed upon PwC the responsibility to inquire further into the accounting for Philidor and not simply rely on management's representations, an obligation PwC did not fulfill as described above including in ¶¶ 258-268.   Because Valeant's transactions related to Philidor were "significant unusual transactions" that, according to PCAOB standards, pose a higher risk of fraud, PwC was required to inquire further into the transactions.  Nonetheless, PwC approved Valeant's decision not to disclose Philidor despite clear indications that Philidor was material and the fact that Valeant had disclosed smaller transactions as material in the same time frame.  Accordingly, PwC either failed to inquire further into the Philidor relationship, thus failing to conduct its audit in accordance with GAAS, or PwC did inquire further, and still approved Valeant's accounting and certified its internal controls, in violation of accounting standards.  Because PwC certified in the

2014 10-K that it had conducted its audit in accordance with GAAS, that Valeant's finances complied with GAAP in all material respects, and that Valeant had adequate internal controls over financial reporting, at least one of those representations was knowingly or recklessly false. Specifically, PwC had heightened responsibility to examine the Philidor transactions, as described above including in ¶¶ 258-268. PwC also had a responsibility to consider several clear indicators that these sales were not negotiated by Philidor at arm's length, including: (i) non-standard sales terms, including unusually large sales volumes; (ii) artificially inflated sales prices; and (iii) payment terms that delayed Philidor's payment obligations. As described above including in ¶¶ 258-268, PwC approved Valeant's decision not to disclose the Philidor-related activity in Valeant's audited 2014 financial statements.

### 3. The Enterprise's Material Misrepresentations and Omissions

458. An essential element of the scheme was the Enterprise members' efforts to conceal their price-based business model and deceptive sales tactics by making prolific false and misleading representations about Valeant's business model and results. Without the cover of this campaign of misrepresentations, the Enterprise would have been unable to retain investors, sell new securities at inflated prices, or sustain its short-term business model of reaping profits by increasing prices. Each of the Enterprise's intentional misrepresentations constitutes a violation of Sections 10(b) of the Exchange Act and gives rise to a separate claim of securities, mail and wire fraud, and, as such, each constitutes a separate predicate act of racketeering under NJ RICO.

459. During the Relevant Period, the Enterprise made numerous material misrepresentations and omissions of material fact concerning Valeant's business including, as detailed in ¶¶ 134-334 above: (i) statements representing that volume played a larger role in Valeant's rapid revenue growth than it actually did; (ii) statements obscuring and omitting to disclose Valeant's ties to Philidor and use of a network of secret pharmacies and deceptive

business practices to unsustainably and artificially inflate sales and prop up prices; (iii) representations that Valeant's reported financials for the third and fourth quarters and full year of 2014, and the first nine months of 2015, complied with GAAP, and that the Company's financial guidance for 2016 had a reasonable basis in fact; (iv) general representations by Defendants and certifications by Valeant's executives that the Company had adequate internal controls; and (v) audit opinions by PwC certifying that Valeant's financial statements complied with GAAP and that Valeant had adequate internal controls.

460.   Among other consequences, the Enterprise's material misstatements and omissions caused Valeant securities to trade at artificially inflated prices during the Relevant Period.  As detailed in ¶¶ 130-133 above, these statements and omissions were materially false and misleading because:

(a) From 2013 to 2015, Valeant pursued a deliberate strategy—devised at the highest levels of the Company, but hidden from investors—that relied on steep and repeated price hikes rather than sustainable volume increases to drive revenue growth;

(b) Valeant helped create Philidor in 2013 solely to benefit Valeant, controlled the pharmacy by staffing it with Valeant employees, and, through Philidor and its network of secret captive pharmacies, implemented deceptive business practices to drive sales of Valeant drugs by ensuring that therapeutically identical generic drugs and other alternatives were not substituted for Valeant's expensive branded drugs;

(c) Valeant employed deceptive practices that included: (i) implementing enormous undisclosed price increases that Defendants knew were unsustainable but allowed Valeant to meet financial targets; (ii) using Valeant's sales force to route patients into Valeant's network of secret and captive pharmacies that presented themselves as

independent; (iii) using the so called "patient assistance" program and public relations strategies to minimize patient complaints and deflect scrutiny into the Company's improper practices; and (iv) concealing these practices from payors and physicians in order to obtain reimbursement for drugs that would not otherwise be reimbursed if these practices were known to private payors, physicians, and PBMs;

(d) Valeant's reported revenues, earnings per share, profitability, growth, and future business prospects were dependent on the Company's continued ability to conceal and rely on these deceptive business practices and thus did not accurately portray Valeant's business prospects and financial performance;

(e) Valeant's control and use of Philidor and its network of secret pharmacies, and the Company's deceptive business practices posed material regulatory and reimbursement risks to Valeant's business prospects. These risks included government investigations, regulatory sanctions, criminal charges, reputational harm, contractual violations, and decreased sales and revenues;

(f) Valeant's growth and ability to service its debt were dependent on maintaining a cycle of acquiring companies and drug portfolios and then generating revenue by putting the newly acquired drugs through its program of massive price increases coupled with the deceptive practices described above. By relying on deceptive practices to support its debt-fueled acquisition strategy, the Defendants exponentially magnified business risks to the Company in the event that discovery forced the Company to stop its secret strategy;

(g) Valeant failed to disclose Philidor as a material VIE, as required by GAAP;

(h) Valeant improperly recognized Philidor revenue, in violation of GAAP, causing revenues, net income, and EPS to be materially misstated and inflated;

(i) Valeant's financial predictions for 2016 did not have a reasonable basis in fact and were issued to artificially inflate Valeant's securities in the face of new revelations about its business model; and

(j) Valeant did not have adequate internal controls, and in fact, Valeant has admitted that certain Valeant executives cultivated an "improper tone at that top of the organization" and a "performance-based environment" where employees prioritized stock price and their own compensation over building a sustainable business and complying with applicable laws, regulations, and contracts.

461.   **The Enterprise Falsely Attributed Valeant's Rapid Revenue Increases to Organic Volume Growth and Obscured Valeant's Reliance on Price Increases**:  As detailed including in ¶¶ 134-189 above, throughout the Relevant Period, the Enterprise repeatedly misrepresented the amount of Valeant's revenue growth that was driven by organic growth in volume, rather than price increases.  These statements were materially false and misleading because they failed to disclose how dependent Valeant was on price increases, supported by a network of captive pharmacies, to drive revenue.  Because investors associate volume-based revenue growth with more sustainable long-term cash flows, and consider price increases to be a short-term boost, these representations were material to investors' decisions to buy Valeant securities.  Valeant could only sustain this model as long as it could rely on a secret network of pharmacies to hide the reimbursement practices it needed to sustain its price increases.  In addition, the statements were false because they failed to disclose that Valeant's already overstated volume figures were inflated by its secret network of pharmacies' deceptive and illegal conduct.  As the details of its deceptive practices were revealed, Valeant lost its ability to receive reimbursement for its high-priced drugs and its profits plunged.

462.    **The Enterprise Misrepresented Valeant's Relationship with Philidor**:   As detailed including in ¶¶ 190-219 above, Defendants created Philidor and a network of secret pharmacies to facilitate Valeant's inflated prices by ensuring that patients received Valeant prescriptions rather than cheaper alternatives and to bypass other cost-controlling systems employed by PBMs and third-party payors.  In order to continue its fraudulent program the Enterprise had to conceal Philidor's ties to Valeant.  To do so, Defendants issued numerous false and misleading statements during the Relevant Period and violated relevant accounting rules in their public filings.

463.    **The Enterprise Misrepresented and Manipulated Valeant's Revenue Recognition**:   As detailed including in ¶¶ 220-245 above, Valeant admitted that reported revenues in publicly filed documents were materially overstated.  The eventual disclosure of these misrepresentations led to significant declines in the value of Valeant securities, reflecting the conclusions that investors would have drawn if Valeant had disclosed the characteristics of its sales through Philidor and its control of the captive pharmacy before or at year-end 2014, as well as the other misstatements concerning revenue recognition.

464.    **The Enterprise Misrepresented Valeant's Compliance with GAAP**:   As detailed including in ¶¶ 220-245 above, Defendants falsely represented in public statements and in filings with the SEC that Valeant's financial statements and public filings had been prepared in accordance with GAAP throughout the Relevant Period.

465.    **The Enterprise Misrepresented Valeant's Certifications of Internal Controls**: As detailed including in ¶¶ 246-257 above, in Valeant's filings with the SEC, Defendants Pearson, Schiller, and Rosiello attested to the effectiveness of Valeant's internal controls and that the filings did not contain an untrue statement of material fact or omit to state a material fact.

These statements were false and misleading because Valeant lacked adequate internal controls, compliance and training programs, and the Company's SEC filings contained numerous untrue statements of material facts and omitted many material facts. These inadequacies in reporting and misleading filings were the direct result of an "improper tone at the top" of the organization, which created a corporate culture of prioritizing short-term revenue growth over compliance with applicable laws, regulations, and contracts.

466. **PwC's 2014 Audit Opinion Contained Numerous Material Misrepresentations**: As detailed in ¶¶ 258-268 above, PwC's audit contained numerous material misrepresentations. PwC certified Valeant's 2014 10-K, and included a February 25, 2015 Audit Report relating to the financial statements, schedule, and the effectiveness of Valeant's control over financial reporting ("2014 Audit Report"). PwC provided its consent to incorporate by reference the 2014 Audit Report in Valeant's 2014 10-K and related Prospectus Supplement filed with the SEC in connection with the Stock Offering. For its services rendered to Valeant in 2013, 2014, and 2015, PwC was paid audit fees of $13.4 million, $12.5 million, and $20.5 million, respectively. Specifically, in Valeant's 2014 10-K, PwC stated:

> In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income (loss), comprehensive income (loss), shareholders' equity, and cash flows present fairly, in all material respects, the financial position of Valeant Pharmaceuticals International, Inc. and its subsidiaries (the "Company") at December 31, 2014 and December 31, 2013, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2014 in conformity with accounting principles generally accepted in the United States of America.
>
> * * *
>
> Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

* * *

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).

467.    PwC provided these assurances to Valeant's investors notwithstanding its knowledge and review of Valeant's relationship with Philidor.  In interrogatory responses submitted to the United States Senate Committee on Aging, Philidor's attorney represented that PwC had evaluated Valeant's relationship with Philidor pursuant to normal audit procedures, subsequent to Valeant and Philidor entering into the Purchase Option agreement.  The responses also represented that Philidor communicated with PwC in the course of its "day-to-day business" to "satisfy any and all information requested."  Specifically, Philidor provided "requested information" in PwC's end of the year audits for fiscal years 2014 and 2015, and for PwC's quarterly audits for 1Q2015 – 4Q2015.

468.    Despite its review of Philidor and Valeant as part of the audit, PwC's 2014 Audit Report contained material misrepresentations of which PwC was aware or should have been aware had PwC conducted the audit with reasonable diligence.  First, PwC certified that Valeant's financial statements complied with GAAP.  As set forth above, this was false.  Second, PwC certified that Valeant's internal controls were effective, despite the fact that, as the Company later admitted, they were ineffective and the organization had an "improper tone at the top."  Third, PwC misrepresented that PwC's audit complied with PCAOB standards, despite the clear deficiencies set forth above.

469.    These misrepresentations were crucial to the Enterprise's ability to conceal Valeant's true relationship with Philidor from investors, payors, patients, and doctors and therefore to the overall scheme to inflate Valeant's securities prices and provide substantial financial benefits to the Enterprise members.

470.    **The Defendants' Continued Misrepresentations and Omissions as the Enterprise's Criminal Scheme Begins to Unravel**:    As detailed in ¶¶ 269-334 above, Defendants issued a number of misstatements as the truth about Valeant's business began to emerge in a series of disclosures.   As the truth leaked out, even as Defendants were forced to shut down Philidor and discontinue some of Valeant's most egregious practices, Defendants continued to mislead investors with a series of misstatements and omissions of material facts designed to conceal the true state of Valeant's business and to maintain the inflated price of the Company's securities.   Eventually, however, investors learned the substantial and material extent to which Valeant's growth and profitability related to price hikes, Philidor, and improper and unsustainable business practices.

### C.    Causation and Damages

471.    As detailed in ¶¶ 269-334, 396-398 above,  the RICO Defendants' violations of RICO caused injuries to Plaintiffs' property.   The material misrepresentations issued by the Defendants to investors, including in direct communications between Pearson, Schiller, and other senior Valeant officials with the Plaintiffs' representatives (which were made with the knowledge that Plaintiffs' representatives would rely on those statements), resulted in the artificial inflation of the price of Valeant's securities.   When the falsity of these representations was made known to investors and the public in a series of gradual disclosures, the price of Valeant's securities declined precipitously, causing billions of dollars of losses.   Moreover, the Enterprise's defrauding of insurance companies and other third-party payors through Philidor and the captive network of pharmacies so as to increase Valeant's purported revenue and further increase the price of Valeant securities, as detailed above, caused significant declines to the value of Plaintiffs' property, *i.e.* the price of Valeant's securities, when Valeant's contracts with third-

party payors and other insurance companies were cancelled, limiting Valeant's ability to sell its branded pharmaceuticals.

### D.    The Scheme's Connection to New Jersey

472.    As set forth herein, the Enterprise's scheme had substantial contacts with the state of New Jersey, where Valeant's U.S. headquarters is located.

473.    Numerous Defendants and Enterprise members were employed or regularly conducted business out of Valeant's offices in New Jersey.

474.    Substantial elements of the illegal scheme including deliberation and implementation of growth-by-acquisition model, price-gouging strategies, and Valeant's AF program were orchestrated from Valeant's New Jersey offices where many of Valeant's senior executives were located.

475.    Moreover, conduct undertaken to conceal the fraudulent scheme, including preparation of false and misleading financial statements and other misrepresentations on investor and earnings calls, originated from Valeant's New Jersey offices.

476.    Finally, the scheme had numerous, significant, foreseeable, and intended adverse effects in New Jersey.

## XI.    COUNTS

**COUNT I**
**VIOLATIONS OF SECTION 10(b) OF THE SECURITIES**
**EXCHANGE ACT OF 1934 AND RULE 10(b)**
**(Against Valeant and the Management Defendants)**

477.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

478.   This claim is brought by Plaintiffs against Valeant and the Management Defendants for violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

479.   During the Relevant Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they misrepresented or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

480.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs related to the purchase and/or acquisition of Valeant common stock.

481.   In addition to the duties of full disclosure imposed on the Defendants attendant to their affirmative false and misleading statements to the public, Defendants had a duty under SEC Regulations S-X (17 C.F.R. §210.01, et seq.) and S-K (17 C.F.R. §229.10, et seq.) to promptly disseminate truthful information with respect to Valeant's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information.

482.   As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases and acquisitions of Valeant common stock

during the Relevant Period.  In reliance on the integrity of the market, Plaintiffs paid artificially inflated prices for Valeant common stock and experienced losses when the artificial inflation was removed from the stock as a result of the revelations and price declines detailed herein. Plaintiffs would not have purchased or acquired Valeant common stock at the prices they paid, or at all, if they had been aware that those prices had been inflated by Defendants' misleading statements and omissions.

483.    By virtue of the conduct alleged herein, Defendants named in this Count have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiffs.

484.    Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Valeant Pharmaceuticals International, Inc. Securities Litigation*, No. 15-cv-7658 (D.N.J.), Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## COUNT II
## VIOLATION OF SECTION 18(a) OF THE EXCHANGE ACT
### (Against Valeant, Pearson, Schiller, and Rosiello)

485.    Plaintiffs repeat and reallege each and every allegation in ¶¶ 1-334, 396-411 above as if fully set forth herein, except that as to this Count, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made. Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

486.    This claim is brought by all Plaintiffs against Defendants Valeant, Pearson, Schiller, and Rosiello for violation of Section 18(a) of the Exchange Act, 15 U.S.C. § 78r.

487.    As alleged above, Defendants filed or caused to be filed with the SEC documents regarding Valeant that contained misrepresented material facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

488.    Prior to purchasing Valeant securities, Plaintiffs read Valeant's SEC filings, and relied upon the misstatements contained therein including as detailed in ¶ 406 above.

489.    Plaintiffs' reliance was reasonable.  Plaintiffs read and relied upon these documents and financial statements not knowing they contained materially false statements and omissions.  Had Plaintiffs known the true facts, they would not have purchased Valeant common stock or would not have purchased it at the inflated prices they paid.  At the time of their purchases and acquisitions of Valeant common stock, Plaintiffs were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions.

490.    Defendants' materially false or misleading statements artificially inflated the prices of Valeant common stock.  When the truth began to emerge about the false and misleading statements and omissions, the prices of Valeant common stock declined significantly and Plaintiffs were damaged.

491.    By virtue of the conduct alleged herein, the Defendants named in this Count have each violated Section 18(a) of the Exchange Act, and are liable to Plaintiffs.

492.    Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Valeant Pharmaceuticals*

*International, Inc. Securities Litigation*, No. 15-cv-7658 (D.N.J.), Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

**COUNT III**
**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT OF 1934**
**(Against Defendants Valeant, Pearson, Schiller, and Rosiello)**

493.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

494.    This claim is brought by all Plaintiffs against Defendants Valeant, Pearson, Schiller, and Rosiello for violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78(a).

495.    During their tenures as officers and/or directors of Valeant, Pearson, Schiller, and Rosiello were controlling persons of Valeant within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Valeant, these Defendants had the power and authority to cause Valeant to engage in the conduct complained of herein.  These Defendants were able to, and did, control, directly and indirectly, the decision making of Valeant, including the content and dissemination of Valeant's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.  Valeant exercised control over and directed the actions of its senior managers, directors and agents, including the individual Defendants.  Valeant controlled Pearson, Schiller, Rosiello and all of its employees and subsidiaries.

496.    In their capacities as senior officers and/or directors of Valeant, and as more fully described herein, Pearson, Schiller, and Rosiello participated in the misstatements and omissions set forth above.  These Defendants had direct and supervisory involvement in the day-to-day

operations of the Company, and had access to non-public information regarding Valeant's deceptive and risky business practices.  Valeant, Pearson, Schiller and Rosiello had the ability to influence and direct and did so influence and direct the activities of each of the Defendants in their violations of Section 10(b) of the Exchange Act and Rule 10b-5.

497.    As a result, Valeant, Pearson, Schiller, and Rosiello, individually and as a group, were control persons within the meaning of Section 20(a) of the Exchange Act.

498.    As set forth above, Valeant violated Section 10(b) of the Exchange Act.  By virtue of their positions as controlling persons, and as a result of their aforesaid conduct and culpable participation, Pearson, Schiller, and Rosiello are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Valeant is liable to Plaintiffs.  Valeant exercised control over the individual Defendants and all of its employees and subsidiaries and, as a result of its aforesaid conduct and culpable participation is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the individual Defendants are liable to Plaintiffs.

499.    By reason of the foregoing, Valeant, Pearson, Schiller, and Rosiello violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78(a), and are liable to Plaintiffs.

500.    Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Valeant Pharmaceuticals International, Inc. Securities Litigation*, No. 15-cv-7658 (D.N.J.), Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

**COUNT IV**
**COMMON LAW FRAUD / FRAUDULENT INDUCEMENT**
**(Against Valeant and the Management Defendants)**

501.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

502.    This Count is against Valeant and the Management Defendants.

503.    Each of these Defendants made, authorized, or caused the misrepresentations at issue, which are identified and summarized above.

504.    The material representations set forth above were fraudulent, and Defendants' representations fraudulently omitted material statements of fact.

505.    Each of these Defendants knew or recklessly disregarded that their representations and omissions were false and/or misleading at the time they were made.  Each made the misleading statements with an intent to defraud Plaintiffs, as detailed above.

506.    These Defendants had reason to expect that Plaintiffs were among the class of persons who would receive and rely on such representations, and intended that their misleading statements and omissions would induce Plaintiffs to purchase Valeant securities.

507.    Plaintiffs justifiably relied on Defendants' false representations and misleading omissions in purchasing Valeant securities, as detailed including in ¶¶ 399-409 above.

508.    Had Plaintiffs known the true facts regarding Valeant's business as set forth above, they would not have purchased Valeant securities at the prices they paid.

509.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT V
## NEGLIGENT MISREPRESENTATION
### (Against Valeant and The Management Defendants)

510.    Plaintiffs repeat and reallege each and every allegation in ¶¶ 1-334, 396-411 as if fully set forth herein, except that as to this Count, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made.  Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

511.    Valeant and the Management Defendants authorized or caused the representations and/or omissions set forth above.

512.    These Defendants supplied false information for use by Plaintiffs in making an investment decision.

513.    These Defendants had numerous in-person and direct communications with Plaintiffs and were aware that Plaintiffs were relying on their public statements in making their investment decision regarding Valeant.  For example, on March 6, 2014, representatives from Hound, including Hound's Managing Manager who had authority over all of Plaintiffs' trading, met with Pearson, Schiller, and Laurie Little (Valeant's SVP of Investor Relations) to discuss Valeant's financials and business prospects.  On August 1, 2014 a Hound analyst had a phone call with Schiller to discuss 2Q2014 financial results.  Similarly, on February 25, 2015, a Hound analyst had a phone call with Schiller to discuss Valeant's 4Q2014 financial results.

514.    Moreover, these Defendants were well aware that Plaintiffs had a significant stake in Valeant.  For example, on November 23, 2013, a Hound analyst emailed Laurie Little requesting a meeting with Pearson and Schiller and informed her that "Valeant has been a huge

position for us for over three years, and remains our largest today." Less than 3 weeks later, Pearson and Schiller met with Hound at Valeant's U.S. headquarters in New Jersey. Further, Valeant repeatedly invited Hound to special events for a select group of key (and known) Valeant investors. For example, on October 16, 2014, Hound was invited to attend a dinner meeting on October 20, 2014 with Valeant management, including Pearson and Schiller, following Valeant's earnings call. A Hound analyst attended that dinner and reported that both Pearson and Schiller touted Valeant's prospects. For example, Pearson stated that he was "as confident as [he's] ever been in the business [they] have." Similarly, on December 10, 2015, Hound was invited to a private lunch for Valeant's "top stakeholders" following Valeant's December 16, 2015 investor presentation. Representatives from Hound attended that lunch and had direct discussions with Valeant executives, including Pearson. These Defendants, at least negligently, made misrepresentations to induce Plaintiffs to purchase Valeant securities.

515.    These Defendants breached their duty to exercise reasonable care in making these misrepresentations to Plaintiffs.

516.    Plaintiffs justifiably relied on these Defendants' false representations and misleading omissions in purchasing Valeant securities, as detailed in ¶¶ 399-409 above.

517.    Had Plaintiffs known the true facts regarding Valeant's business as set forth above, they would not have purchased Valeant securities at the prices they paid.

518.    As a direct and proximate result of these Defendants' negligent misrepresentations, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT VI
## VIOLATION OF SECTION 11 OF THE SECURITIES ACT
### (Against Valeant, Pearson, Schiller, the Director Defendants, PwC, and the Underwriter Defendants)

519.    Plaintiffs repeat and reallege each and every allegation in ¶¶ 1-334, 396-411 as if fully set forth herein, except that as to this Count, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made.  Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

520.    This claim is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, for damages they incurred in connection with purchases of Valeant common stock traceable to the Stock Offering.

521.    This cause of action is brought against Valeant, Pearson, Schiller, the Director Defendants, PwC, and the Underwriter Defendants.  Each of the following defendants is liable to Plaintiffs as follows:

(a) Valeant was the issuer of the stock and as such is strictly liable for misstatements and omissions in the Offering Materials and statements incorporated therein;

(b) Pearson and Schiller each signed and/or authorized the signing of the Registration Statement, which was part of the Offering Materials and each was an officer and director of Valeant at the time of the filing of the Offering Materials;

(c) The Director Defendants each signed and/or authorized the signing of the Registration Statement, which was part of the Offering Materials, or was a director of Valeant at the time of the filing of the Offering Materials;

(d) Each of the Underwriter Defendants served as an underwriter with respect to the Stock Offering and was responsible for the contents of the Offering Materials. In addition, the Underwriter Defendants received over $16 million for their services in underwriting the 7.3 million shares of Valeant common stock; and

(e) PwC served as Valeant's outside accounting expert, and, as described above, certified Valeant's financial statements contained within the Offering Materials, and consented to the inclusion of its 2014 Audit Report in the Offering Materials.

522.    As described above, the Offering Materials, which were negligently prepared, and contained untrue statements of material fact and/or omitted to state other material facts that were necessary to prevent the statements contained therein from being misleading. In addition, the Offering Materials incorporated by reference the 2014 10-K which, as described above, contained numerous untrue statements of material fact and/or omitted to state other material facts that were necessary to prevent the statements contained therein from being misleading.

523.    In addition, the Offering Materials negligently failed to disclose information required under Items 303 and 503 of SEC Regulation S-K. Specifically, Item 303 required the Offering Materials and the 2014 10-K incorporated into the Offering Materials to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii). Similarly, the regulation required the Offering Materials and the 2014 10-K to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported

income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii).

524.    In violation of Item 303, the Offering Materials and the 2014 10-K omitted that at the time of the Stock Offering, Valeant's growth and profitability were increasingly dependent upon its undisclosed practices of price gouging, routing patients into its undisclosed and controlled network of pharmacies, and using patient assistance and PR strategies, all of which resulted in Valeant obtaining higher reimbursements for Valeant's products and had a major impact in driving Valeant's revenue growth while exposing the Company to increased risks of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations, decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products. These known trends, events or uncertainties that were reasonably likely to have a material unfavorable impact on Valeant's net sales or revenues or income from continuing operations and cause reported financial information to not necessarily be indicative of future results were negligently omitted from the Offering Materials and the 2014 10-K incorporated into the Offering Materials.

525.    Additionally, Item 503 of SEC Regulations S-K, 17 C.F.R. §299.503 ("Item 503"), required the Offering Materials to include among other things, a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. §299.503(c).  Although the Offering Materials included a discussion or risk factors, it was materially incomplete and therefore misleading.

526.    In violation of Item 503, the Offering Materials did not disclose that one of the most significant factors that made the Stock Offering speculative or risky to investors was the fact that Valeant was operating an unsustainable business model based on undisclosed practices

designed to drive short-term sales prices but had exposed the Company to: increased risks of nonpayment, regulatory sanctions and associated costs of investigations, reputational harm, decreased sales and reimbursements, increased scrutiny and substitution of Valeant products. Nowhere within the Offering Materials did Valeant disclose these material facts which it was required to do under Item 503.

527.    Each of the Defendants against whom this claim is asserted was obligated by law to make a reasonable and diligent investigation of the statements contained in the Offering Materials including financial statements and statements regarding Valeant's internal controls and failed to do so.  Had these Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

528.    At the time of the Stock Offering, Plaintiffs were not aware of the untrue and misleading nature of the statements and/or omissions alleged herein and could not have reasonably discovered such untrue statement or omissions before they acquired Valeant common stock in the Stock Offering.

529.    Plaintiffs have sustained damages in connection with their purchases of Valeant Common Stock.

530.    Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Valeant Pharmaceuticals International, Inc. Securities Litigation*, No. 15-cv-7658 (D.N.J.), Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the Stock Offering.  Consequently, this action is timely.

**COUNT VII**
**VIOLATION OF SECTION 12(a)(2) OF THE SECTIONS ACT**
**(Against Valeant, Pearson, Schiller, and the Underwriter Defendants)**

531.    Plaintiffs repeat and reallege each and every allegation in ¶¶ 1-334, 396-411, 519-530 as if fully set forth herein, except that as to this Count, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made. Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

532.    This cause of action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77(a)(2), for rescissions and/or damages in connection with the Stock Offering.

533.    Plaintiffs collectively purchased at least 268,175 shares of Valeant common stock in the Stock Offering pursuant to the Offering Materials.

534.    As referenced above, the Offering Materials contained untrue statements of material fact and/or omitted to state other material facts that were necessary to prevent the statements contained therein from being misleading.  In addition, the Offering Materials incorporated by reference the 2014 10-K which, as described above, contained numerous untrue statements of material fact and/or omitted to state other material facts that were necessary to prevent the statements contained therein from being misleading.

535.    In addition, the Offering Materials negligently failed to disclose information required under Items 303 and 503 of SEC Regulation S-K.  Specifically, Item 303 required the Offering Materials and the 2014 10-K incorporated into the Offering Materials to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing

operations." 17 C.F.R. §229.303(a)(3)(ii).   Similarly, the regulation required the Offering Materials and the 2014 10-K to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii).

536.    In violation of Item 303, the Offering Materials and the 2014 10-K omitted that at the time of the Stock Offering, Valeant's growth and profitability were increasingly dependent upon its undisclosed practices of price gouging, routing patients into its undisclosed and controlled network of pharmacies, and using patient assistance and PR strategies, all of which resulted in Valeant obtaining higher reimbursements for Valeant's products and had a major impact in driving Valeant's revenue growth while exposing the Company to increased risks of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations, decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products. These known trends, events or uncertainties that were reasonably likely to have a material unfavorable impact on Valeant's net sales, revenues, or income from continuing operations and cause reported financial information to not necessarily be indicative of future results were negligently omitted from the Offering Materials and the 2014 10-K incorporated into the Offering Materials.

537.    Additionally, Item 503 of SEC Regulations S-K, 17 C.F.R. §299.503 ("Item 503"), required the Offering Materials to include among other things, a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. §299.503(c).  Although

the Offering Materials included a discussion or risk factors, it was materially incomplete and therefore misleading.

538.     In violation of Item 503, the Offering Materials did not disclose that one of the most significant factors that made the Stock Offering speculative or risky to investors was the fact that Valeant was operating an unsustainable business model based on undisclosed practices designed to drive short-term sales prices but had exposed the Company to: increased risks of nonpayment, regulatory sanctions and associated costs of investigations, reputational harm, decreased sales and reimbursements, increased scrutiny, and substitution of Valeant products. Nowhere within the Offering Materials did Valeant disclose these material facts which it was required to do under Item 503.

539.     Defendants identified above were statutory sellers who solicited the sale of securities to Plaintiffs by means of the defective Prospectus Supplement used in the Stock Offering and incorporated in the Offering Materials, and did so for the benefit of Valeant and/or for their own personal gain.  In addition, Deutsche Bank passed title of the Valeant common stock to Plaintiffs by means of the defective Prospectus Supplement used in the Stock Offering and incorporated in the Offering Materials.

540.     At the time they acquired the Valeant stock in the Stock Offering, Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths contained in and/or omissions from the Prospectus Supplement.

541.     As a direct and proximate result of Defendants' violation of Section 12(a)(2) of the Securities Act, the Plaintiffs sustained damages in connection with their purchases of securities pursuant to the Prospectus Supplement.

542.     The Plaintiffs have the right to rescind and recover the consideration paid for their securities, upon tender of their securities to the Defendants named in this Count.  To the extent Plaintiffs have sold their securities, they seek damages to the extent permitted by law.

543.     Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Valeant Pharmaceuticals International, Inc. Securities Litigation*, No. 15-cv-7658 (D.N.J.), Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the Stock Offering.  Consequently, this action is timely.

**COUNT VIII**
**VIOLATION OF SECTION 15 OF THE SECURITIES ACT**
**(Against Valeant, Pearson, and Schiller)**

544.     Plaintiffs repeat and reallege each and every allegation in ¶¶ 1-334, 396-411, 519-543 as if fully set forth herein, except that as to this Count, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made. Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading. This claim is brought by Plaintiffs pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77k, against Pearson and Schiller for their control of Valeant, and also against Valeant for its control of the Management Defendants (and all of its officers and employees) in connection with the controlled persons' violations of Sections 11 and 12(a)(2) of the Securities Act relating to the Stock Offering.

545.     During the Relevant Period, Pearson and Schiller each signed SEC filings which contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they

197

were made, demonstrating that each of these persons possessed the power to control, and did control, the contents of those filings. Pearson signed every 10-K, 10-Q, and offering document filed with the SEC by Valeant during the Relevant Period, including the Offering Materials. Likewise, Schiller signed every 10-K filed with the SEC by Valeant during the Relevant Period, every 10-Q filed with the SEC by Valeant from the first quarter of 2013 through the first quarter of 2015, and numerous offering documents filed with the SEC by Valeant during the Relevant Period, including the Offering Materials.

546. Pearson and Schiller possessed the power to control, and did control, directly and/or indirectly, the actions of Valeant throughout the Relevant Period. Pearson and Schiller held executive and director positions at Valeant, as detailed above. Pearson was Valeant's Chairman and CEO. Schiller was an Executive Vice President of the Company and its CFO. By their positions, Pearson and Schiller possessed the power and authority to control the contents of Valeant's offering materials, financial reports, press releases, and presentations to securities analysts and institutional investors, *i.e.*, the market, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Pearson and Schiller were also responsible for the running of the Company and the management of its affairs, including decisions to raise and deploy capital, conduct securities offerings and hire underwriters for the offerings. Valeant exercised control over and directed the actions of its senior managers, directors and agents, including Pearson, Schiller, and all of its employees. Valeant, Pearson and Schiller had the ability to influence, and direct and did so influence and direct, the activities of one another in each's violations of Sections 11 and 12(a)(2) of the Securities Act in connection with the offer and sale of Valeant securities in the Stock Offering.

547.    By reason of the foregoing, Valeant, Pearson, and Schiller violated Section 15 of the Securities Act, 15 U.S.C. § 77k, and are liable to the Plaintiffs.

548.    Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Valeant Pharmaceuticals International, Inc. Securities Litigation*, No. 15-cv-7658 (D.N.J.), Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the Stock Offering.  Consequently, this action is timely.

### COUNT IX
### RACKETEERING IN VIOLATION OF N.J. STAT. ANN. 2C:41-2(c)
### (Against Valeant, the Management Defendants, and PwC)

549.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

550.    The RICO claims are brought against Valeant, the Management Defendants, and PwC (the "RICO Defendants").  The RICO Defendants are persons within the meaning of N.J. STAT. ANN. 2C:41-1(b).

551.    The RICO Defendants comprise an association, associations, and/or associated-in-fact Enterprise as defined in N.J. STAT. ANN. 2C:41-1(c).  The Enterprise has an existence beyond that which is merely necessary to commit predicate acts and, among other things, oversaw and coordinated the commission of numerous predicate acts on an on-going basis in furtherance of the scheme and efforts to conceal the scheme, each of which caused direct injury to Plaintiffs.  The Enterprise was operated, managed, and controlled by, among others, Valeant, the Management Defendants, Philidor, and Andrew Davenport.

552.    During the Relevant Period, the RICO Defendants willfully conducted and participated in the Enterprise's scheme through a pattern of racketeering activity within the

meaning of N.J. STAT. ANN. 2C:41-1(d).  The RICO Defendants' conduct involved more than two incidents of racketeering conduct, and therefore constituted a pattern of racketeering activity within the meaning of N.J. STAT. ANN. 2C:41-1(d)(1).  This pattern consisted of repeated, continuous incidents of racketeering activity that had the same or similar purposes, results, participants, victims, or methods of commission, and are interrelated by distinguishing characteristics rather than isolated incidents within the meaning of N.J. STAT. ANN. 2C:41-1(d)(2).

553.    The purpose of the Enterprise was to artificially inflate the value of Valeant securities by misleading investors, including Plaintiffs, regarding Valeant and its operations, and profiting from that conduct through, *inter alia*, the sale of Valeant securities at inflated prices. This extensive scheme manipulated the market and pharmaceutical sector, and was intended to, and did, provide substantial profits to the Enterprise's members and caused enormous harm to Plaintiffs.  The RICO Defendants operated the Enterprise, and achieved these objectives by the conduct of racketeering activity, including but not limited to: (i) extreme price gouging; (ii) creating a national network of secret captive pharmacies intended to conceal the Enterprise's efforts to ensure sales of Valeant's price-gouged drugs and fraudulently extract payments from insurance companies for prescriptions that the insurance companies would otherwise not cover; (iii) misleading patients, doctors, insurers and other payors to ensure sales of Valeant's drugs at unsustainably high prices; (iv) misleading the investing public as to the Company's business model and results, current operations, and future prospects; and, (v) committing accounting fraud and other violations of GAAP and GAAS to further the common goal of the Enterprise, inflating the price of Valeant securities.

554.    The RICO Defendants knowingly and intentionally participated in the conduct of the Enterprise, and the entities and enterprises associated with the Enterprise, directly and indirectly through a pattern of racketeering activity, including by committing, among others, the following predicate acts:

(a) fraud in the offering, sale, and purchase of securities in violation of N.J. STAT. ANN. 49:3-71 and 15 U.S.C. §§ 78j and 78ff, and 17 C.F.R. § 240.10b-5, which are incorporated as racketeering activity under of N.J. STAT. ANN. 2C:41-1(a)(1)(p);

(b) use of the wires in United States or foreign commerce to commit a fraud in violation of 18 U.S.C. § 1343, which is incorporated as "racketeering activity" under the New Jersey RICO statute pursuant to of N.J. STAT. ANN. 2C:41-1(a)(2).

(c) use of the mails in the United States to commit a fraud in violation of 18 U.S.C. § 1341, which is incorporated as "racketeering activity" under N.J. STAT. ANN. 2C:41-1(a)(2);

(d) fraudulent concealment of racketeering activity and other fraudulent practices, including numerous false and misleading statements and omissions for the purpose of promoting the sale of securities in violation of N.J. STAT. ANN. 2C:21-7(i), which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(1)(o);

(e) use, control, and operation of Valeant and Philidor( among other corporate entities) in furtherance and promotion of criminal objectives in violation of N.J. STAT. ANN. 2C:21-9(c), which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(1)(o);

(f) perpetration of an illegal kickback scheme in violation of N.J. STAT. ANN. 2C:21-10, which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(1)(o);

(g) money laundering in violation of N.J. Sᴛᴀᴛ. Aɴɴ. 2C:21-25, which is incorporated as racketeering activity under N.J. Sᴛᴀᴛ. Aɴɴ. 2C:41-1(a)(1)(o), and in violation of 18 U.S.C. § 1956, which is incorporated as racketeering activity under N.J. Sᴛᴀᴛ. Aɴɴ. 2C:41-1(a)(2);

(h) interstate travel or transportation in aid of the Enterprise in violation of 18 U.S.C.A. § 1952, which is incorporated as racketeering activity under N.J. Sᴛᴀᴛ. Aɴɴ. 2C:41-1(a)(2); and

(i) illegal monetary transactions in violation of 18 U.S.C. § 1957, which is incorporated as racketeering activity under N.J. Sᴛᴀᴛ. Aɴɴ. 2C:41-1(a)(2).

555.    As alleged herein, beginning as early as January 2013, each of the RICO Defendants, as part of their pattern of racketeering activities and in furtherance of and to assist their manipulative scheme, knowingly, willfully, and unlawfully made misrepresentations or omissions of material fact for the purpose of improperly inflating the price of Valeant securities by misleading Plaintiffs and the investing public concerning Valeant's business model and sustainability; engaged in massive, improper price-increases and deceptive and illegal sales practices, misleading patients, doctors, and insurers and other third-party payors to ensure sales of and payment for Valeant products; and created and disseminated false and misleading reports and information concerning Valeant's performance, including by committing accounting fraud, among other fraudulent conduct, for the unlawful purpose of artificially inflating the price of Valeant securities.  Such actions were intended to, and did, constitute false statements of material fact and/or omissions of material fact, on which the RICO Defendants intended for Plaintiffs and the investor public to rely, and on which Plaintiffs and the investing public reasonably relied in electing to purchase and own Valeant securities, which they would not have done but for the

RICO Defendants' fraudulent conduct.   Such misrepresentations and omissions constitute securities fraud in violation of N.J. STAT. ANN. 49:3-70 and N.J. STAT. ANN. 2C:2-6.   The conduct independently constitutes violations of 15 U.S.C. §§ 78j and 78ff, and 17 C.F.R § 240.10b-5.

556.    As alleged herein, each of the RICO Defendants on numerous occasions used and caused to be used wire communications in interstate and foreign commerce and the U.S. mails by both making and causing to be made wire communications and mailings in furtherance of and for the purpose of executing and attempting to execute the Enterprise's scheme.   These wire communications and mailings were made for reasons including but not limited to: (i) communicating between the RICO Defendants to effectuate the dissemination of false and misleading statements and information necessary to perpetrate the Enterprise's scheme to improperly inflate the price of Valeant securities and harm investors including the Plaintiffs; (ii) disseminating false and misleading statements and information concerning the Valeant business model and corresponding value of Valeant securities; (iii) perpetrating fraud on insurance companies and other third-party payors to receive payment Valeant-branded pharmaceuticals; and, (iv) coordinating their manipulation of the market for Valeant securities.   These false wire communications caused direct injury to Plaintiffs' businesses and property.

557.    Each use of a wire communication and/or mailing as described herein in connection with the Enterprise's scheme constitutes a separate and distinct violation of N.J. STAT. ANN. 2C:41-1(a)(2), by virtue of violating the incorporated federal predicate acts proscribed by 18 U.S.C. §§ 1341 and/or 1343.   The RICO Defendants used the wires and mails to perpetrate their fraudulent scheme and to disseminate the fraudulent statements and

misinformation concerning Valeant's business model and the value of Valeant securities, and each caused direct injury to Plaintiffs' business and property.

558.    The RICO Defendants also spoke on the phone and used electronic mail and U.S. mail regularly to conduct the activities of the Enterprise, causing direct injury to Plaintiffs.  The total number of phone calls, e-mails, and mailings, and the identities of all Enterprise members is not yet known, but each such call, e-mail, and U.S. mailing is described herein constitutes a separate mail or wire communication in furtherance of the Enterprise's fraudulent scheme.

559.    As alleged herein, the RICO Defendants have transported and/or possessed property they knew or reasonably should have believed to be derived from their criminal activity throughout the duration of the Enterprise's fraudulent scheme, from receipt of the first ill-gotten proceeds of the Enterprise.  To further the Enterprise, the RICO Defendants engaged in myriad transactions involving the proceeds of their fraudulent scheme, property that the RICO Defendants knew or reasonably should have believed to be derived from criminal activity, with the intent to facilitate and/or promote the criminal activity underlying the Enterprise and with knowledge that the transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of such proceeds and/or to avoid reporting requirements under law.  In addition to participating directly in this misconduct, the RICO Defendants directed, organized, financed, planned, managed, supervised, and/or controlled such conduct.  This conduct constitutes money laundering in violation of N.J. STAT. ANN. 2C:21-25, which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(1)(o), and in violation of 18 U.S.C.A. § 1956, which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(2).

560.    The RICO Defendants made numerous false and misleading written statements in the form of press releases, proxy statements, annual reports, and security filings with regulatory agencies, for the purpose of promoting the sale of securities, and omitted information required by law to be disclosed in written documents relating to those securities.  This conduct constitutes fraudulent concealment of racketeering activity and other fraudulent practices, including the making of false and misleading statements and omissions for the purpose of promoting the sale of securities in violation of N.J. STAT. ANN.  2C:21-7(i), which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(1)(o) and (p).

561.    In furtherance of the Enterprise, the RICO Defendants traveled in interstate and/or foreign commerce and used the mail and other facilities in interstate or foreign commerce to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of the unlawful activities underlying the Enterprise, as set forth herein.  Specifically, as set forth above, the RICO Defendants travelled between Valeant's headquarters in New Jersey to Philidor's offices in Pennsylvania, among other states in the United States to facilitate acquisitions of pharmaceutical companies and/or pharmacies to facilitate and expand the Enterprise's fraudulent scheme.  Likewise, as set forth above, the RICO Defendants employed the mail in furtherance of the Enterprise's fraudulent scheme.  This conduct constitutes interstate travel or transportation in aid of the Enterprise in violation of 18 U.S.C.A. § 1952, which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(2).

562.    The RICO Defendants have knowingly engaged and/or attempted to engage in monetary transactions in criminally derived property, including the proceeds of the Enterprise's fraudulent scheme, of a value greater than $10,000 within the United States, which was derived from the unlawful activities set forth herein.   This conduct constitutes illegal monetary

transactions in violation of 18 U.S.C. § 1957, which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(2).

563.    Each of the predicate acts referred to in the preceding paragraphs was for the purpose of executing the Enterprise's fraudulent scheme, and the RICO Defendants and Enterprise members engaged in such acts with the specific intent of furthering that scheme, willfully and with knowledge of its illegal and fraudulent nature.  Each of the RICO Defendants performed or participated in the performance of at least two of the predicate acts set forth herein.

564.    The conduct and actions set forth herein were related to each other by virtue of common participants, common victims, common methods, and the common purpose and common result of a concerted campaign of misinformation concerning Valeant's true business model, growth strategy, and sales practices to artificially inflate the value of Valeant securities and enrich the members of the Enterprise to the harm and detriment of Plaintiffs, among other investors.  The RICO Defendants' activities were interrelated, not isolated, and involved a calculated series of repeated violations of the law in order to conduct, conceal, and promote fraudulent activity.  The Enterprise existed with the members identified herein and others yet unknown since at least 2013, and the conduct and activities continued through at least October 2015.

565.    The RICO Defendants' willful and knowing direct and indirect participation in the Enterprise's affairs through the pattern of racketeering and activity described herein constitutes a violation of N.J. STAT. ANN. 2C:41-2(c).

566.    These violations of N.J. STAT. ANN. 2C:41-2(c) caused Plaintiffs to suffer direct injury to their business and property through massive losses in investment opportunities and gains, and fees and expenses, caused by the Enterprise's wrongful actions described herein.

Plaintiffs, therefore, are entitled to recover from the RICO Defendants the amount in which they have been damaged, to be trebled in accordance with N.J. STAT. ANN. 2C:41-4(c), together with interest and the costs of this suit, including reasonable attorneys' fees.

### COUNT X
### RACKETEERING IN VIOLATION OF N.J. STAT. ANN 2C:41-2(d)
#### (Against Valeant, the Management Defendants, and PwC)

567.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

568.     Beginning as early as January 2013, the RICO Defendants and all members of the Enterprise agreed to facilitate the scheme described herein to manage, operate, conduct, and participate in the conduct of the affairs of the Enterprise and conspired to do the same within the meaning of N.J. STAT. ANN. 2C:5-2 through a pattern of racketeering activity within the meaning of N.J. STAT. ANN. 2C:41-2(d).

569.     Each of the RICO Defendants and Enterprise members being persons intimately involved in the transactions carried on by and the affairs of the Enterprise—which was engaged in, and the activities of which affected, trade and commerce—unlawfully and willfully conspired, confederated, and agreed with each other to violate N.J. STAT. ANN. 2C:41-2(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, through a pattern of racketeering activity, all in violation of N.J. STAT. ANN. 2C:41-2(d).

570.     As part of the conspiracy, the RICO Defendants personally committed or agreed to commit two or more fraudulent and illegal racketeering acts and conducted and agreed to conduct the affairs of the Enterprise through the pattern of racketeering in violation of N.J. STAT. ANN. 2C:41-2(c) described above.

571.    These violations of N.J. STAT. ANN. 2C:41-2(c) caused Plaintiffs to suffer direct injury to their business and property through massive losses in investment opportunities and gains, and fees and expenses, caused by the Enterprise's wrongful actions described herein. Plaintiffs, therefore, are entitled to recover from the RICO Defendants the amount in which they have been damaged, to be trebled in accordance with N.J. STAT. ANN. 2C:41-4(c), together with interest and the costs of this suit, including reasonable attorneys' fees.

## COUNT XI
## AIDING AND ABETTING RACKETEERING IN VIOLATION OF
## N.J. STAT. ANN 2C:41-2(c) AND (d)
### (Against Valeant, the Management Defendants, and PwC)

572.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

573.    The RICO Defendants aided and abetted the Enterprise in executing its fraudulent scheme and racketeering acts in violation of N.J. STAT. ANN. 2C:41-2(c) and (d) alleged herein. The RICO Defendants pursued a common plan and design, and actively participated in, aided and encouraged the other Enterprise members in executing a pattern of racketeering activity as defined in N.J. STAT. ANN. 2C:41-1 and in violation numerous provisions of the New Jersey RICO Act as alleged herein.

574.    The RICO Defendants willingly, and substantially participated in the Enterprise's fraudulent scheme with knowledge of the numerous violations of the New Jersey RICO Act and the underling pattern of racketeering activity perpetrated by the Enterprise.

575.    Plaintiffs were injured as a direct and proximate result of the RICO Defendants' aiding and abetting the Enterprise's violations of the New Jersey RICO Act alleged herein.

208

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Awarding Plaintiffs compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including pre-judgment and post-judgment interest, treble, and punitive damages as allowed by law;

B.    Awarding Plaintiffs extraordinary, injunctive and/or equitable relief, including rescission, as appropriate, in addition to any other relief that is just and proper under the circumstances;

C.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other relief as this Court may deem just and proper.

## XIII.   JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury in this action on all issues so triable.

Dated:  January 4, 2017          By: */s/ Chad Johnson*
                                   Chad Johnson
                                   Jennifer Barrett
                                   Steig D. Olson
                                   Rollo C. Baker
                                   Jesse Bernstein
                                   QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                   51 Madison Avenue
                                   New York, NY 10010
                                   Tel:  212-849-7000
                                   Fax: 212-849-7100
                                   chadjohnson@quinnemanuel.com
                                   jenniferbarrett@quinnemanuel.com
                                   steigolson@quinnemanuel.com
                                   rollobaker@quinnemanuel.com
                                   jessebernstein@quinnemanuel.com

                                   *Attorneys for Plaintiffs*
                                   *Hound Partners Offshore Fund, LP, Hound*
                                   *Partners Long Master, LP, and Hound Partners*
                                   *Concentrated Master, LP*